No. 23-11299-E

_____

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

PENNY PHELPS,

*Plaintiff-Appellant*,

v.

SHERIFF RICK RAMSAY, in his Official
and Individual capacities, CARA HIGGINS,
LAUREN JENAI, and FRANKLIN TUCKER,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Florida

No. 4:21-cv-10070-JEM

_____

## APPELLANT'S PRINCIPAL BRIEF

_____

Prepared by:
Victor J. Mastromarco, Jr. (P34564)
The Mastromarco Firm
1024 N. Michigan Avenue
Saginaw, Michigan 48602
(989) 752-1414

*Attorneys for Appellant*

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . vi

STATEMENT OF SUBJECT-MATTER & APPELLATE JURISDICTION . . . . . .vii

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .viii

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ix

STATEMENT OF CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

    I.     PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

    II.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

    I.     STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

    II.    THAT PHELPS STATED A PLAUSIBLE CLAIM OF
          VIOLATIONS OF THE LAW ENFORCEMENT OFFICERS'
          BILL OF RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

    III.   THAT PHELPS STATED A PLAUSIBLE CLAIM OF
          DEFAMATION AGAINST DEFENDANT RAMSAY . . . . . . . . . . .24

    IV.   THAT PHELPS STATED A PLAUSIBLE CLAIM OF TORTIOUS
          INTERFERENCE WITH A BUSINESS RELATIONSHIP . . . . . . . . 26

    V.    THAT PHELPS STATED A FACUAL ISSUE REGARDING
          HER CLAIMS OF SEX & SEXUAL ORIENTATION
          DISCRIMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

    VI.   THAT PHELPS STATED A FACTUAL ISSUE REGARDING
          WHETHER DEFENDANT RAMSAY IS ENTITLED TO
          QUALIFIED IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

VII.   THAT PHELPS STATED A FACTUAL ISSUE REGARDING HER CLAIMS OF DEFAMATION AGAINST HIGGINS, JENAI & TUCKER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

VIII.   THAT PHELPS STATED A FACUAL ISSUE REGARDING HER CLAIMS OF CIVIL CONSPIRACY . . . . . . . . . . . . . . . . . . . .47

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel, Victor J. Mastromarco, Jr., certifies that the following persons may have an interest in the outcome of this case:

### REPRESENTED ENTITIES

1. Penny Phelps, Plaintiff-Appellant

2. Sheriff Rick Ramsay, Defendant-Appellee

3. Cara Higgins, Defendant-Appellee

4. Lauren Jenai, Defendant-Appellee

5. Franklin Tucker, Defendant-Appellee

### LEGAL REPRESENTATIVES

1. Victor J. Mastromarco, Jr. of The Mastromarco Firm, counsel for Plaintiff-Appellant

2. Kevin J. Kelly of The Mastromarco Firm, counsel for Plaintiff-Appellant

3. Rikki M. Mays-Reak of The Mastromarco Firm, counsel for Plaintiff-Appellant

4. David P. Reiner, II of Reiner & Reiner, P.A., counsel for Plaintiff-Appellant

5. John R. Shek of J. Shek Law Offices, former local counsel for Plaintiff-Appellant

6. Jerome A. Ballarotto of Ballarotto Law, counsel for Defendants-Appellees Higgins, Jenai, and Tucker

7. Mark W. Catanzaro of the Law Offices of Mark W. Catanzaro, counsel for Defendants-Appellees Higgins, Jenai, and Tucker

8. Robert L. Norton of Allen, Norton & Blue, P.A., counsel for Defendant-Appellee Ramsay

9. Brian Koji of Allen, Norton & Blue, P.A., counsel for Defendant-Appellee Ramsay

10. Luke C. Savage of Allen, Norton & Blue, P.A., counsel for Defendant-Appellee Ramsay

11. Jason S. Miller of Allen, Norton & Blue, P.A., former counsel for Defendant-Appellee Ramsay

## OTHER INTERESTED PARTIES

1. The Honorable Jose E. Martinez, U.S. District Court Judge

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Penny Phelps respectfully requests that this matter is calendared for oral arguments pursuant to FED. R. APP. P. 34(a)(1) and 11th Cir. R. 28-1(c).  Ms. Phelps submits that the facts and legal arguments cannot be adequately presented in the briefs and record, because of the complex factual nature and extensive legal arguments necessary to decide this appeal.  Ms. Phelps believes that the decisional process will be significantly aided by permitting her counsel to succinctly present her position orally and being available to answer any questions the Court may have.

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

## STATEMENT OF SUBJECT-MATTER & APPELLATE JURISDICTION

The United States District Court for the Southern District of Florida had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over Ms. Phelps' claims arising under 42 U.S.C. § 1983 and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. The District Court also had supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Ms. Phelps' claims arising under Florida law. On March 31, 2023, the District Court issued an Omnibus Order on Motions for Summary Judgment, granting Defendants' motions and dismissing Plaintiff's claims. On April 19, 2023, Ms. Phelps filed a timely notice of appeal. This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1294(1).

## <u>STATEMENT OF ISSUES</u>

I.      WHETHER PHELPS STATED A PLAUSIBLE CLAIM OF VIOLATIONS OF THE LAW ENFORCEMENT OFFICERS' BILL OF RIGHTS?

II.     WHETHER PHELPS STATED A PLAUSIBLE CLAIM OF DEFAMATION AGAINST RAMSAY?

III.    WHETHER PHELPS STATED A PLAUSIBLE CLAIM OF TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP?

IV.     WHETHER PHELPS STATED A FACTUAL ISSUE REGARDING HER CLAIMS OF SEX & SEXUAL ORIENTATION DISCRIMINATION?

V.      WHETHER PHELPS STATED A FACTUAL ISSUE REGARDING WHETHER RAMSAY IS ENTITLED TO QUALIFIED IMMUNITY?

VI.     WHETHER PHELPS STATED A FACTUAL ISSUE REGARDING HER CLAIMS OF DEFAMATION AGAINST HIGGINS, JENAI & TUCKER?

VII.    WHETHER PHELPS STATED A FACTUAL ISSUE REGARDING HER CLAIMS OF CIVIL CONSPIRACY?

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

# TABLE OF CITATIONS

## CASES

*Alvarez v Royal Atlantic Developers, Inc.*,
610 F.3d 1253 (11th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Bannum, Inc. v. City of Fort Lauderdale*,
901 F.2d 989 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Bell v. State*,
122 So. 3d 958 (Fla. Dist. Ct. App. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Bostock v. Clayton County, Georgia*,
590 U.S. __; 140 S. Ct. 1731 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Boyle v. City of Pell City*,
866 F.3d 1280 (11th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Brooks v. Cnty. Comm'n of Jefferson Cnty.*,
446 F.3d 1160 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

*Brown v. Nexus Bus. Cols., LLC*,
29 F.4th 1315 (11th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Bryant v. Jones*,
575 F.3d 1281 (11th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Cassell v. India*,
964 So. 2d 190 (Fla. Dist. Ct. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*City of Miami v. Cosgrove*,
516 So. 2d 1125 (Fla. Dist. Ct. App. 1987) . . . . . . . . . . . . . . . . . . . . . .19-20, 23-24

*Comer v. City of Palm Bay*,
171 F. Supp. 2d 1307 (M.D. Fla. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*D'Agastino v. City of Miami*,
220 So. 3d 410 (Fla. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21-22

*Daly v. Marion County*,
265 So. 3d 644 (Fla. Dist. Ct. App. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Day v. Taylor*,
400 F.3d 1272 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

*Densmore v. City of Boca Raton*,
368 So. 2d 945 (Fla. Dist. Ct. App. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Diaz v. Miami-Dade County*,
849 F. App'x 787 (11th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Ethan Allen, Inc. v. Georgetown Manor, Inc.*,
647 So. 2d 812 (Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

*Flowers v. Troup County, Ga., Sch. Dist.*,
803 F.3d 1327 (11th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-32

*Gray v. Rodriguez*,
481 So. 2d 1298 (Fla. Dist. Ct. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

*Hill v. White*,
321 F.3d 1334 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Lewis v. City of Union City, Georgia*,
918 F.3d 1213 (11th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32-34

*Mesa v. Rodriguez*,
357 So. 2d 711 (Fla. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21, 27-28

*Migliore v. City of Lauderhill*,
415 So. 2d 62 (Fla. Dist. Ct. App. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23

*Migliore v. City of Lauderhill*,
431 So. 2d 986 (Fla. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Mile Marker, Inc. v. Petersen Publishing, LLC*,
811 So. 2d 841 (Fla. Dist. Ct. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Mize v. Jefferson City Bd. of Ed.*,
93 F.3d 739 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Molinoes Valle Del Cibao, C. por A. v. Lama*,
663 F.3d 1130 (11th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20-21

*Morrison v. Booth*,
763 F.2d 1366 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Quigg v. Thomas County Sch. Dist.*,
814 F.3d 1227 (11th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Raimi v. Furlong*,
702 So. 2d 1273 (Fla. Dist. Ct. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Readon v. WPLG, LLC*,
317 So. 3d 1229 (Fla. Dist. Ct. App. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Resha v. Tucker*,
670 So. 2d 56 (Fla. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

*Riley-Stabler Const. Co. v. Westinghouse Elec. Corp.*,
396 F.2d 274 (5th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Romer v. Evans*,
517 U.S. 620; 116 S. Ct. 1620 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Ross v. Rhodes Furniture, Inc.*,
146 F.3d 1286 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

*Russell v. Smith*,
434 So. 2d 342 (Fla. Dist. Ct. App. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Scott v. Suncoast Beverage Sales, Ltd.*,
295 F.3d 1223 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

*Smith v. Lockheed-Martin Corp.*,
644 F.3d 1321 (11th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Sylvester v. City of Delray Beach*,
584 So. 2d 214 (Fla. Dist. Ct. App. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Watkins v. Sverdrup Technology, Inc.*,
153 F.3d 1308 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

*Weeks v. Town of Palm Beach*,
252 So. 3d 258 (Fla. Dist. Ct. App. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . .24-25

## STATUTES

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

28 U.S.C. § 1294 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

28 U.S.C. § 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

42 U.S.C. § 2000e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .vii

42 U.S.C. § 2000e-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31-32

FLA. STAT. § 112.532 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18-24, 27-28, 31

FLA. STAT. § 112.533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 24-25, 42

FLA. STAT. § 112.534 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18-20, 23-24

## RULES

FED. R. CIV. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 16

FED. R. CIV. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

## STATEMENT OF CASE

## I.    PROCEDURAL HISTORY

On July 16, 2021, Plaintiff filed the instant complaint.  (**Appellant Appendix, No. 1, Plaintiff's Complaint, at 1a-41a**).  On August 10, 2021, Higgins, Jenai, and Tucker (collectively referred to as "Individual Defendants") filed a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6).  (**No. 2, Motion to Dismiss, at 42a-68a**).  On August 11, 2021, Ramsay filed a similar motion to dismiss.  (**No. 3, Motion to Dismiss, at 69a-77a**).  On August 20, 2021, Plaintiff filed an amended complaint.  (**No. 4, First Amended Complaint, at 78a-123a**).  The District Court entered a paperless order denying the two motions as moot.

On August 24, 2021, Ramsay and, on August 26, 2021, the Individual Defendants refiled motions to dismiss.  (**No. 5, Motion to Dismiss, at 124a-132a**); (**No. 6, Motion to Dismiss, at 133a-160a**).  On September 7, 2021 and September 9, 2021, Plaintiff filed her responses to said motions.  (**No. 7, Response, at 161a-169a**); (**No. 8, Response, 170a-185a**).  On September 13, 2021 and September 16, 2021, Ramsay and the Individual Defendants filed reply briefs.  (**No. 9, Reply Brief, at 186a-194a**); (**No. 10, Reply Brief, at 195a-205a**).  On February 7, 2022, the District Court entered an omnibus order on the motions to dismiss, dismissing four

claims raised by Plaintiff.  (**No. 11, Omnibus Order, at 206a-221a**).[1]

On June 20, 2022, Ramsay and the Individual Defendants filed motions for summary judgment pursuant to FED. R. CIV. P. 56.  (**No. 19, Motion for Summary Judgment, at 925a-945a**); (**No. 22, Motion for Summary Judgment, at 1466a-1491a**).  On July 19, 2022, Plaintiff filed responses.  (**No. 23, Response to Motion, at 1492a-1513a**); (**No. 25, Response to Motion, at 1818a-1842a**).  On July 26, 2022, Defendants submitted reply briefs.  (**No. 30, Reply Brief, at 1907a-1916a**); (**No. 32, Reply Brief, at 1962a-1974a**).  On March 31, 2023, the District Court entered an omnibus order on the motions of summary judgment, dismissing all of Plaintiff's remaining claims.  (**No. 32, Omnibus Order, at 1975a-2015a**).

## II.    STATEMENT OF FACTS

On February 26, 2002, the Monroe County Sheriff's Office ("MSCO") hired Pehlps at the rank of captain and assigned her to the Bureau of Corrections.  (**No. 16(a), at 262a**).  Phelps was subsequently assigned command of the Planning and Research, Professional Standards, and Internal Affairs Division.  (**No. 16(a), at 266a-267a**).  On April 30, 2010, Phelps was reassigned and given command of the Training Division.  (**No. 16(a), at 268a; No. 16(g), at 871a**).  Phelps subsequently received additional commands, including Support Services Division, Special

---

[1] On March 1, 2022, Plaintiff filed a motion for reconsideration, which the District Court denied on April 11, 2022. (**No. 12, at 222a-229a**); (**No. 15, at 248a-250a**).

Operations, which included the Major Crimes Unit and Narcotics Unit, along with the High Intensity Drug Trafficking Area Team.  (**No. 16(a), at 269a-275a**).

On November 17, 2017, Matthew Bonnett was killed in what is now colloquially known as the "Tree House" murder.  *See* (**No. 16(a), at 275a**).  Phelps and several other officers investigated the murder.  On November 20, 2017, Phelps discussed investigative strategy with Sergeant Christian Kellenberger and Detectives Matthew Pitcher and Danielle Malone in the Criminal Investigation Office.  (**No. 16(a), at 276a-277a**).  Unbeknownst to them, audio recording equipment in an adjacent room had not been turned off and surreptitiously recorded them.  (**No. 16(a), at 276a-277a**).  They discussed a way to identify Rory "Detroit" Wilson without alerting him to the fact that he was a suspect in a murder case.  (**No. 16(a), at 277a, 284a**).  Acknowledging the need to have someone sit in the area and keep eyes on "Detroit," Phelps then called Deputy Lee Malone.  *See* (**No. 16(a), at 618a, 632a**).  A recording capture's Phelps' side of the conversation:

> My grumpy old man . . . can I use you again today? . . . What I want you to do is be a marked unit in that area and when Detroit gets on his bike and wheels away from there, I want you to make a legitimate traffic stop, for riding on the wrong side of the road or waiving through a stop sign and I want you to write him a ticket so I can get his thumbprint.
>
> \*     \*     \*
>
> Just do this . . . hang out, make a traffic stop.  If you do have a legitimate traffic stop, we'll have a road patrol deputy come over and meet you and you can write a ticket with road patrol deputy.  I just need somebody that can be in the area, Lee, and not leave, because I don't know when he's going to move or if he's going to move . . . because we don't want

Detroit knowing that we know who the hell he is we want it to look like you the grumpy old man . . . You have nothing better to do than . . . you know white supremacist you're messing with the black guy riding a bike. . . .

(**No. 16(a), at 219a-220a**).  Det. Malone then notes how her husband, Lee Malone was cutting his hair "so it will fit right into that."  (**No. 16(a), at 220a**).  Phelps continues, "There you go. . . . I just want you to be the neo-Nazi that's picking on the black guy riding a bike." (**No. 16(a), at 220a**).[2]  Plaintiff testified regarding her goal with the proposed ruse.  (**No. 16(a), at 399a-400a**).

The proposed ruse *never* happened.  The same day, November 20, 2017, detectives obtained a search warrant and were able to identify Wilson.  On November 22, 2017, MCSO arrested Wilson, Defendant Tucker, and Travis John Johnson as they were charged with robbery and felony murder.[3]  Tucker came to be represented by Cara Higgin.  During discovery in that matter, the recording of the November 20, 2017 conversation was turned over to Higgins.  *See* (**No. 16(a), at 283a-284a**).  The recording would later become part of "Project Mayhem," a plan developed by Tucker and Jenai in the summer of 2019.

"Project Mayhem" was the nickname given to Tucker and Jenai's plan to file complaints against Phelps, the other investigators, and the prosecuting attorneys, to

---

[2] See also (**AT App., No. 16(a), at 221a**)(recording Phelps telling a sergeant, "he knows his bit is the . . . it's the white supremacist cop picking on the poor black guy that is riding a bike").

[3] *See State of Florida v. John Travis Johnson*, Case No. 2017-CF-841-A-K (Fla. Cir. Ct.); *State of Florida v. Rory Hank Wilson*, Case No. 2017-CF-841-B-K (Fla. Cir. Ct.); *State of Florida v. Franklin Tyrone Tucker*, Case No. 2017-CF-841-C-K (Fla. Cir. Ct.).

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

raise media attention, and discredit Phelps and others to improve Tucker's chances of defeating the murder charge. The plan developed, in part, through numerous recorded, jailhouse phone calls. The records demonstrate multiple occasions Tucker and Jenai discussed Project Mayhem and touched on Higgins' knowledge of the same:

- June 22, 2019: Tucker discussed posting depositions online and a motion filed by Tucker's attorney; he also indicated that should be another round of news articles coming out. (06/22/19 Recording).

- July 29, 2019: Jenai told Tucker she thought one of the most effective strategies would be filing complaints against Phelps; Tucker agreed and said he was with her on that strategy. (07/29/19 Recording).

- On July 30, 2019: Tucker and Jenai discussed sending letters to MCSO's Internal Affairs Unit, suggesting it would look bad for MCSO; if the sheriff investigated, the subject of the complaint would have to admit he or she was under investigation when under oath, and if the sheriff did not investigate, it would look as if MCSO was doing bad things. (07/30/19 Recording).

- July 30, 2019: Tucker and Jenai posting on Facebook; Tucker states he will have his "letter" finished for Higgins the following day. (07/30/19 Recording).

- August 20, 2019: Tucker and Jenai specifically mentioned "Project Mayhem"; Tucker explained that there are certain things the attorneys will do and there would be things he and Jenai did; Tucker states "Project Mayhem" is underway and he has been in contact with Higgins' office. (08/20/19 Recording).

- August 27, 2019: Tucker told Jenai he told Higgins about "Project Mayhem" and Higgins did not try to talk him out of it; Tucker states, "everbody's on board with Project Mayhem." (08/27/19 Recording).

In Fall 2019, Tucker, Jenai, and Higgins began acting out "Project Mayhem." On September 15, 2019, Tucker sent a letter to MCSO Internal Affairs Division. (**No. 16(h), at 1604a-1607a**).  Tucker accuses Phelps, Pitcher, Malone, and others of engaging "in a broach spectrum of misconduct."  (**No. 16(h), at 1605a**).  Higgins also partook, finding any excuse to lodge a complaint.  On October 3, 2019, Higgins wrote Patrick McCullah, MCSO General Counsel, and her friend, Michelle Maxwell, MSCO Investigator in Internal Affairs, advising them that twenty officers were seated in a courtroom and claiming they were trying to intimidate her or Tucker.  (**No. 26(f), at 1880a-1881a**).  Higgins acknowledged she did not complain or identify the intimidation on the record.  (**No. 30(a), at 1930a**).  The officers were present, because they were under the mistaken belief that Pitcher, who had been accused of perjury by Higgins, was going to testify and wanted to show support; the officers soon realized the error and sat quietly as Higgins stood up and counted them, with a local media videographer snapping photographs.  (**No. 16(a), at 288a-290a, 372a-374a, 440a**).

On October 4, 2019, Major Chad Scibilia served Plaintiff with a notice of investigation for IA-2019-039.  (**No. 16(a), at 292a; No. 24(e), at 1596a-1597a**). The notice describes the investigation into the appearance of twenty employees at a routine, pre-trial conference.  (**No. 24(e), at 1596a**).  Higgins is listed as the complainant.  (**No. 24(e), at 1596a**).  The notice also instructs Plaintiff to see the

attached memorandum from Colonel Lou Caputo. (**No. 24(e), at 1596a**). The attached October 4, 2019 memorandum notified Plaintiff that the supervision of the Tree House murder cases was being transferred to Major Scibilia. (**AT App., No. 24(e), at 1597a**). On October 11, 2019, without any context, McCullah emailed Higgins a copy of the Caputo memorandum, which had been attached to the notice of a confidential internal investigation. (**No. 24(gg), at 1664a**). By intentionally disclosing the memorandum, McCullah violated FLA. STAT. § 112.533(2)(a). This statutory provision makes all information obtained pursuant to an investigation confidential, until the investigation ceases to be active or is concluded. Confidentiality extends to all documents furnished in connection with the investigation. FLA. STAT. § 112.533(4). The willful disclosure of any such information constitutes a misdemeanor of the first degree. *Id*. This unlawful disclosure provided ready fuel and fanned the flames of Project Mayhem. Within two days of the disclosure, MCSO faced questions from the media about the removal of Plaintiff from the murder cases. One report noted in an email that she heard through the grapevine that Phelps was under investigation and removed from those files. (**No. 24(hh), at 1666a**).

With such early success, Project Mayhem was emboldened and Higgins continued to make complaints and pressure MCSO to take further action. On October 15, 2019, Higgins wrote Inspector Maxwell and questioned whether Phelps

was reviewing her cell phone records prior to release and threatening legal action. (**No. 24(ii), at 1667a**).    On October 19, 2019, Higgins attached the Caputo memorandum to a filing made in the *State of Florida v. Tucker* case, making the memorandum, which was part of a confidential, internal affairs investigation, a public document.  On October 23, 2019, Higgins sent another email to McCullah and Maxwell, accusing Phelps of personal acts of aggression.  (**No. 26(h), at 1883a-1884a**).  On October 23, 2019, Higgins and Tucker met with Inspector General Lee Ann Holroyd and Inspector Donny Barrios to discuss the Tree House murder investigation.  *See* (10/23/19 Recording).  Approximately thirty seconds of the conversation related to the November 20, 2017 recording of Phelps.  *Id*.  During that brief time, no one requested an investigation into that matter or recording.  *Id*.

On November 14, 2019, Major Scibilia served Plaintiff with two notices of investigations.  The first, IA-2019-043, related to "[e]vents and circumstances surrounding the investigation and management" of the Tree House murder.  (**No. 24(j), at 1608a**).  The notice identifies Higgins as the complainant.  (**No. 24(j), at 1608a**).  The second, IA-2019-046, related to Phelps discussion with Deputy Malone about him acting like a neo-Nazi.  (**No. 24(k), at 1609a**).  The notice identifies Tucker/Higgins as the complainant.  (**No. 24(k), at 1609a**).  Phelps expressed concern to Major Scibilia about receiving multiple complaints in one day and how uncomfortable she felt.  (**No. 16(a), at 301a**).  Scibilia laughed at Phelps' concerns;

Phelps reiterated how she felt and asked if she should get an attorney. (**No. 16(a), at 302a**). Phelps noted she thought it was in her best interest to have an attorney moving forward. (**No. 16(a) at 302a**). Ramsay also texted Phelps:

> On another note, please do not stress too much over the complaint. I know that it is hard, but we have to look into a complaint by Ms. Higgins. Not nice things were said by the Blue Paper and Higgins. We support you and hope to clear your name! Stress after if you believe that you have to at that time. Sorry :(

(**No. 24(kk), at 1671a**).

On November 18, 2019, Higgins sent Ramsay a cease-and-desist letter, accusing Ramsay of defaming Tucker and threatening suit. (**No. 24(ll), at 1672a-1673a**). On November 19, 2019, Phelps met with Caputo and Scibilia. (**No. 16(a), at 297a**). Phelps was relieved of her command of Major Crimes and Narcotics. (**No. 16(a), at 302a**). Phelps protested and said she felt this was being orchestrated, first the multiple complaints, the removal from the Tree House murders cases, and now removal from supervision of two units. (**No. 16(a), at 306a**). On November 20, 2019, Holroyd circulated an email amongst investigators, noting Caputo was "stressing the need to push forward as quickly as possible on our open cases related to the Tree house murder." (**No. 24(o), at 1636a**).

On December 4, 2019, Caputo prepared a memorandum to Phelps, stating the command of the Narcotics Unit and Major Crimes Unit was being transferred to Director Patty Thompson. (**No. 16(a), at 759a**). With Project Mayhem's continued

success, Higgins, Tucker, and Jenai turned to social and print media to pressure

Ramsay to take action against Phelps.  On December 7, 2019, Higgins posted on

Facebook:

> "I want you to be the neo-Nazi picking on the black guy riding the
> bike."  This is how a captain at MCSO directs her subordinates to act.
> Like neo-Nazis.  A prosecutor lies and hides evidence.  A racist cop
> who thinks she's above the law.  Why do they STILL have jobs?

(**No. 17, at 907a**).  On December 7, 2019, Tucker posted on Facebook, referencing

Phelps, "I'm happy she's finally being outed and yeah the racist set up is bad but

setting someone up for murder is so much worse." (**No. 17, at 907a**).  Tucker stated,

"While they did release the audio of her racist bullshit, they seemed to have left out

the parts where she's talking about setting me up. . . ." (**No. 17, at 907a**).  Tucker

posted, "[O]ne of the things she's in trouble for is telling a deputy to play neo-nazi,

racist cop to illegally pull Rory over on his bike." (**No. 17, at 907a**).  On December

10, 2019, The Washington Post ran an article, "Deputy told to act like a 'white

supremacist' when stopping black murder suspect,' by Hannah Knowles.  (**No.

24(nn), at 1709a-1713a**).  Higgins is quoted, blatantly pressuring Ramsay to

terminate Plaintiff:

> Now, Higgins wants Phelps dismissed from the agency.
>
> "Anyone who uses those words has no place in that department at that
> level," she said.

(**No. 24(nn), at 1712a**).  On December 11, 2019, Jenai referred to the MCSO as "a

very corrupt police department," implying that Phelps as part of MCSO is corrupt.

(**No. 17, at 907a**).  On December 11, 2019, Tucker posted:

> My only real criticism is of the expert who says her actions were "probably legal".  While the acting like a racist may be legal, telling the officer to pull him over for some imagined infraction, is not.  Once again, this is the least of what Captain Phelps did wrong in this case but hopefully this topic will shed light on her many other acts of misconduct, namely framing me for murder.

(**No. 17, at 907a-908a**).  On December 11, 2019, Ramsay appeared on the morning magazine radio show and said:

> I need all of the information before I can make a decision. . . . I can't make a decision on one complaint that comes in . . . there is a due process and we are in the middle of that due process right now.

(**No. 24(w), at 1647a**).

On December 12, 2019, Phelps' attorney sent Holroyd an email, requesting she review the jailhouse phone calls between Tucker and Jenai, advising about Project Mayhem, and requesting interviews of Assistant State Attorney Colleen Dunne and Inspector Maxwell.  (**No. 24(w), at 1646a-1647a**).  The following say there was a surge of activity.  On December 13, 2019, once Maxwell finalized the report, Holroyd forwarded a copy to Scibilia.  (**No. 24(q), at 1638a**).  Scibilia wrote a memorandum to Ramsay, recommending Phelps' termination.  (**No. 24(s), at 1640a**).  Caputo wrote to Ramsay, concurring in the recommendation.  (**No. 24(t), at 1641a**).  Ramsay signed a letter to Phelps notifying her of the termination of her employment over the statements recorded on November 20, 2017.  (**No. 24(u), at**

**1642a-1643a**).  Tucker posed on Facebook, referring to Phelps, "I'd love to see her not only fired but charged criminally for setting me up."  (**No. 17, at 908a**).  On December 14, 2019, Tucker posted, referring to Phelps, "Hopefully she'll be charged criminally for that shit she did to me!!"  (**No. 17, at 908a**).  On December 14, 2019, four officers dressed in tactical vests, as if conducting a high-risk search warrant, served Phelps at her home with the December 13, 2019 investigative summary and memoranda.  (**No. 24(w), at 1645a**).

On December 18, 2019, Ramsay appeared on the morning magazine radio show and said, "The sheriff's office does not tolerate these types of comments.  I just can't defend this. . . ."  (**No. 24(y), at 1654a**).  Ramsay's statement demonstrated he was already determined to terminate Phelps' employment prior to a pre-determination hearing that occurred on the following day, December 19, 2019.  (**No. 24(y), at 1654a; No. 24(w), at 1645a-1647a; No. 24(x), at 1654a-1655a**).  Phelps read a statement to those in attendance, which included Ramsay, Caputo, and Scibilia.  (**No. 24(w), at 1645a-1647a**).  Phelps' attorney also read a statement.  (**No. 24(x), at 1648a-1653a**).  Later in the day, December 19, 2019, Ramsay sent Phelps a memorandum indicating her appointment was withdrawn.  (**No. 16(a), at 741a**).

On December 20, 2019, Tucker and Jenai appeared on the Sean Hannity radio show hosted by Jonathan Gilliam.  (**No. 17, at 908a**).  Tucker stated that Phelps "got in trouble for some racially motivated comments she made and directing officers to

make illegal stops. . . ."  (**No. 17, at 908a**).  On December 20, 2019, Tucker posted on YouTube an accusation that Phelps instructed a subordinate officer to make an illegal traffic stop.  (**No. 17, at 909a**).  On November 23, 2020, Tucker and Jenai appeared in the New York Post and Jenai was quoted, "What if somebody framed me for murder and there was nobody to help?" implying Phelps framed Tucker for murder.  (**No. 17, at 909a**).

Significant evidence demonstrates the MCSO had a history of providing preferential treatment to heterosexual male employees.  In 2017, a heterosexual male, Sergeant David Lariz, was involved in a series of highly publicized situations in which he racially profiled Latino males.  (**No. 16(a), at 336a-337a; No. 24(pp), at 1750a-1779a**).  The first situation involved Lariz responding to a hit-and-run accident in which a bicyclist was injured.  Instead of first assisting the victim, Lariz immediately asked the victim if he was "illegal," in a sad exchange captured on body cam footage.  In the second incident, a motorist provided an Argentinian license and Lariz requested immigration documents and yelled at the individual for not having proper paperwork.  *See* (**No. 24(pp), at 1750a-1779a**).  Lariz had not been investigated by Internal Affairs or otherwise disciplined.  (**No. 16(a), at 336a-337a**).  While Phelps discussed using a potential ruse that involved an individual *pretending* to be racist, Lariz engaged in racial profiling and *actual* discriminatory behavior.  (**No. 16(a), at 336a-337a**).  Ramsay was aware of both situations involving Lariz.

(**No. 16(b), at 778a**).  Ramsay admitted that the situation was publicized int eh media and he read some news articles on it.  (**No. 16(b), at 778a-779a**).  While Ramsay claimed in press releases that he directed the investigation into Phelps once he became aware of the allegations, he did not similarly direct an investigation or Lariz.  *See*, *e.g.*, (**No. 24(v), at 1644a**).

Plaintiff testified how Ramsay fostered a hostile environment where there is a proclivity to subjugate women.  (**No. 16(a), at 335a-336a**).  There have been numerous extramarital affairs between male command officers and female subordinates, including Ramsay being involved with several female subordinates.  (**No. 16(a), at 335a-336a, 513a-514a**).  One lieutenant told Phelps, "you don't lose your wife at the Monroe County Sheriff's Office, you just lose your turn."  (**No. 16(a), at 335a-336a**).

Ramsay has also expressed anger at gay men questioning if he was also gay and towards Phelps when such a situation arose.  (**No. 16(a), at 336a**).  One year, Phelps attended the Florida Law Enforcement Gays and Lesbians Conference, hosted in Key West, where a group of gay men asked for Ramsay's telephone number and questioned his sexual orientation.  (**No. 16(a), at 347a**).  Ramsay spoke to Phelps about the conversation and was extremely angry.  (**No. 16(a), at 350a-351a**).  Ramsay repeated he was not gay and was offended Phelps would even think that, adding that he was "absolutely not gay."  (**No. 16(a), at 350a-351a**).

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

Phelps had also repeatedly complained to McCullah and Scibilia that Ramsay consistently used the term "lawman," which erases and does not consider the female officers who are not "law*men*." (**No. 16(a), at 337a-338a**). Ramsay also referred to female command officers by "Miss" as opposed to their rank. (**No. 16(a), at 341a-342a**). Phelps reported that disparate treatment to McCullah on multiple occasions. (**No. 16(a), at 342a**). One glaring example, Ramsay referred to Phelps as "Ms. Phelps" and not "Captain Phelps" on the radio. (**No. 24(y), at 1654a**).

Ramsay has also tolerated explicitly discriminatory behavior. While he was a colonel, Sergeant Fernando Lopez referred to Phelps as "my dumb, cunt captain" in front of a room full of recruits. (**No. 16(a), at 345a**). Although Sgt. Lopez received discipline, he engaged in making discriminatory statements, whereas Phelps was terminated for discussing a deputy pretend to have discriminatory views. (**No. 16(a), at 345a**). On another occasion, a male deputy, Nick Whiteman, grabbed a female deputy's breast while in the presence of a sergeant. (**No. 16(a), at 351a-352a**). Deputy Whiteman did not receive discipline and was promoted. (**No. 16(a), at 351a-353a**). There are also instances where males were not similarly subjected to internal affairs investigations. For instance, Lieutenant James Norman admitted under oath he instructed Detective Danielle Malone to access emergency contact information from the Driver and Vehicle Identification Database; Det. Malone, the female, was subject to an internal affairs investigation and received discipline, whereas Lt.

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

Norman experienced neither. (**No. 16(a), at 362a-363a**). Plaintiff was investigated relating to the mishandling of evidence by members of the Major Crimes Unit; however, the two heterosexual males, a lieutenant and a sergeant, that oversaw the day-to-day operations were not likewise investigated. (**No. 16(a), at 364a-365a**). Ramsay has also acted as a male dominating scantily clad women on stage as part of a fundraiser for battered women. (**No. 24(rr), at 1785a**). The photograph, published in a local newspaper, depicts Sheriff Ramsay sitting in a chair, waiving a cat o' nine tails, a sexual whip, at half-naked women crawling on the ground. (**No. 24(rr), at 1785a**). Sheriff Ramsay did not see anything wrong with pretending to be a sexist dominator of women; he was just playing a role for charity. (**No. 24(qq), at 1781a-1784a**).

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court reviews *de novo* the grant of a motion to dismiss under FED. R. CIV. P. 12(b)(6). *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). The court accepts the allegations in the complaint and true and construes them in a light most favorable to the plaintiff. *Id*. A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Boyle v. City of Pell City*, 866 F.3d 1280, 1286 (11th Cir. 2017). A claim is facially plausible where there are sufficient facts pled to draw the inference that the defendant is liable for the alleged misconduct. *Id*. This

Court has described this standard as "exceedingly low." *Day v. Taylor*, 400 F.3d 1272, 1275 (11th Cir. 2005).

This Court also reviews the grant of summary judgment *de novo*. *Alvarez v Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1263 (11th Cir. 2010). The Court reviews the evidence submitted in a light most favorable to the plaintiff and draws all justifiable inferences in her favor. *Brown v. Nexus Bus. Cols., LLC*, 29 F.4th 1315, 1317-1318 (11th Cir. 2022). Summary judgment is properly only when there is no genuine issue as to any material facts. *Id*. at 1317 (quoting FED. R. CIV. P. 56(a)). If a trier of fact can construe more than one inference from the facts and one of those inferences creates a genuine factual issue, summary judgment is not proper. *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990). Courts do not weigh conflicting evidence or make credibility determinations. *Mize v. Jefferson City Bd. of Ed.*, 93 F.3d 739, 742 (11th Cir. 1996). Courts should not grant summary judgment where motive, intent, subjective feelings and reactions, consciousness and conscience are at issue. *See Riley-Stabler Const. Co. v. Westinghouse Elec. Corp.*, 396 F.2d 274, 277 (5th Cir. 1968).

> In cases where employment discrimination has been alleged, the Eleventh Circuit has long stated that the granting of summary judgment is especially questionable, because such cases usually involve the examination of motive and intent.

*Comer v. City of Palm Bay*, 171 F. Supp. 2d 1307, 1311 (M.D. Fla. 2000).

## II.    THAT PHELPS STATED A PLAUSIBLE CLAIM FOR VIOLATIONS OF THE LAW ENFORCEMENT OFFICERS' BILL OF RIGHTS

Florida's Law Enforcement Officers' Bill of Rights provides "[a]ll law enforcement officers . . . employed by or appointed to a law enforcement agency" shall have several enumerated rights. FLA. STAT. § 112.532. FLA. STAT. § 112.532(3) provides:

> CIVIL SUITS BROUGHT BY LAW ENFORCEMENT OFFICERS OR CORRECTIONAL OFFICERS.—Every law enforcement officer or correctional officer shall have the right to bring civil suit against any person, group of persons, or organization or corporation, or the head of such organization or corporation, for damages either pecuniary or otherwise suffered during the officer's official duties, for abridgement of the officer's civil rights arising out of the officer's performance of official duties, or for filing a complaint against the officer which the person knew was false when it was filed. This section does not establish a separate civil action against the officer's employing law enforcement agency for the investigation and processing of a complaint filed under this part.

At the same time, FLA. STAT. § 112.534 provides various procedures for situations in which a law enforcement agency intentionally fails to comply with the requirements of Part VI of Title X, Chapter 112. FLA. STAT. § 112.534(1). The procedure involves the law enforcement officer providing notice of the intentional violation to the investigator, permit the investigator an opportunity to cure, and report to and request a compliance review hearing. FLA. STAT. § 112.534(1). To understand why the District Court erred in failing to find Phelps had a plausible cause of action pursuant to FLA. STAT. § 112.532(3), one must understand how one

court deviated from the appropriate rules of statutory construction and subsequent courts have followed suit without challenging whet the underlying analysis has changed as the Florida Legislature has amended FLA. STAT. § 112.534.

The Florida intermediate appellate courts' erroneous interpretation of the Law Enforcement Officers' Bill of Rights begins with *Migliore v. City of Lauderhill*, 415 So. 2d 62 (Fla. Dist. Ct. App. 1982), *approved* 431 So. 2d 986 (Fla. 1983). The plaintiff employee sought through mandamus to have a hearing before a complaint review board and, as such, the Court reviewed FLA. STAT. § 112.532(2), which created complaint review boards. *Migliore*, 415 So. 2d at 63-64. The *Migliore* Court noted:

> We interpret the statute as providing a law enforcement officer with a means of vindicating his actions and his reputation against unjust and unjustifiable claims made against him by persons outside the agency which employs him.

415 So. 2d at 64. The *Migliore* Court is silent about FLA. STAT. § 112.532(3).

In *City of Miami v. Cosgrove*, 516 So. 2d 1125 (Fla. Dist. Ct. App. 1987), the plaintiff filed suit for damages, claiming the city defendant removed him from the rank of captain in violation of FLA. STAT. § 112.532(4) and (5). *Cosgrove*, 516 So. 2d at 1126-1127. The city defendant argued that the plaintiff's exclusive remedy was an injunction pursuant to FLA. STAT. § 112.534. *Cosgrove*, 516 So. 2d at 1127. The *Cosgrove* Court then assumed an injunction was the plaintiff's only remedy without any real statutory analysis. In statutory language that no longer exists, the Court

found that Section 112.534 contained the only remedy provision and specifically provided that an officer "may apply directly to the circuit court . . . for an injunction to restrain and enjoin such violation. . . ." *Cosgrove*, 516 So. 2d at 1127. Even though the plaintiff argued that his suit for damages was authorized by Section 112.532(3), the Court did not engage in any statutory analysis and dismissed the argument:

> The choice provided by statute, however, is not between injunctive relief and damages, but between injunctive relief and no relief. Lastly, Cosgrove suggests that his suit for damages is authorized by Section 112.532(3), which, as we read it, has nothing whatsoever to do with the employee's rights vis-à-vis his employer but simply memorializes that a policeman shall have the right to sue other persons for damages suffered by the officer *in performance of his official duties*.

*Cosgrove*, 516 So. 2d at 1129 (emphasis in original).

The *Cosgrove* Court failed to start with the statutory language, as we must. This error was compounded by later courts. *See, e.g., Sylvester v. City of Delray Beach*, 584 So. 2d 214, 215 (Fla. Dist. Ct. App. 1991); *Diaz v. Miami-Dade County*, 849 F. App'x 787, 793 (11th Cir. 2021). This Honorable Court, however, has instructed that it is to predict how the Florida Supreme Court would decide the issue presented:

> Where the highest court—in this case, the Florida Supreme Court—has spoken on the topic, we follow its rule. Where that court has not spoken, however, we must predict how the highest court would decide the case. Decisions of the intermediate appellate courts—here, the Florida District Courts of Appeal—provide data for this prediction. As a general matter, we must follow the decisions of these intermediate courts. But we may disregard these decisions if persuasive evidence demonstrates that the highest court would conclude otherwise.

*Molinoes Valle Del Cibao, C. por A. v. Lama*, 663 F.3d 1130, 1348 (11th Cir. 2011)(citations omitted).

The Florida Supreme Court has discussed FLA. STAT. § 112.532 on at least two occasions. In *Mesa v. Rodriguez*, 357 So. 2d 711 (Fla. 1978), the plaintiff filed suit pursuant to Section 112.532(3), against a private citizen, who had written a letter to the chief of police, claiming the plaintiff officer had mistreated him. *Id.* at 712. The plaintiff claimed that the letter was "malicious, scandalous, false, defamatory and libelous." *Id.* Referring to Section 112.532(3), the Florida Supreme Court found that:

> The section declares that every law enforcement officer has the right to bring a civil suit for damages suffered during the performance of his official duties or for abridgment of his civil rights arising out of the performance of official duties. . . .
>
> * * *
>
> The challenged statutory section simply declares that law enforcement officers have a right to recover damages suffered during performance of their official duties. As written, it does nothing to restrict impermissibly the constitutional right to petition for redress of grievances.

*Id.* at 712-713. In *D'Agastino v. City of Miami*, 220 So. 3d 410 (Fla. 2017), the Court acknowledged:

> Section 112.532 also provides for complaint review boards, *a statutory right to bring a civil action for damages arising from false complaints*, a prohibition against disciplinary action without first affording an officer notice and an opportunity to respond, and protection from even the threat of retaliation for the exercise of the rights contained in the PBR.

*D'Agastino*, 220 So. 3d at 417 n. 4. The Florida Supreme Court's recognition that the statute creates a right to bring a civil action is consistent with the statutory language.

FLA. STAT. § 112.532(3) provides that "[e]very law enforcement officer . . . shall have the right to bring civil suit against *any person*. . . ." (emphasis added). "Any" is generally defined as "one, some, every, or all without specification." *Bell v. State*, 122 So. 3d 958, 961 (Fla. Dist. Ct. App. 2013). Courts have also interpreted "government entities as 'persons' under section 1.01." *Daly v. Marion County*, 265 So. 3d 644, 650-651 (Fla. Dist. Ct. App. 2018). Because the plain statutory text permits a law enforcement officer to bring suit against "any person" and Ramsay as well as Monroe County Sheriff's Office falls within the definition of "any person," consistent with *D'Agastino*, Phelps can state a plausible claim against Ramsay for violations of the Law Enforcement Officers' Bill of Rights. The District Court erred in failed to recognize FLA. STAT. § 112.532(3) created a statutory right to bring a cause of action in contradiction to Florida Supreme Court language in *D'Agastino* and the plain statutory text, this Honorable Court should reverse the District Court's dismissal of Phelps' claim under the Law Enforcement Officers' Bill of Rights against Ramsay.

Unlike the sheriff, who is not only himself a person, but also represents a municipality, Higgins is an individual, not associated with the MCSO. For the same

reasons, Higgins falls within "any person" whom a law enforcement officer may bring a civil suit for damages contained within FLA. STAT. § 112.532(3). However, additional reasons, apart from the plain statutory language, to recognize the cause of action against an individual not associated with the employing agency exist as the Florida Courts have never interpreted the language to provide otherwise.

First, it must be noted that the rationale of *Cosgrove* does not apply in this situation. As shown above, the reasoning of *Cosgrove* was based upon the incorrect assumption that FLA. STAT. § 112.534 provided the sole remedy for a law enforcement agency's failure to comply with the Bill of Rights. This was not true as argued above, but even it was an accurate statement of the statutory text, Section 112.534 does not provide any remedy for any entity or individual other than "any law enforcement agency or correctional agency," "investigators in its internal affairs or professional standards division," or "an assigned investigating supervisor." The only statutory remedy against an individual's abridgment of an officer's civil rights or for filing false complaints is the private cause of action recognized by FLA. STAT. § 112.532(3).

Moreover, courts have consistently distinguished claims that did not involve the employing agency. For example, the *Migliore* Court interpreted the statutory provision as addressing "unjust and unjustifiable claims made by persons outside the agency which employs him." 415 So. 2d at 64. The *Cosgrove* Court read FLA. STAT.

§ 112.532(3) as "memorializes that a policeman shall have the right to sue other persons for damages suffered by the officer *in the performance of his duties*." *Cosgrove*, 516 So. 2d at 1129 (emphasis in original). These cases recognize that Section 112.534 does not speak to actions against another person who is not the employing agency. Under the plain language of Section 112.532(3), had the right to bring a civil action against *any person* for the abridgement of the officer's civil rights or for filing a complaint the person knew was false. Because Phelps alleged that Higgins filed complaints to abridge Phelps' civil rights and knowingly submitted false complaints, Phelps has stated a plausible cause of action under FLA. STAT. § 112.532(3) against Higgins.

## III.    THAT PHELPS STATED A PLAUSIBLE CLAIM OF DEFAMATION AGAINST RAMSAY

The trial court erroneously held that Defendant Ramsay was entitled to absolute immunity for the above defamatory statements, failing to consider Plaintiff's argument that Ramsay acted outside the scope of his employment as his statements violated FLA. STAT. § 112.533. Whether Defendant Ramsay's statements are absolutely privileged is a question of law for the court. *Resha v. Tucker*, 670 So. 2d 56, 59 (Fla. 1996). "In Florida, [p]ublic officials who make statements within the scope of their duties are absolutely immune from suit for defamation." *Cassell v. India*, 964 So. 2d 190, 194 (Fla. Dist. Ct. App. 2007). As such, the key question is "whether the communication was within the scope of the officer's duties." *Weeks v.*

*Town of Palm Beach*, 252 So. 3d 258, 262 (Fla. Dist. Ct. App. 2018).

> [I]n order to invoke the doctrine the official must have been acting within the scope of his powers. For instance, if the city personnel rules prohibited the release of information concerning the discharge of an employee, the city manager would probably be acting beyond the scope of his duties if he disclosed such information.

*Densmore v. City of Boca Raton*, 368 So. 2d 945, 947 (Fla. Dist. Ct. App. 1979).

The District Court concluded that Sheriff Ramsay possessed absolute immunity to make comments to the news media, especially considering the notoriety of the Tree House Murders cases. (**No. 11, at 214a-215a**). The District Court entirely ignored Phelps' argument that Sheriff Ramsay was not acting within the scope of his powers when his statements violated the Law Enforcement Officers' Bill of Rights. As noted above, all information obtained pursuant to an investigation under the statute is confidential until the investigation ceases to be active, or the agency concludes the investigation with a finding to proceed or not proceed with disciplinary action. FLA. STAT. § 112.533(2)(a). As such, any person who participates in an investigation, who willfully discloses any information obtained pursuant to the agency's investigation, is guilty of a misdemeanor of the first degree. FLA. STAT. § 112.533(4). This confidential information includes the identity of the officer under investigation, information revealed, and documents furnished in connection with the investigation. FLA. STAT. § 112.533(4). Since Phelps had a constitutional right to a predetermination hearing prior to Ramsay deciding to issue discipline, Ramsay's

commenting on matters that were subject of internal investigations was illegal and outside of his powers.

Because Sheriff Ramsay went on the radio to discuss Phelps' situation, the events surrounding the internal affairs investigation, illegally shared confidential information, and defamed Phelps in the process, Sheriff Ramsay is not entitled to absolute immunity. The District Court failed to apply the proper standard of review by ignoring Phelps' argument and failing to address the same. Because the District Court failed to address Phelps' argument and because the District Court reached an erroneous conclusion, this Honorable Court should reverse the District Court and reinstate Plaintiff's claim of defamation against Sheriff Ramsay.

## IV.    THAT PHELPS STATED A PLAUSIBLE CLAIM OF TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

The elements of tortious interference with a business relationship are: (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff because of the breach of the relationship. *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994). The Individual Defendants argued that Phelps' claim of tortious interference must fail, because Defendants claimed they had a constitutional right to file complaints with Phelps' employer. The District Court agreed with and adopted the Defendants' argument. This conclusion is unwarranted and contradicts Florida

Supreme Court precedent the District Court was obliged to follow.

In so ruling, the District Court, like Defendants, relied upon *Gray v. Rodriguez*, 481 So. 2d 1298 (Fla. Dist. Ct. App. 1986). In *Gray*, the plaintiff police officer sued the defendant citizen for defamation pursuant to FLA. STAT. § 112.532(3) relating to a complaint the defendant made to the Metropolitan Dade County Police Department's Internal Review Panel. *Id.* at 1299-1300. The trial court noted that the defendant had an absolute right to petition the government for redress of grievances. *Id.* at 1299. The trial court found that the system set up by Dade County was "quasi-judicial" and, therefore, the complaint, filed pursuant to that system, was absolutely privileged, presumably under the judicial proceedings privilege. *Id.* at 1300. Importantly, the *Gray* Court noted that the defendant filed his complaint in accordance with the Internal Review Panel's procedures established by Dade County. *Id.*

This is important, because *Mesa* comes to the opposite conclusion regarding complaints filed outside of the procedure adopted by the employing agency. *Mesa*, 357 So. 2d at 713. In *Mesa*, the defendant, a private citizen, had written a letter to the Chief of Police. *Id.* at 712. The trial court declared Section 112.532(3) unconstitutional as infringing upon citizens' right to petition the government for a redress of grievances. *Id.* at 712-713. The *Mesa* Court rejected that there was any such infringement:

Facially, the statute does not interfere with the constitutional right. It expresses no intent that the right be restricted in any way, nor can a restriction be inferred from it. In fact, a companion section of the statute, also part of "The Policeman's Bill of Rights," requires state law enforcement agencies to establish a system of receiving, investigating and determining complaints from any person. If Rodriguez had chosen, he could have lodged a complaint with the investigation system set up, pursuant to the statute, by the Miami Police Department. His complaint could have been reviewed by a Complaint Review Board composed as required by Section 112.532(2), Florida Statutes. And, the board, after a hearing, would have had authority to render an advisory recommendation as to action to be taken against Officer Mesa.

The challenged statutory section simply declares that law enforcement officers have a right to recover damages suffered during performance of their official duties. As written, it does nothing to restrict impermissibly the constitutional right to petition for redress of grievances.

*Id.* at 713. Either *Mesa* controls as an opinion of the highest state appellate court or one must reconcile *Mesa* and *Gray*. Under *Mesa*, there is no absolute privilege as Section 112.532(3) does not unconstitutionally infringe upon a citizen's right to petition. At the same time, *Mesa* and *Gray* can be read harmoniously, if *Mesa* stands for the proposition that complaints not filed in accordance with the employing agency's procedures are not privileged, while *Gray* stands for the proposition that complaints filed in accordance with those procedures are privileged. Under either alternative, the District Court erred by concluding as a matter of law that all the actions complained about as part of the tortious interference claim constituted privileged complaints.

It is important to note that the District Court's conclusion is based on a

disputed fact. Higgins testified that she was not and has never been a complainant on an Internal Affairs investigation at the Monroe County Sheriff's Office. If one credits Higgins' testimony, Higgins could not avail herself of any privilege she might receive as a complainant on an Internal Affairs investigation. If one discredits Higgins' testimony, there is a question as to how she was identified as the complainant and whether Defendants appropriately followed the employing agency's procedures, which would be necessary for the privilege to apply.

The District Court also ignored other behavior by the Individual Defendants that would form the basis for a tortious interference claim that existed in addition to the Internal Affairs complaints. Some of this behavior includes the following acts:

(a)     September 15, 2019 – Tucker sent letter to Internal Affairs Division;

(b)     October 3, 2019 – Higgins emailed McCullah, complaining about officers in the courtroom and blaming Phelps;

(c)     October 11, 2019 – Higgins disclosed the confidential October 4, 2019 Caputo memorandum to news outlets in violation of the Law Enforcement Officers' Bill of Rights;

(d)     October 15, 2019 – Higgins emails Maxwell, questioning Phelps' role in reviewing her cell phone contents and threatening legal action.

(e)     October 23, 2019 – Higgins emailed McCullah claiming Phelps was taking personal acts of aggression towards her.

(f)     October 23, 2019 – Higgins and Tucker meeting with Inspector General Holroyd and Inspector Barrios;

(g)     November 18, 2019 – Higgins sent Ramsay a cease-and-desist letter.

(h)    December 7, 2019 – Higgins posted on Facebook, attacking Phelps and calling her "[a] racist cop," and questioning, "Why do they STILL have jobs?"

(i)    December 7, 2019 – Tucker posted on Facebook, claiming Phelps set him up for murder;

(j)    December 7, 2019 – Tucker posted that MCSO left out recordings where Phelps was talking about setting him up.

(k)    December 7, 2019 – Tucker made an online post, falsely claiming Phelps told Malone to illegally pull Wilson over on his bicycle.

(l)    December 10, 2019 – Higgins appearing in a Washington Post article, claiming she "wants Phelps dismissed from the agency," and saying Phelps had "no place in that department at that level";

(m)    December 11, 2019 – Jenai made a statement in a New York Times article, implying Phelps was part of a "very corrupt police department";

(n)    December 11, 2019 – Tucker posted on Facebook accusing Phelps of telling an officer to pull Wilson "over for some imagined infraction, is not [legal]";

(o)    December 11, 2019 – Higgins going on the radio and challenging Ramsay's statements that he would not decide to terminate Phelps based on one complaint, stating "to say that this is based on one complaint of Penny Phelps's behavior is simply outrageous"; and

(p)    December 14, 2019 – Tucker posting on Facebook, wishing Phelps would be criminally charged.

*See* (**No. 4, at ¶¶ 50, 61, 69-71, 89-90, 94-99, 104-107, 109, 121-125, 127**). While Higgins denies ever making an Internal Affairs complaint, most of the alleged interference has nothing to do with Internal Affairs complaints. Perhaps one or two of the above actions may be properly characterized as the formal making of an

Internal Affairs complaint; such complaints do not cover all the alleged conduct and the District Court's conclusion otherwise is clearly erroneous and contradicted by the contents of Plaintiff's First Amended Complaint.

Because FLA. STAT. § 112.532(3) does not violate the Constitution, the claim for tortious interference made by Phelps does not offend the Constitution. Because it does not offend the Constitution, Higgins, Tucker, and Jenai do not possess an absolute privilege to interfere with Phelps' employment. Moreover, even if there was an absolute privilege, it is not applicable to numerous allegations contained in Plaintiff's First Amended Complaint. To dismiss Phelps' tortious interference claim, the District Court had to ignore factual allegations made by Phelps and borne out by the evidence. Because any privilege the Individual Defendants possess does not defeat Phelps' tortious interference claim, the District Court committed reversal error by dismissing the same.

## V.    THAT PHELPS STATED A FACUAL ISSUE REGARDING HER CLAIMS OF SEX & SEXUAL ORIENTATION DISCRIMINATION

The Equal Protection Clause provides individuals a constitutional right to be free from unlawful discrimination in public employment, which embraces discrimination against both sex and sexual orientation. *See*, *e.g.*, *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011); *Romer v. Evans*, 517 U.S. 620; 116 S. Ct. 1620 (1996). Title VII of the Civil Rights Act makes it an unlawful employment practice to discriminate against an individual with respect to her compensation, terms,

conditions, or privileges of employment, because of such individual's "sex."  42 U.S.C. § 2000e-2(a)(1).  The term "sex" includes both biological sex and sexual orientation.  *Glenn*, 663 F.3d at 1316; *Bostock v. Clayton County, Georgia*, 590 U.S. __; 140 S. Ct. 1731, 1754 (2020).  Discrimination claims brought pursuant to the Equal Protection Clause and Title VII are subject to the same standards of proof and employ the same analytical frameworks.  *Bryant v. Jones*, 575 F.3d 1281, 1296 n. 20 (11th Cir. 2009).  There are multiple methods through which a plaintiff can establish sufficient facts to permit a jury to rule in her favor.  *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220, 1220 n. 6 (11th Cir. 2019).  In responding to Defendant Ramsay's motion for summary judgment, Plaintiff relied upon three methods to establish a factual dispute: (1) using the *McDonnell-Douglas* burden-shifting framework; (2) establishing plaintiff's protected characteristics were a motivating factor in the decision to take adverse action under the mixed-motive analysis; and (3) demonstrating a "convincing mosaic" of circumstantial evidence that warrants an inference of intentional discrimination.  *Id.*; *Quigg v. Thomas County Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  The trial court erred by failing to find a genuine issue of material fact under either or all these methods.  Since the pertinent evidence is the same under each analysis, Phelps will focus on the *McDonnell-Douglas* approach.

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

The *McDonnell-Douglas* framework begins with the plaintiff's burden of establishing a *prima facie* case of discrimination. *Lewis*, 918 F.3d at 1220-1221. To demonstrate a *prima facie* case of discrimination, a plaintiff must show: (1) she belongs to a protected class; (2) she was subjected to an adverse employment action; (3) she was qualified to perform the job in question; and (4) her employer treated "similarly situated" employees outside her protected class more favorably. *Id.*; *see also Flowers v. Troup County, Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015). If the plaintiff succeeds in making out a *prima facie* case, a presumption that the employer discriminated against the plaintiff arises. *Flowers*, 803 F.3d at 1336. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Lewis*, 918 F.3d at 1221. If the employer carries its burden, the burden returns to the plaintiff to show that the employer's proffered reason was merely a pretext for the unlawful discrimination, which "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Id.*

Ramsay solely challenged Phelps' ability to establish the fourth element and the District Court only evaluated the same. A plaintiff's *prima facie* burden is "not onerous" and represents "a low bar to hurdle." *Flowers*, 803 F.3d at 1336. This Court recognized in *Lewis* that its case law had been inconsistently applied, utilizing different standards in determining whether one employee is "similarly situated" with

another employee, sometimes using a "nearly identical" while other times using a "same or similar" standard. *Lewis*, 918 F.3d at 1224. The *Lewis* Court clarified that to satisfy the *prima facie* burden, a plaintiff must show that she and her comparator are "similarly situated in all material respects." *Id*. at 1226. The Court continued to advise what sort of similarities the "all material respects" standard requires would "have to be worked out on a case-by-case basis, in the context of individual circumstances." *Id*. at 1227. The Court explained:

> We know, for instance, that the plaintiff and her comparators need *not* be "similar in all but the protected ways." A plaintiff needn't prove, therefore, that she and her comparators are identical save for their race or gender, as the case may be. Not even the nearly-identical standard requires that level of exactitude. Nor is it necessary for a plaintiff to prove purely formal similarities—*e.g.*, that she and her comparators had precisely the same title. Nor will minor differences in job function disqualify a would-be comparator.

*Id*. (citations omitted). The Court continued:

> Ordinarily, for instance, a similarly situated comparator—
> - will have engaged in the same basic conduct (or misconduct) as the plaintiff;
> - will have been subject to the same employment policy, guideline, or rule as the plaintiff;
> - will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff; and
> - will share the plaintiff's employment or disciplinary history.

*Id*. at 1227-1228 (citations omitted).

Plaintiff sought to compare herself with Lariz. In 2017, Lariz responded to a bicycle versus truck accident, approached the Latino-appearing victim and prior to

asking if the man needed medical treatment, Lariz berated him, whether he spoke English, had identification, and whether he was a legal citizen.  A few weeks later, Lariz interrogated a Latino-appearing individual, questioning why he did not have legal documents after being "here" for 16 years.  The incidents drew criticism from community organizations, such as the Florida Immigration Coalition and Women's March Florida and attracted national media attention.  *See* (**No. 24(pp), at 1753a**). The Key West City Commission passed a resolution to address how these situations would be handled in the future.  (**No. 24(pp), at 1754a-1755a**).  While Ramsay represents he had no involvement in how Lariz's situation was handled, Ramsay's involvement with the media tells a different story; as noted in one article: "But there has been no formal discipline and Ramsay says he has no problem with Lariz asking about immigration status. . . ."  (**No. 24(pp, at 1755a**).

Phelps argued that both Phelps and Lariz were accused of engaging in racially charged behavior.  Both situations received national media attention and required Ramsay to make public statements.  Both situations drew criticism from local groups.  While Plaintiff discussed with a subordinate the subordinate pretending to be racist, Lariz engaged in actual racists acts when he approached Latino-appearing men and instantly questioned their citizenship, a clear instance of profiling and stereotyping, where Lariz assumed that Latino-appearing individuals are not citizens.  Both Lariz and Phelps were subject to the same policies and procedures.

While both had different immediate supervisors, they both ultimately reported to Ramsay, who makes the decision to direct Internal Affairs to conduct investigations and the decision on who to hire or fire.  Ramsay did not consider Phelps' disciplinary history and, as such, the comparator's employment history is immaterial.  Ramsay could not explain why the two situations were treated differently.

While the decision-maker could not explain why the two situations were treated differently, Ramsay's counsel and the District Court attempted to fill in the gaps, actions that conflict with the appropriate standard of care.  In his initial motion, the only distinction Sheriff Ramsay offered was that neither individual involved in the Lariz situations complained to MCSO.  (**No. 19, at 930a-931a**).  This is not a proper or true distinction; "Detroit" never filed a complaint against Phelps with MCSO.  In his reply brief, Ramsay pointed to the difference rank between Phelps and Lariz; however, there is no testimony from Ramsay that he treated the situations differently for that reason.  In fact, the only import of the distinction appears to come from Ramsay's suggestion that the issues with Lariz were handled at a lower command level.  (**No. 31, at 1966a**).  Ramsay's testimony about his involvement is contradicted by Ramsay's statements to the media, indicating that there had not been formal discipline and Ramsay had no problem with Lariz's questioning about immigration status.  (**No. 24(pp), at 1755a**).  Ramsay has stated that when issues were brought to his concern he "immediately forwarded them to our Internal Affairs

Division and directed that an investigation be initiated." (**No. 24(v), at 1644a**). Ramsay has not and cannot explain why he forwarded concerns about Phelps to Internal Affairs but did not forward concerns about Lariz to Internal Affairs.

The only other basis Ramsay asserts to justify the disparate treatment is his argument that Lariz did not engage in racial profiling. In his reply brief, Ramsay argued that Lariz responded to the incident with no advanced knowledge of the individuals' nationality. *See* (**No. 31, at 1966a**). Ramsay, however, does not explain how lacking advanced knowledge of the individuals' nationality affects any analysis of this matter. Lariz did not have advanced knowledge of the individuals' nationality. He lacked that knowledge, observed the gentlemen, saw that they appeared Latino, and immediately questioned whether they were illegal. He made a judgment about a citizen based upon his membership in a protected class and based on that membership he questioned the Latino-appearing men about their immigration status. It must be remembered as well that this racial profiling occurred during a time period where many discussed building a wall to keep immigrants (whether legal or illegal) from coming to America.

In finding Lariz was not an appropriate comparator, the District Court engaged in improper factual findings. While the District Court cited case law providing that comparison in respective ranks and responsibilities may be appropriate, there is no testimony or evidence that Ramsay considered that a material difference between

Lariz and Phelps. The District Court further characterizes the record as devoid of indication that the Lariz incidents drew similar negative feedback from community organizations. The District Court overlooked, however, the media articles demonstrating Lariz's behavior did draw negative feedback from the Florida Immigration Coalition, Women's March Florida, and others. *See* (**No. 24(pp), at 1754a-1755a**). Again, to reach the conclusion it did, the District Court had to ignore or gloss over evidence in the record.

When viewing the entire record, in a light most favorable to Phelps, a genuine issue of material fact exists whether Phelps and Lariz are similarly situated for purposes of establishing a *prima facie* case of discrimination. Both were command officers; both were accused of engaging in some racially charged act; both events were known by Ramsay; both received national media attention; both caused negative feedback from community groups. The only difference is that Ramsay did not have the heterosexual, male investigated, but did have the homosexual female investigated and terminated. Such disparate treatment is sufficient to raise a factual dispute regarding Phelps' *prima facie* case of discrimination.

To avoid summary judgment, a plaintiff must introduce probative evidence showing that the asserted reason is merely a pretext for discrimination. *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006). A proffered reason is pretextual if it is both false and if discrimination was the real reason. *Id.*

An employee can show pretext by demonstrating

> such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find all of [the employer's] reasons unworthy of credence.

*Watkins v. Sverdrup Technology, Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998).

The District Court concluded that Defendant Ramsay proffered a legitimate, non-discriminatory reason for Phelps' termination. There is no explanation as to what Phelps did wrong that warranted termination. Phelps discussed engaging in a ruse that involved an officer playing a role in which he would play a white supremacist role. The proposed ruse is no different than other ruses, such as an officer playing the role of a prostitute and sexually harassing would-be johns. The pretend prostitute does not commit discrimination based on sex by sexually harassing men; it is a necessary costume the officer dons to apprehend a suspect. Likewise, a pretend racist does not commit discrimination based on race by pulling over a minority suspect for a legitimate traffic stop. Neither Ramsay nor the District Court identifies a work rule or law suggesting that considering, but not using, a ruse is improper police work. The nature of the proffered reason is such that on its face, reasonable minds could differ on whether Ramsay's justification has any basis in fact.

The disparate treatment Lariz, a heterosexual, male raises a question as to Ramsay's motivation and whether whatever Phelps did warranted the severity of the

action taken.  If Ramsay tolerates racially charged actions made by heterosexual male employees, it leads to an inference that Ramsay did not tolerate the alleged racially charged statement by Phelps due to her homosexuality and gender.  The same evidence also permits an inference that Ramsay did not feel racially charged behavior is sufficient to warrant an Internal Affairs investigation as he did not refer Lariz for such an investigation.  In other words, this piece of evidence demonstrates Phelps' sexual orientation and sex were a motivating factor and the proffered reason is a pretext for that discrimination.  The record contained numerous other incidents where Ramsay treated male employees more preferentially.

Evidence also demonstrates that Ramsay and his office tolerated egregious misconduct engaged in by male officers.  On one occasion, Sgt. Lopez referred to Phelps as "my dumb, cunt captain" in front of a room full of recruits; although he made an explicitly discriminatory statement, he was not terminated for such behavior.  On another occasion, a male deputy, Nick Whiteman, grabbed a female deputy's breast in the presence of a sergeant.  Deputy Whiteman did not receive discipline but did subsequently receive a promotion to sergeant.  Ramsay would also frequently act in a discriminatory manner.  Ramsay had the habit of referring to female command officers as "Miss," such as Miss Penny or Miss Phelps, as opposed to referring to them by rank, such as Captain Phelps; at the same time, Ramsay would call male officers by their rank.  Phelps complained on multiple occasion that

Ramsay referred to employees of both genders as "lawmen," while mis-gendering the entire female population of the workforce. Most revealing of Ramsay's animus towards gay and lesbians is his angry reaction to Phelps over her being asked whether Ramsay was gay. Ramsay angrily and adamantly told Phelps he was not gay and was offended that she would think he was, indicating he felt there was something wrong with being identified incorrectly as gay, as if being gay was something bad. The District Court ignored this evidence, including those statements and habits about Ramsay, the decisionmaker, by labelling it comments or behavior by nondecision-makers. The District Court was wrong, as many of the comments come directly from Sheriff Ramsay. Such comments do constitute circumstantial evidence of pretext. *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir. 2002); *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1292 (11th Cir. 1998).

Phelps can also identify irregularities and inconsistencies in the IA-2019-046 investigation. First, it is not clear how and why the investigation started. There is no written record of any complaint being filed and one of the identified complainants has denied making the complaint under oath. There is no factual basis in the record as to how the investigation started, despite the District Court's effort to divine one. Under MSCO Policy Chapter 20-A, the Internal Affairs Division Complaint Investigations Manual, requires all investigations be completed within thirty (30)

days of receipt of the complaint and if an extension is necessary, it must be made in writing and approved by certain individuals. Maxwell did not complete the investigation within thirty (30) days and there is no evidence of any written extension request being made. *See Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985)("Departures from normal procedures may be suggestive of discrimination."). Lastly, there are inconsistencies related to the scope of the investigation. Maxwell maintained that the scope of the investigation was solely into whether Phelps made the statements on the audio recordings. Yet at the same time, Maxwell included within the IA investigative file various news reports. Such evidence suggests that Ramsay is not being honest about the investigation and its scope, which serves as further evidence questioning whether Ramsay's business reason is a pretext for discrimination.

An additional piece of evidence calling into question Ramsay's motivation is the illegal disclosure of the October 4, 2019 Caputo memorandum. Florida law required the Sheriff's Office, including its general counsel, to keep any "documents furnished in connection with a confidential internal investigation" confidential and any willful disclosure of the same is a misdemeanor of the first degree. FLA. STAT. § 112.533(4). On October 11, 2019, McCullah unlawfully disclosed the memorandum to Higgins. Higgins subsequently filed the memorandum as an exhibit in the criminal case and shared it with media outlets. This additional unlawful act

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

would give a fact finder added reason to question Ramsay and his office's credibility and whether the stated business reason was the true motivation.  Ramsay and his agents fanned the public flames through the unsolicited and unlawful release of the memorandum.  With the obvious effect this memorandum would have in garnering more media attention, one can infer that Ramsay had an ulterior and discriminatory motive in permitting the confidential record to unlawfully go public.

There is also significant evidence that Ramsay and his staff did not actually view Phelps as having engaged in any wrongdoing.  After the audio recording garnered significant media attention, Ramsay and his staff made several statements to Phelps indicating that they did not sincerely believe Phelps had engaged in wrongdoing.  In November 2019, Ramsay told Phelps not to stress over the complaint, and stated, "We support you and hope to clear your name!" and advised her to stress afterwards.  Caputo and Scibilia told Phelps she was not going to get fired.  Similarly, McCullah told Phelps she was not going to get fired and that had never been a topic of discussion.  Such evidence calls into question whether Ramsay truly believed Phelps did anything wrong and further establishes Ramsay used the investigation as a pretext to discriminate against her.

Ramsay's treatment of Phelps raises a genuine issue of material fact regarding whether he discriminated against Phelps because of her sex and/or sexual orientation.  Ramsay created an atmosphere at MCSO that was sexually charged, as

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

evidenced by the multiple affairs by male command staff. Sheriff Ramsay habitually used discriminatory language in day-to-day interactions, by failing to refer to female employees by their rank or by referring to them as "lawmen." In this atmosphere Ramsay failed to investigate and discipline a heterosexual male command officer that made racially charged statements to two different Latino men, which became the subject of significant media coverage. The disparate treatment along with the tolerance of and cultivation of a discriminatory atmosphere demonstrates that Phelps' actions do not rise to a level that warrants discipline or termination. The District Court erred in dismissing Phelps' claims, because genuine questions exist regarding Ramsay's motivation in terminating Phelps for considering using a ruse. To reach the conclusion it did, once again, the District Court had to ignore or dismiss relevant evidence. In so ruling, the District Court's opinion violates the standard of review and requires reversal.

## VI.    THAT PHELPS STATED A FACTUAL ISSUE REGARDING WHETHER RAMSAY IS ENTITLED TO QUALIFIED IMMUNITY

In this case, the District Court found that it was undisputed that Ramsay acted within his discretionary authority and that Phelps' right to be free from employment discrimination based on her sex and/or sexual orientation was clearly established. The District Court concluded qualified immunity applied, however, because it had previously concluded that Ramsay had not violated Phelps' right. As argued above, the District Court erred in drawing that conclusion and a question of fact exists

regarding Ramsay's motivation.  Because a factual question exists regarding whether Ramsay violated Phelps' right to be free from discrimination, a factual dispute exists regarding whether Ramsay is entitled to summary judgment.

## VII.  THAT PHELPS STATED A FACUAL ISSUE REGARDING HER CLAIMS OF DEFAMATION AGAINST HIGGINS, JENAI & TUCKER

"The First Amendment safeguards publishers from defamation suits brought by public figures unless the publisher acts with actual malice."  *Readon v. WPLG, LLC*, 317 So. 3d 1229, 1235 (Fla. Dist. Ct. App. 2021).  Police officers are subject to the public figure standard.  *See*, *e.g.*, *Russell v. Smith*, 434 So. 2d 342, 343 (Fla. Dist. Ct. App. 1983).  To demonstrate actual malice, a plaintiff must:

> [E]stablish that the disseminator of the information either knew the alleged defamatory statements were false or published them with reckless disregard despite awareness of their probable falsity.

*Mile Marker, Inc. v. Petersen Publishing, LLC*, 811 So. 2d 841, 845 (Fla. Dist. Ct. App. 2002).

The District Court ignored significant evidence that created a genuine issue of material fact whether the Individual Defendants acted with actual malice.  The record disclosed that Higgins, Jenai, and Tucker engaged in a scheme that had a nickname, "Project Mayhem."  Tucker and Jenai spoke about "Project Mayhem" on the jailhouse phone calls.  The goal of the project was to take control of the Tucker criminal matter by causing Phelps and others to lose their employment or other harm that would ultimately benefit Tucker escaping conviction for the murder charge.

Consistent with the articulate plan, Higgins, Jenai, and Tucker made repeated defamatory statements to members of the Sheriff's Office, news reporters, and members of the public.  Higgins unlawfully released the November 20, 2017 audio recording of Phelps' conversation, part of a confidential internal affairs investigation to the New York Times.  Ultimately, and as part of the project, they openly demanded Phelps lose her employment.  Many of the statements Tucker repeated is that Phelps instructed an officer to illegally pull over Wilson.  Tucker had access to the recording and heard Phelps tell Deputy Malone to make a *legal* stop for Wilson.  Tucker knew that Phelps said the exact opposite of what Tucker was repeating on Facebook and online.  Much of the defamatory statements made by Tucker are not based on facts, but are completely made up by Tucker, such as there being audio recordings of Phelps talking about setting Tucker up, something a reasonable juror could conclude Tucker knew was false.  A reasonable juror could conclude Tucker knew several of his statements were false.  The evidence the Individual Defendants knew many of their statements were false when combined with the evidence establishing "Project Mayhem" give rise to a genuine issue of material fact whether the Individual Defendants acted with actual malice.  Because the District Court erred in failing to consider this evidence in a light most favorable to Phelps and because the evidence demonstrates a material factual dispute, this Honorable Court should reverse the District Court's grant of summary judgment on this claim.

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

## VIII. THAT PHELPS STATED A FACUAL ISSUE REGARDING HER CLAIMS OF CIVIL CONSPIRACY

The trial court found Phelps could not sustain a claim for conspiracy, because the underlying claim for defamation failed. "[A]n actionable conspiracy requires an actionable underlying tort or wrong." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997). Because, as argued above, Phelps can maintain a claim of defamation against Higgins, Jenai, and Tucker, the trial court erred in finding the alleged conspiracy lacked an underlying tort. Because of that error, this Court should reverse the dismissal of Plaintiff's conspiracy claim.

## <u>CONCLUSION</u>

WHEREFORE, Plaintiff requests that this Court enter an opinion reversing the District Court's order on Defendants' motions to dismiss and motions for summary judgment for the reasons set forth above.

Respectfully submitted,

Dated: <u>June 22, 2023</u>　　　By:　*/s/ Victor J. Mastromarco, Jr.*
　　　　　　　　　　　　　　　VICTOR J. MASTROMARCO, JR. (P34564)

　　　　　　　　　　　　　　　THE MASTROMARCO FIRM
　　　　　　　　　　　　　　　1024 N. Michigan Avenue
　　　　　　　　　　　　　　　Saginaw, Michigan 48602
　　　　　　　　　　　　　　　(989) 752-1414
　　　　　　　　　　　　　　　<u>vmastromarco@mastromarcofirm.com</u>

　　　　　　　　　　　　　　　*Attorneys for Plaintiff-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because it contains 12,018 words, excluding the parts of the brief exempted by 11th Cir. R. 32-4. This brief further complies with typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) as counsel prepared the brief using proportionally spaced typeface with Microsoft Word, in 14-point Times New Roman font.

Respectfully submitted,

Dated: <u>June 22, 2023</u>        By:    */s/ Victor J. Mastromarco, Jr.*
VICTOR J. MASTROMARCO, JR. (P34564)

THE MASTROMARCO FIRM
1024 N. Michigan Avenue
Saginaw, Michigan 48602
(989) 752-1414
<u>vmastromarco@mastromarcofirm.com</u>

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on **June 22, 2023**, I presented the foregoing papers to the

Clerk of the Court for the filing and uploading to the Court's electronic filing system,

which will send notification of such filing to the following:

Victor J. Mastromarco, Jr.
Kevin J. Kelly
Rikki M. Mays-Reak
The Mastromarco Firm
1024 N. Michigan Avenue
Saginaw, Michigan 48602
(989) 752-1414
*Attorneys for Plaintiff-Appellant*

David P. Reiner, II
Reiner & Reiner, P.A.
9100 S. Dadeland Blvd., Ste. 301
Miami, Florida 33156
(305) 670-8282
dpr@reinerslaw.com
*Attorneys for Plaintiff-Appellant*

Jerome A. Ballarotto
143 White Horse Avenue
Trenton, New Jersey 08610
(609) 581-9509
jabesquire@aol.com
*Attorneys for Defendants-Appellees Higgins, Jenai & Tucker*

Mark W. Catanzaro
21 Grant Street
Mount Holly, New Jersey 08060
(609) 261-3400
mark@catanzarolaw.com
*Attorneys for Defendants-Appellees Higgins, Jenai & Tucker*

Robert L. Norton
Brian Koji
Allen, Norton & Blue, P.A.
121 Majorca Ave., Ste. 300
Coral Gables, Florida 33134
(305) 445-7801
*Attorneys for Defendant-Appellee Ramsay*

Respectfully submitted,

Dated: <u>June 22, 2023</u>    By:    <u>*/s/ Victor J. Mastromarco, Jr.*</u>
                                      VICTOR J. MASTROMARCO, JR. (P34564)

                                      THE MASTROMARCO FIRM
                                      1024 N. Michigan Avenue
                                      Saginaw, Michigan 48602
                                      (989) 752-1414
                                      <u>vmastromarco@mastromarcofirm.com</u>

                                      *Attorneys for Plaintiff-Appellant*