**No. 23-11299-E**

---

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

PENNY PHELPS,

*Plaintiff-Appellant*

v.

SHERIFF RICK RAMSAY, in his Official
and Individual capacities, CARA HIGGINS,
LAUREN JENAI, and FRANKLIN TUCKER,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Florida

No. 4:21-cv-10070-JEM

---

**APPELLEES' HIGGINS, JENAI AND TUCKER'S PRINCIPAL BRIEF**

---

Prepared by:
 Mark W. Catanzaro, Esquire
21 Grant Street
Mt. Holly, New Jersey 08060
(609) 261-3400
*Attorneys for Appellees,
Higgins, Jenai and Tucker*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel, Mark W. Catanzaro, certifies that the following persons my have an interest in the outcome of this case:

### REPRESENTED ENTITIES

1.    Penny Phelps, Plaintiff-Appellant

2.    Sheriff Rick Ramsay, Defendant-Appellee

3.    Cara Higgins, Defendant-Appellee

4.    Lauren Jenai, Defendant-Appellee

5.    Franklin Tucker, Defendant-Appellee

6.    Monroe County Sheriff's Office

### LEGAL REPRESENTATIVES

1.    Victor J. Mastromarco, Jr. of The Mastromarco Firm, counsel for Plaintiff-Appellant

2.    Kevin J. Kelly  of The Mastromarco Firm, counsel for Plaintiff-Appellant

3.    Rikki M. Mays-Reak of The Mastromarco Firm, counsel for Plaintiff-Appellant

4.    David P. Reiner, II of Reiner & Reiner, P.A., counsel for Plaintiff-Appellant

5.    John R. Shek of J. Shek Law Offices, former local counsel for Plaintiff-Appellant

i

6.    Jerome A. Ballarotto of Ballarotto Law, counsel for Defendants-Appellees Higgins, Jenai and Tucker

7.    Mark W. Catanzaro of the Law Offices of Mark W. Catanzaro, counsel for Dependants-Appellees Higgins, Jenai and Tucker

8.    Robert L. Norton of Allen, Norton & Blue, P.A., counsel for Defendant-Appellee Ramsay

9.    Brian Koji of Allen, Norton & Blue, P.A., counsel for Defendant-Appellee Ramsay

10.    Luke C. Savage of Allen, Norton & Blue, P.A., counsel for Defendant-Appellee Ramsay

11.    Jason S. Miller of Allen, Norton & Blue, P.A., counsel for Defendant-Appellee Ramsay

## OTHER INTERESTED PARTIES

1.    The Honorable Jose E. Martinez, U.S. District Court Judge

## STATEMENT REGARDING ORAL ARGUMENT

Higgins, Jenai and Tucker believe the matter has been exhaustively briefed and all the issues have been adequately addressed in the briefs that were submitted below and that have been and will be submitted to this court. In the absence of the court not having a clear understanding from the submissions, they do not believe oral argument is necessary.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . .  iii

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vi

STATEMENT OF SUBJECT-MATTER & APPELLATE JURISDICTION . . . .  x

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xi

STATEMENT OF CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    I.     PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    II.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

    I.     THE TRIAL COURT CORRECTLY DETERMINED
        THAT PLAINTIFF COULD NOT MAINTAIN AN
        ACTION FOR DAMAGES FOR A VIOLATION
        OF THE LAW ENFORCEMENT OFFICERS BILL
        OF RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

    II.    THE TRIAL COURT CORRECTLY DETERMINED
        THERE WAS NO CAUSE OF ACTION FOR
        INTERFERENCE WITH BUSINESS RELATIONS . . . . . . . . . . .  27

    III.   THE TRIAL COURT CORRECTLY DETERMINED
        THAT NO CAUSE OF ACTION EXISTED AS TO
        HIGGINS, JENAI AND TUCKER FOR DEFAMATION . . . . . . .  32

    IV.   THERE CAN BE NO CIVIL CONSPIRACY . . . . . . . . . . . . . . . .  50

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

# TABLE OF CITATIONS

Page

*New York Times Co. v. Sullivan,*
  376 U.S. 254, 2270, 79-80 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Loeb v. Geronemus*,
  66 So. 2d 241, 243 (Fla. 1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Mesa v. Rodriquez,*
  357 So. 2d 711 (Fla. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 30, 32

*Berisha v. Lawson,*
  973 F.3d 1304, 1312 (11ᵗʰ Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Diaz v. Miami-Dade County,*
  849 F. App'x 787, 793 (11th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Horsley v. Rivera*,
  292 F. 3d 695, 702 (11ᵗʰ Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Silvester v. America Broadcasting, Co.,*
  839 F.2d 1491, 1499 (11ᵗʰ Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Tobinick, v. Novella,*
  848 F.3d 935, 946-47 (11th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *50*

*Adamson-James v. Fla. Dep't of Corr.*,
  2013 WL 1968499, at 9 (M.D. Fla. May 13, 2013). . . . . . . . . . . . . . . . . . . . . . . . 25

*Berisha v. Lawson,*
  378 F. Supp. 3d 1145, 1161 (S.D. Fla. 2018)
  *aff'd,* 973 F.3d 1304 (11th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

vi

*Diaz v. Miami-Dade County,*
  424 F. Supp. 3d 1345 (S.D. Fla 2019)
  affirmed, 849 F. App'x 787 (11th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Fiedor v. Florida Dep't of Fin. Servs.,*
  2018 U.S. Dist. LEXIS 197929, 2018 WL 6495194
  *2 (N.D. Fla. Sept. 4, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Fortson v. Colangelo,*
  434 F. Supp. 2d 1369, 1378 (S.D. Fla. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Grayson v. No Labels, Inc.,*
  (M.D. Fla. May 20, 2022) 2022 U.S. Dist. LEXIS 96317, at *18 . . . . . . . . . . . 48

*Kamenesh v. City of Miami*
  772 F. Supp. 583, 593 (S.D. Fla., 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Medina v. City of Hialeah*
  (S.D. Fla. March 20, 2003) U.S. Dist. LEXIS 4890 . . . . . . . . . . . . . . . . . . . . . . 49

*Tillett v. BJ's Wholesasle Club Inc.*,
  (M.D. Fla, 2010) U.S. Dist. LEXIS 79443 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Bailey v. Bd. Of County Comm'Rs*,
  659 So. 2d 295, 301 (Fla. 1st DCA 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Balcor Property Management v. Ahronovitz*,
  634 So. 2d 277, 279 (Fla. 4th DCA 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Fish v. Adams*,
  401 So. 2d 843, 845 (Fla. 5th DCA 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*FOP, Gator Lodge 67 v. City of Gainesville,*
  148 So. 3d 798, 802 (Fla. 1st DCA 2014**)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*From v. Tallahassee Democrat, Inc.,*
  400 So. 2d 52, 57 (Fla. 1st DCA 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Gray v. Rodriguez,*
  481 So. 2d 1298 (Fla. 3rd DCA 1986) . . . . . . . . . . . . . . . . . . . . . . 26, 28, 29, 30, 32

*McCurdy v. Collis,*
  508 So. 2d 380, 382-383 (Fla. 1st DCA 1987),
  *rev. den.*, 518 So. 2d 1274 (Fla. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*McQuade v. Fla. Dep't. Of Corr.,*
  51 So. 3d 489, 495 (Fla. 1st DCA 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Miami v. Cosgrove,*
  516 So.2d. 1125, 1127 (Fla. 3rd DCA 1987) . . . . . . . . . . . . . . . . . . . . . . 23, 24, 25

*Nowik v. Mazda Motors of America (East), Inc.*,
  523 So. 2d 769, 771 (Fla. 1st DCA 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Statutes**

*28 U.S.C. §§ 1291* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

*28 U.S.C. §§ 1294* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

*28 U.S.C. § 1331* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

*28 U.S.C. § 1367* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

*42 U.S.C. § 1983* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

*42 U.S.C. § 2000e* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Fla. Stat. § 112.532 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23, 24, 25, 29

Fla. Stat. § 112.532(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Fla. Stat. § 112.533(2)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Fla. Stat. § 112.533(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Fla. Stat. §112.534 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26

**Rules**

Fed R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 21, 27

Fed R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 32, 50

11ᵗʰ Cir. R. 36-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## STATEMENT OF SUBJECT-MATTER & APPELLATE JURISDICTION

The United States District Court for the Southern District of Florida had subject matter jurisdiction pursuant to *28 U.S.C. § 1331* over Ms. Phelps' claims arising under *42 U.S.C. § 1983* and *Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq*. The District Court also has supplemental jurisdiction pursuant to *28 U.S.C. § 1367* over Ms. Phelps' claims arising under Florida law.  On February 7, 2022, The District Court issued an Omnibus Order on the Motions to Dismiss, granting in part and denying in part, the motions.  On March 31, 2023, the District Court issued an Omnibus Order on Motions for Summary Judgment, granting Defendants' motions and dismissing the balance of Plaintiff's claims. On April 19, 2023, Ms. Phelps filed a timely notice of appeal.  The Notice of Appeal only seeks review of the Court's entry of Summary Judgment in favor of Defendants.  It does not seek to appeal the District Court's partial dismissal although Plaintiff's principal brief does so.  This Honorable Court has jurisdiction pursuant to *28 U.S.C. §§ 1291 and 1294(1)*.

## STATEMENT OF ISSUES

I.    WHETHER PHELPS ESTBLISHED A PLAUSIBLE CLAIM OF VIOLATIONS OF THE LAW ENFORCEMENT OFFICERS' BILL OF RIGHTS?

II.    WHETHER PHELPS ESTABLISHED A PLAUSIBLE CLAIM OF TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP?

III.    WHETHER PHELPS ESTABLISHED FACTUAL ISSUES OF MATERIAL FACTS TO SUSTAIN A DEFAMATION CLAIM AGAINST HIGGINS, JENAI AND/OR TUCKER?

IV.    WHETHER PHELPS ESTABLISHED FACTUAL ISSUES OF MATERIAL FACT TO SUSTAIN A CIVIL CONSPIRACY CLAIM AGAINST HIGGINS, JENAI AND/OR TUCKER?

## STATEMENT OF CASE

## Procedural History

Plaintiff commenced her action by filing a complaint in the United States District Court for the Southern District of Florida.  **(Appellant Appendix, No. 1, Plaintiff's Complaint at 1a-41a)**  On August 10, 2021, Higgins, Jenai and Tucker filed a Motion to Dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*. **(No. 2, Motion to Dismiss at 42a-68a)**  On August 11, 2021, the Sheriff Rick Ramsay filed a Motion to Dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*.  **(No. 3, Motion to Dismiss at 69a-77a)**  On August 20, 2021, Plaintiff filed her First Amended Complaint. **(No. 4, First Amended Complaint at 78a-123a)**  In light of the filing of an Amended Complaint, the District Court entered a paperless order denying the motions as moot.

On August 24, 2021, Rick Ramsay filed a Motion to Dismiss the Amended Complaint  pursuant to *Fed. R. Civ. P 12(b)(6)*. **(No. 5, Motion to Dismiss at 124a-132a)**  On August 26, 2021, Higgins, Jenai and Tucker filed a Motion to Dismiss the Amended Complaint pursuant to *Fed. R. Civ. P 12(b)(6)*. **(No. 6, Motion to Dismiss at 133a-160a)**  On September 7, 2021, Plaintiff filed a response to Ramsay's Motion to Dismiss. **(No. 7, Response to Ramsay Motion at 161a-169a)**  On September 9, 2021, Plaintiff filed a response to Higgins, Jenai and Tucker's Motion to Dismiss. **(No. 8, Response to Higgins, Jenai & Tucker's Motion at 170a-185a)**    On

1

September 13, Ramsay filed his reply brief. **(No. 9, Ramsay reply brief at 186a-194a)** On September 16, 2021, Higgins, Jenai and Tucker filed their reply brief**. (No. 10, Higgins, Jenai and Tucker's reply brief at 195a-205a)** On February 7, 2022, the court entered an Omnibus Order granting in part and denying in part the motions. **(No. 11, Omnibus Order at 206a-221a)** The Court granted Ramsay's motion dismissing Count II alleging a violation of Title VII of the Civil Rights Act in his individual capacity but denying in his official capacity; **(No. 11 at 212a)** granting Ramsay's motion dismissing Count III alleging a violation of the Law Enforcement Officer's Rights; **(No. 11 at 212a-213a)** granting Ramsay's motion dismissing Count IV alleging defamation. **(No. 11 at 215a)** The court granted Higgins motion to dismiss Count III alleging a violation of the Law Enforcement Officer's Rights. **(No. 11 at 212a-213a)** The court granted Higgins, Jenai and Tucker's motion dismissing Count VIII alleging Tortious Interference with Business Relations. **(No. 11 at 219a-220a)** The court denied Higgins, Jenai and Tucker's motion with regard to Counts V, VI and VII alleging Defamation and Count IX alleging a Civil Conspiracy. **(No. 11 at 220a-221a)**.

On February 22, 2022, Ramsay filed an Answer to Plaintiff's Amended Complaint. **(No. 33, Docket Sheet, DE 51 at 2020a)** On February 22, 2022, Higgins, Jenai and Tucker filed an Answer to Plaintiff's Amended Complaint**. (No. 33,**

**Docket Sheet, DE 51 at 2020a)** On February 25, 2022, Ramsay filed an Amended Answer to Plaintiff's Amended Complaint. **(No. 33, Docket Sheet, DE 51 at 2020a)**[1]

On March 4, 2022, Plaintiff filed a Motion for Reconsideration of the court's order on the Motions to Dismiss. **(No. 12, Plaintiff's Reconsideration Motion at 222a-229a)** On March 11, 2022, Higgins, Jenai and Tucker filed a Response to the Reconsideration Motion**. (No. 13, Response to Motion at 230a-238a)** On March 14, 2022, Ramsay filed a Response to the Reconsideration Motion. **(No. 14, Response to Motion at 239a-247a)** On March 21, 2022, Plaintiff filed a reply to the responses to the Reconsideration Motion. **(No. 33, Docket Sheet, DE 68 at 2021a)**[2] On April 11, 2022, the court entered an order denying Plaintiff's Motion for Reconsideration. **(No. 15. Court Order at 248a-250a)**

On August 11, 2021, the had court had entered a scheduling order requiring the filing of Summary Judgment motions by April 11, 2022. Defendants filed motions in accordance with the schedule. **(No. 33, Docket Sheet, DE 74-78, at 2022a)** On

---

[1]Plaintiff did not make the answers a part of the record nor does plaintiff make any argument that they were insufficient or had some bearing upon disposition of this appeal. Defendant has not attached the answers as they appear to be unnecessary to the court's consideration of the issues.

[2]Plaintiff did not reference the reply or make it a part of the record. As the court denied the motion for reconsideration, it is unnecessary to the court's disposition of the issues pending before it.

that same date, the court entered an order extending discovery and extending deadlines to file Summary Judgment motions. **(No. 33, Docket Sheet, DE 80 at 2021a)** The court allowed defendant's to maintain the filed Summary Judgment motions or strike them and refile at the conclusion of the new filing deadline. Defendants elected to strike their pleadings and to refile[3]. **(No. 33, Docket Sheet, DE 88 & 90 at 2022a)**

On June 20, 2022, Ramsay filed a Motion for Summary Judgment pursuant to *Fed. R. Civ. P 56.* **(Nos. 16-19, Ramsay Motion for Summary Judgment at 251a-1452a)**. On June 20, 2022, Higgins, Jenai and Tucker filed a Motion for Summary Judgment pursuant to *Fed. R. Civ. P 56.* **(Nos. 21-22, Higgins, Jenai and Tucker Motion for Summary Judgment at 1453a-1491a)**. On July 19, 2022, Plaintiff filed a response to Ramsay's Summary Judgment Motion. **(No. 23-24, Plaintiff's response at 1492a-1817)** On July 19, 2022, Plaintiff filed a response to Higgins, Jenai and Tucker's Summary Judgment Motion. **(No. 25-26, Plaintiff's response at 1818a-1886a)** On July 22, 2022. Plaintiff filed a counter statement of facts to Ramsay's Statement of Material Facts. **(No. 27, Plaintiff's counter statement at 1887a-1903a)**.

---

[3] Plaintiff did not attach any of these items to the Appendix. They are not necessary to this Court's disposition but noted as it is part of the procedural history of the case.

On July 25, 2022, Higgins, Jenai and Tucker filed a reply. **(No. 28-29; Higgins, Jenai and Tucker Reply at 1904a-1916a)** On July 26, 2022, Ramsay filed a reply**. (No. 30-31; Ramsay Reply at 1917a-1974a)** On March 31, 2023, the United States District Court entered an Omnibus Order granting the Motions for Summary Judgment in their entirety and dismissing plaintiff's complaint. **(No. 32, Court's order at 1975a-2015a**)

### Statement of Facts

On November 17, 2017, Matthew Bonnett was murdered. **(No. 4, ¶ 12 at 79a)** The murder became known as the "Treehouse Murder"**. (No. 4, ¶ 13 at 79a)** Penny Phelps (hereinafter "Phelps") was a Captain in the Monroe County Sheriff's Department (hereinafter "MCSO") and in charge of the major crimes unit**. (No. 16(a) Phelp's deposition at 385a, lines 6 to 8)**. She was responsible for all officers operating in the major crimes unit. **(No. 16(a) at 385a, lines 9 to 11)**. She, along with other officers became involved in the investigation of the Treehouse murder case. **(No. 4, ¶ 15 at 80a)**

Paula Belmonte identified one of the participant's in the murder as a black male known to her as "Detroit". **(No. 4, ¶ 22 at 80a)** The State's Attorney's Office wanted the MCSO to identify "Detroit" and obtain a visual or thumb print. **(No. 4, ¶ 25 at 81a)** Phelps directed her subordinate, Deputy Lee Malone, in pertinent part, as follows:

> What I want you to do is be a marked unit in that area and when Detroit gets on his bike and wheels away from there, I want you to make a legitimate traffic stop for him riding on the wrong side of the road or waving through a stop sign and I want you to write him a ticket so I can get a thumbprint."

**(No. 20a, Higgin's declaration ¶ 8 at 951a)** Phelps further told him, "You have nothing better to do than ... you know, you white supremacist you're messing with the black guy riding a bike. I just want you to be the neo-Nazi picking on the black guy riding the bike." **(No. 20a, ¶ 9 at 951a)** Wilson was identified as "Detroit**" (No. 4, ¶ 24 at 3a)** The stop never occurred as Rory Wilson was arrested and charged with participating in the Treehouse murder case. **(No. 1, ¶ 36 at 5a)** Franklin Tucker was arrested and charged with participating in the Treehouse murder case. **(No. 4, ¶ 37 at 82a)** Cara Higgins was retained to represent Franklin Tucker. **(No. 4, ¶ 38 at 82a)** The communication Phelps had concerning the neo-Nazi/White Supremacist was recorded**. (No. 4, ¶ 41 at 82a)** Higgins was provided the recording of Phelps and Malone from the State's Attorney's Office in discovery. **(No. 4, ¶ 43 at 82a)**

The recorded conversation referenced above was conducted on November 17, 2017 in an interview room while Phelps discussed the investigation with her subordinates. **(No. 20(a), ¶ 8 at 951a and 996a)** During a conversation with Deputy Lee Malone, she told Deputy Malone to make a "legitimate traffic stop of Rory

Wilson.  **(No. 20(a), ¶ 8 at 951a and 996a)** Lee Malone is a white male and Rory Wilson is a black male. **(No. 20(a), ¶ 7 at 951a)** She instructed him to act like a "white supremacist" and a neo-Nazi when making the stop. **(No. 20(a), ¶ 9 at 951a and 997a)**

On November 20, 2017, a confidential informant, later identified as William Peoples, advised the police he saw Wilson, who was involved in the murder, with Tucker walking to an MCS store**. (No. 20(a), ¶ 26 at 956a and 1044a)** By 12:00 pm, Phelps determined that Tucker was the white guy involved in the murder.  **(No. 20(a), ¶ 27 at 956a)** Tucker did not match the physical description of the individual that was provided by a witness, Todd O'Quinn.  **(No. 20(a), ¶ 25 & 27 at 956a)**

On a recording from the interview room, Phelps is heard saying, " We got Franklin Norris - that is who was at Metro PCS - that is where our white guy is - he is in the upper right hand corner of the line up - that is your white guy" **(No. 20(a), ¶ 28 at 956a - 957a)** During the recording, Phelps instructed her subordinates to show the photographic line up to Todd O'Quinn. **(No. 20(a), ¶ 28 at 957a)** During the recording Phelps acknowledges that the 911 caller identified a "black sedan" pulling away from the Treehouse at the time of the crime. **(No. 20(a), ¶ 30 at 957a)** Days later, Phelps ignores the black sedan and decides it was Travis Johnson's pick up truck while interviewing Travis Johnson. **(No. 20(a), ¶ 30 at 957a and 1046a)**

7

The problems for Phelps continued and she is recorded saying, "I hope Todd can ID him otherwise, Jesus Christ we are all in trouble**. (No. 20(a), ¶ 31 at 957a)** O'Quinn did not identify Tucker. **(No. 20(a), ¶ 32 at 957a and O'Quinn deposition at 1051a, lines 7-15)** O'Quinn told law enforcement that Tucker was not involved. **(No. 20(a), ¶ 32 at 957a and 1051a, lines 18-23)** Phelps partially concluded that Tucker was her "white guy" from a Facebook post where he was wearing make up and holding a knife. **(No. 20(a), ¶ 33 at 958a, 968a & 969a, 1053a)** The lead detective, Matthew Pitcher, did not believe there was enough evidence to arrest Tucker and wanted to wait for a line up. **(No. 20(a), ¶ 35 at 958a and 971a)** In reference to Tucker, Phelps can be heard saying, "Oh well ... you can go to prison for murder too. We just want to close it out." **(No. 20(a), ¶ 34 at 958a)**

Phelps interviewed April Walker, who was Rory Wilson's significant other but did not record the conversation. **(No. 20(a), ¶ 37 at 959a)** Lead Detective Pitcher believed Phelps told Walker what to say. **(No. 20(a), ¶ 37 at 959a and Pitcher deposition at 973a-974a)** Detective Rosa DiGiovanni believed Phelps interviewing of Walker was improper. **(No. 20(a), ¶ 46 at 961a - 962a, 1056a, line 11-1057a, line 11)**

When interviewing Rory Wilson (Detroit), Phelps repeatedly told Wilson that Tucker participated in the murder. **(No. 20(a), ¶ 41 at 959a)** In the span of three

8

minutes, Phelps told Wilson that Tucker committed the murder eight (8) times. **(No. 20(a), ¶ 42 at 960a)** Phelps told Wilson that his significant other is home alone in the dark and told him to read between the lines indicating that Tucker would be going home if he did not implicate him. **(No. 20(a), ¶ 43 at 960a)** She asked Wilson why Tucker gets to walk away and he does not. **(No. 20(a), ¶ 43 at 960a)** Wilson denied involvement and told Phelps that she told him Tucker did it. He then said, "I can go home? If I just say, if I, if just say that yes, Tyrone done it". **(No. 20(a), ¶ 44 at 961a)** The recording stops and there is a three minute gap. When the recording continues, Wilson said Tucker helped to plan the robbery**. (No. 20(a), ¶ 44 at 961a and 976a-978a)** Detective Pitcher was concerned that Phelps had fed the story to Rory Wilson. **(No. 20(a), ¶ 4 at 961a and 978a)** Phelps and Assistant State's Attorney Colleen Dunne, re-interviewed Rory Wilson three more times. **(No. 20(a), ¶ 47 at 962a)** Wilson changed his story any number of times and admitted to lying in prior statements. **(No. 20(a), ¶ 48 at 962a)**

Phelps interviewed Travis Johnson who denied involvement in the murder. Phelps spent approximately six (6) minutes speaking. She told Travis what to say. **(No. 20(a), ¶ 45 at 961a and 1046a-1048a)**

One victim, Paula Belmonte, indicated the only reason she believed Tucker was involved was because the police told her when they arrested him. **(No. 20(a), ¶ 50 at**

**960a, 1060a)** Belmonte subsequently said that she could not say Tucker was involved and could not identify him being there. **(No. 20(a), ¶ 50 at 960a, 1061a)**

Phelps Internal Affairs file is over 600 pages long. **(No. 20(a), ¶¶ 20-21 at 954a-955a; 1020a-1041a)** Phelps was investigated for race discrimination which was determined to be unfounded. **(No. 20(c) ¶ 43 at 954a; 1026a)** Phelps was presented with a Last Chance Agreement in 2010. **(No. 20(d), ¶ 20(d) at 954a; 1037a-1041a)**

The plaintiff has alleged that Lauren Jenai made defamatory statements that are actionable. Lauren Jenai became Tucker's girlfriend and eventual wife. **(No. 4, ¶ 44 at 83a).**

The first statement attributable to Jenai was contained in the NEW Key West Paper, also known as The Blue Paper published on October 19, 2019 and states:

> I looked into the case", says Lauren. "The reports said Ty was on surveillance video - he was not. The reports said a lot of things that ended up not being true. And when I saw there was absolutely no credible evidence against him, I became 100% sure of his innocence.

**(No. 4, ¶ 71 at 86a; No. 20(b), Jenai declaration, ¶ 1 at 1066a and 1071a)**

The second alleged defamatory statement attributed to Lauren Jenai was contained in the New York Times and states:

> I think the bigger story here is really about a very corrupt police department and prosecutor's office in a very small town.

10

> Basically, they've been getting away with this kind of thing for years, because mostly they're picking on poor people and homeless people, and they count on the fact that nobody's going to come and look into what they're doing.

**(No. 4, ¶ 107 at 91a)**

The third alleged defamatory statement attributed to Lauren Jenai was made during the Sean Hannity radio program when Jenai and Tucker were interviewed by Jonathan Gilliam.  (No. 4, ¶ 138 at 95a)  Jenai made the following statements during that program:

> Thank you Jonathan.  I heard that Ty got arrested.  I immediately looked into the case and saw that it it was apparent he had been um named as a suspect due to association with another suspect he was ID'd by one of the victim.  Right from the bat it has been a really interesting story and has been fascinating in a terrible way to see how the system has been broken down here in Key West.

**(No 20(b), ¶ 3 at 1067a)**

The last defamatory statement alleged is Lauren Jenai appearing in the New York Post on November 23, 2020 where she said,  "What if somebody framed me for murder and there was nobody to help?" **(No. 4, ¶ 152 at 96a; No. 17, ¶ 33  at 909a; No. 20(b), ¶ 3 at 1067a)**

The plaintiff has alleged that Cara Higgins made defamatory statements that are actionable.  The first statement attributable to Higgins was contained in a Facebook

11

post on December 7, 2019 where she said:

> I want you to be the neo-Nazi picking on the black guy on the bike."
> This is how a Captain at the MCSO directs her subordinates to act. Like neo-Nazis.
> A prosecutor who lies and hides evidence. A racist cop who thinks she is above the law. Why do they STILL have jobs?

**(No. 4, See ¶ 89 at 88a)**   The Facebook post linked the Florida Keys Citizen article, "Officials may lose jobs in the aftermath of murder case".  **(No. 20(a) at 988a)** The article notes that it had obtained and reviewed a recording where:

> In a recording entered into evidence in the Tree House case, Phelps can be heard using racially charged language in relation to a suspect in the case. Phelps can be heard telling another officer to act so overzealously that the black suspect will think "you are a white supremacist messing with a black guy riding a bike."
>
> The transcript seems to detail a tactic by Phelps to have deputies pull over the suspect on his bike under the ruse of a routine traffic stop when the real intent was to obtain a phone number and other information and evidence.
>
> "I want you to be the neo-Nazi picking on the black guy on the bike, " Phelps said several seconds later.
>
> A recording of the conversation has been reviewed by the Key West Citizen.

**(No. 20(a) at 989a)**

The second alleged defamatory statement attributed to Higgins is associated

12

with an article in the Washington Post on December 9, 2019, entitled, "Deputy told to act like a 'white supremacist' when stopping black murder suspect".  Plaintiff alleges she was defamed because:

> Higgins wanted Phelps dismissed from the agency.  The article quoted Higgins as saying, "Anyone who uses those words has no place in that department at that level."

**(No. 4, ¶ 99 at 89a-90a; No. 20(a) at 1064a)**

The final alleged defamatory statements attributable to Higgins occurred during an interview  with US 1 Radio on December 11, 2019.   She said:

> I heard the Sheriff say that he is not going to make a determination on whether or not to terminate Captain Phelps based on one complaint. Captain Phelps has an IA file that is over 600 pages long. She does not have an exemplary record and she has had at least one prior complaint for race discrimination. It was several years ago at the Sheriff's Department. The Sheriff's Internal Affairs division found that it was unfounded, but for the Sheriff to say that this was based on one complaint about Penny Phelps's behavior is simply outrageous."

**(No. 20(a) at 1017a)**  The second comment Higgins made in the interview was:

> We don't feel that she had any probable cause whatsoever. What Penny Phelps did was botch this investigation. She created a story in her mind and manufactured the evidence to fit her narrative. The actions of Penny Phelps, in my opinion, are criminal. And, for this to be taken lightly and suggested that it's just one complaint over a poor choice of words is really despicable.

13

**(No. 20(a) at 1018a).**

The first statement attributable to Tucker  was contained in a Facebook post on December 7, 2019 where he said:

> I'm happy she's finally being outed and yeah the racist set up is bad but setting someone up for murder is so much worse.

**(No. 4, ¶ 104 at 90a).**  He made a second post that day where he said:

> While they did release the audio of her racist bullshit, they seem to have left out the parts where she was setting me up ...

**(No. 4, ¶ 105 at 90a)**  A third post followed which stated:

> [O]ne of the things she's in trouble for is telling a deputy to play a neo-nazi, racist cop to illegally pull Rory over on his bike.

**(No. 4, ¶ 106 at 90a)**

On December 11, 2019, Tucker posted on Facebook:

> My only real criticism is of the expert who says her actions were 'probably legal'.  While the acting like a racist may be legal, telling the officer to pull him over for some imagined infraction, is not.  Once again, this is the least of what Captain Phelps did wrong in this case but hopefully this topic will shed light on her many other acts of misconduct, namely framing me for murder.

**(No. 4, ¶ 109 at 91a)**

On December 13, 2019, Tucker posted on Facebook:

14

> I'd love to see her not only fired but charged criminally for setting me up.

**(No. 4, ¶ 125 at 93a)**

On December 14, 2019, Tucker posted on Facebook:

> Hopefully she'll be charged criminally for that shit she did to me.!!"

**(No. 4, ¶ 127 at 93a)**

On December 20, 2019, Tucker and Jenai appeared on the Sean Hannity radio program with Jonathan Gilliam hosting. **(No. 4, ¶ 138 at 95a)** During that program, Tucker, without mentioning Phelps, discussed how he was arrested for being white and living in the same building with a suspect, as well as how video had been manipulated. **(No. 20(b) at 1081a)** Tucker then notes that Phelps is recorded interviewing Rory Wilson and the video cuts out before returning with three minutes missing. **(No. 20(b) at 1082a)** He further notes that he made an internal affairs complaint against Phelps, and others, and noted that Phelps got in trouble for "racially motivated comments" and she directed officers to make illegal stops. He confirmed that Phelps had been terminated. **(No. 4, ¶ 141 at 95a; No. 20(b) at 1082a-1083a)**

On December 20, 2019, Tucker appeared on his YouTube channel and indicated that Phelps had instructed an officer to make an illegal stop. **(No. 4, ¶ 143 at 96a)**

15

On November 23, 2020, Tucker was interviewed along with Jenai and wore a shirt that said "Not Guilty". Tucker said, " If we declared ready for trial today, there is no way the prosecution would be ready. They don't have a case." **(No. 4, ¶ 151 at 96a)**

Higgins, Jenai and Tucker submit that the court properly dismissed Counts III and VII and properly granted summary judgment as to the defamation claims (V, VI & VII) and civil conspiracy (IX).

## SUMMARY OF ARGUMENT

Phelps has asserted that Cara Higgins caused her damage by violating the Law Enforcement Bill of Rights; Interfered with her Business Relationship with the Monroe County Sheriff's Department; Defamed her and was part of a Civil Conspiracy with Lauren Jenai and Franklin Tucker. Phelps alleges that Jenai and Tucker Interfered with her Business Relationship with the Monroe County Sheriff's Department, Defamed her and was part of a Civil Conspiracy with Higgins and one another. There is no merit to Phelp's claims.

Higgins is an attorney that was retained to represent Franklin Tucker, who was charged with, among other things, the murder of Matthew Bonnet. Tucker was held in pretrial detention for the better part of two years. During the course of her representation, Higgins was provided discovery. She was provided with a recording wherein Phelps suggested to a white subordinate that he should stop an African American individual and act like a neo-Nazi and white supremacist. The purpose of the stop was purportedly to identify the subject. In addition, additional recordings were obtained wherein the Phelps was conducting interviews and compelling them to identify Tucker. Phelps understood her conduct was suspect, at one point acknowledging if a witness did not identify Tucker, she was in trouble. Higgins and Tucker found the investigation to be an abomination and Tucker believed he had been

"set up" by Phelps. Lauren Jenai, an old friend of Tucker's became involved and was equally appalled by the conduct of the Monroe County Sheriff's Department and the State's Attorney's Office.

Higgins, as was her obligation, utilized the material provided in the defense of Tucker. She, along with Tucker, made various complaints to the Monroe County Sheriff's Office concerning Phelps' conduct and that of other investigators in the case. Those complaints were investigated. One of the those complaints involved Phelps directing her subordinate to act like a neo-Nazi and white supremacist. The claim was sustained and Phelps' position with the Sheriff's Department was terminated. Phelps does not deny making the statements since they were recorded. She justified them as a ruse. The Sheriff was clear that in these times, that type of behavior was unacceptable.

Florida jurisprudence has maintained for forty years that there is no action for damages for a violation of the Law Enforcement Bill of Rights. The courts have allowed officers to bring claims for defamation or other claims when warranted. Higgins did nothing to violate the statute. The court correctly dismissed Count III as to Higgins.

The District Court was correct to dismiss plaintiff's claim for Interference with Business Relations. The parties were entitled to bring to the attention of the Sheriff's

Office the conduct of his subordinates, to include Phelps. The District Court noted that Plaintiff failed to allege in her complaint that they failed to follow proper channels to do so when dismissing this count without prejudice. Plaintiff never amended her complaint to allege facts to support such a claim. The conduct of the defendants going to the press cannot constitute a cause of action of this type. There was no information that was provided to the Sheriff through the newspapers or other publications that he did not have and properly investigate. The Sheriff ultimately fired Phelps for her acknowledged comments. The District Court properly granted Defendant's motion to dismiss.

Defendants did not defame Phelps. Phelps was a public figure and as such had to establish "actual malice". Jenai never mentioned Phelps or even alluded to her. She spoke about the entire department. Higgins comments were absolutely true or expressions of opinion. Clearly she believed what she said. There was absolutely no evidence to suggest that the statements were untrue or Higgins had reason to believe they were untrue. Finally, Tucker made a number of statements. The statements were those of an individual that believed was being "set up" for murder based upon the discovery provided to him. He believed, contrary to Phelps suggestion, that the stop of Wilson would have been illegal. Once again the court was correct in finding that Phelps produced no credible evidence that Tucker did not believe what he was saying

19

or made the statements with an awareness that they were untrue.  Tucker, to this day, believes the statements are true.

In the absence of a viable cause of action, there can be no civil conspiracy in Florida.  It is not a standalone cause of action.  The court properly dismissed that count of plaintiff's complaint as well.

## ARGUMENT

I.    **THE TRIAL COURT CORRECTLY DETERMINED THAT PLAINTIFF COULD NOT MAINTAIN AN ACTION FOR DAMAGES FOR A VIOLATION OF THE LAW ENFORCEMENT OFFICERS BILL OF RIGHTS.**

STANDARD OF REVIEW: The trial court granted defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). The standard of review is *de novo*.

In Count III of the amended complaint, Phelps contended that Higgins violated her rights as a law enforcement officer under *Fla. Stat. §§ 112.533(2)(a)* and *112.533(4)*. **(111a; ¶¶ 269 - 272; 275-277)** Specifically, Phelps claims that Higgins violated her rights by: (1) using the October 4, 2019 memorandum provided to her by the Sheriff's Office to her client's advantage by attaching the memorandum to a motion and by disclosing it to the media. **(No. 4 at 110a - 111a, ¶ 268- 270)** Phelps further makes that vague allegation her rights were violated by the disclosure of unspecified "information" and "matters" to the media and other undefined "sources of publication**." (No. 4 at 111a, ¶ 271-276)**

Initially, Higgins would note that Phelps never made a claim against her for a violation of *Fl. Stat. 112.532*. The allegations associated with that statute were directed at Sheriff Ramsay. The claims made against Higgins **is she attached** a

21

memorandum from the Sheriff to a motion which Phelps maintains was confidential **(No. 4 at 111a; ¶ 269-270)**; she disclosed the memorandum to media outlets **(No. 4 at 111a; ¶ 272)**; Higins discussed information that was part of a confidential investigation with various publications. **(No. 4 at 111a, ¶ 276)** *Fl. Stat. 112.533(4)* does not provide remedy for a violation. It indicates that anyone who "willfully discloses any information .... commits a misdemeanor of the first degree, ...". **(No. 4 at 110a, ¶ 267)** Higgins denies any violation this or any other statute, but submits that even if the court accepted the allegations as true, the statute offers Phelps no remedy for damages.

Higgins is not part of any law enforcement agency. In addition, there is no allegation that Higgins obtained the October 4, 2019 memorandum unlawfully; to the contrary, according to plaintiff's complaint, the memorandum was given to Higgins by the Sheriff's Office. **(No. 4 at 111a; ¶ 68)** Higgins is not subject to the procedural statutes regarding internal affairs investigations because she is not part of the Sheriff's Office and because any information provided to her was in connection with the criminal case, not the internal affairs investigation.

Contrary to Phelps' assertions, *Fla. Stat. §112.532(3)*, commonly known as the Policeman's Bill of Rights, does not provide for a private cause of action against individuals such as Higgins. It provides:

22

> (3) Civil suits brought by law enforcement officers or correctional officers. Every law enforcement officer or correctional officer shall have the right to bring civil suit against any person, group of persons, or organization or corporation, or the head of such organization or corporation, for damages, either pecuniary or otherwise, suffered during the performance of the officer's official duties, for abridgment of the officer's civil rights arising out of the officer's performance of official duties, or for filing a complaint against the officer which the person knew was false when it was filed. This section does not establish a separate civil action against the officer's employing law enforcement agency for the investigation and processing of a complaint filed under this part.

Phelps wishes to set aside a body of law which has existed in the State of Florida for over forty years. She cites to *Mesa v. Rodriquez,* 357 So. 2d 711 (Fla. 1978) for the proposition that the Florida Supreme Court recognized a cause of action against a private citizen for a violation of *Fl. Stat. § 112.532. Mesa* did not indicate that a plaintiff could bring a private cause of action for a violation of the statute. The Supreme Court of Florida concluded that the statute was not unconstitutional and remanded to the trial court **to allow Mesa to bring common law claims for defamation**. *Mesa, supra, at 713.*

The trial court in this matter agreed with the body of law established by this court and Florida appellate courts. The remedy provided in the statute for a violation thereof is exclusive and does not authorize an action for damages. *Miami v. Cosgrove,*

23

516 So.2d. 1125, 1127 (Fla. 3rd DCA 1987); *Bailey v. Bd. Of County Comm'Rs*, 659 So. 2d 295, 301 (Fla. 1st DCA 1994). In *Cosgrove,* Plaintiff, Assistant Chief of Police, Michael M. Cosgrove was removed from his position without notice or statement of reasons and returned to his permanent civil service rank as police captain. He sued the City of Miami for damages claiming that the city had violated his rights under *Fla. Stat. § 112.532 et seq.* and was awarded a money judgment. In reversing the judgement for damages, the Third District held that the only remedy provided in *Fla. Stat. §112.534* was a suit for an injunction and not an action for damages. *Cosgrove*, at 1127.

It should be noted that *Fla. Stat. §112.534* was amended after *Cosgrove* was decided and the exclusive remedy was changed from injunctive relief to a process for compliance review. The statutory change does not alter the holding in *Cosgrove* however and *Fla. Stat. §112.534* still does not authorize the private cause of action claimed by Phelps. *See*, *McQuade v. Fla. Dep't. Of Corr.*, 51 So. 3d 489, 495 (Fla. 1st DCA 2010).

Plaintiff filed a motion for reconsideration of the trial court's order arguing that the statute had been changed and that the change was not considered by the court in making it's ruling. In the decision rejecting reconsideration, the court noted that the "Middle District of Florida expressly found that the 2009 amendments do not affect

24

the analysis." *Adamson-James v. Fla. Dep't of Corr.*, No.: 6:11-cv-628-Orl-26TBS, 2013 WL 1968499, at 9 (M.D. Fla. May 13, 2013).  It went on to say the amendments narrowed not expanded, the statute.  **(No. 11, Court's Opinion at 249a)**

Phelps chooses to ignore the clear authority in the Eleventh Circuit that the Law Enforcement Bill of Rights does not permit a private cause of action.  In <u>*Diaz v. Miami-Dade Cty., 849 F. App'x 787, 793 (11th Cir. 2021)*</u>, the court stated:

> However, courts have found that <u>*section 112.532*</u> does not create a private right of action for money damages. *See City of Miami v. Cosgrove, 516 So. 2d 1125, 1127 (Fla. Dist. Ct. App. 1987)* (per curiam) (finding that <u>*section 112.534*</u> provides the only express remedy for alleged violations of <u>*section 112.532*</u>, and "[c]learly, <u>*Section 112.534*</u> provides only for a suit for an injunction, not a suit for damages"). In *Kamenesh v. City of Miami*, the District Court for the Southern District of Florida found "that the holding in *Cosgrove* was intended to quash all suits for damages under <u>*§ 112.532*</u>," whether against a municipality or a defendant in his individual capacity. <u>*772 F. Supp. 583, 593 (S.D. Fla., 1991)*</u> (abrogated on other grounds).
>
> Therefore, because "[t]he sole remedy provided for in <u>*§ 112.534*</u> is injunctive relief," case law precludes Diaz's claim for money damages against Rosen. *See id.*

While unpublished opinions are not binding precedent, they are persuasive authority. See 11th Cir. R. 36-2.

Phelps has not cited the court to a single case which has allowed the plaintiff to recover monetary damages for a violation of *§112.532*.  Higgins however can cite to

*Gray v. Rodriguez,* 481 So. 2d 1298 (Fla. 3rd DCA 1986), *Diaz v. Miami-Dade County,* 424 F. Supp. 3d 1345 (S.D. Fl. 2019), *affirmed,* 849 F. App'x 787 (11th Cir. 2021), an action for money damages and *Fiedor v. Florida Dep't of Fin. Servs.,* 2018 U.S. Dist. LEXIS 197929, 2018 WL 6495194, *2 (N.D. Fla. Sept. 4, 2018).   The Fiedor court referenced *FOP, Gator Lodge 67 v. City of Gainesville,* 148 So. 3d 798, 802 (Fla. 1st DCA 2014) which noted the amendment and stated:

> Prior to 2009, a law enforcement officer or correctional officer who was injured by his or her employing agency's failure to comply with the LEO Bill of Rights could petition the circuit court for an injunction to "restrain and enjoin such violation" and to "compel the performance of the duties imposed by [the LEO Bill of Rights]." § 112.534(1), Fla. Stat. (2008). Effective July 1, 2009, this broad judicial remedy was replaced with a multi-step process culminating in a "compliance review hearing" before an administrative panel with the authority to award only limited relief: removal of the investigator from further involvement with the investigation of the officer. See Ch. 2009-200, § 3, Laws of Fla. (amending section 112.534).

Contrary to Phelps' assertion, the removal of the language for an injunction does not permit monetary relief but replaced the injunctive relief with alternative relief which did not include a monetary recovery.

Phelps wants this court to find that this court, Florida appellate courts, and United States District Courts, including in this case, all were mistaken in their evaluation of the statutes.  As did the prior courts that addressed this issue, the trial

26

court correctly determined that Phelps could not establish a cause of action against Cara Higgins for a violation of the Police Officer's Bill of Rights.

## II. THE TRIAL COURT CORRECTLY DETERMINED THERE WAS NO CAUSE OF ACTION FOR INTERFERENCE WITH BUSINESS RELATIONS

STANDARD OF REVIEW: The trial court granted defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). The standard of review is *de novo.*

In Count VIII, Phelps alleged that Higgins, Tucker and Jenai tortiously interfered with the business relationship between Phelps and the Monroe County Sheriff's Office. **(No. 4 at 118a, ¶¶ 327-329)** The basis for the purported cause of action is the allegation that Higgins, Tucker and Jenai "...acted in a concreted (sic) fashion as part of "Project Mayhem" with the stated purpose of discrediting plaintiff and having her removed from her employment. **(No. 4 at 118a, ¶ 330)** The complaint described "Project Mayhem" as a plan by Tucker and Jenai (not Higgins) to file internal affairs complaints against Phelps and another detective**. (No. 4 at 83a, ¶¶ 45 - 47)** How Higgins became involved with "Project Mayhem," if in fact she was at all, was not specified in the complaint **(No. 4 at 83a, ¶¶ 44-45)** other than by implication and is simply based upon the fact that Higgins filed a complaint against Phelps for official misconduct that resulted in an internal affairs investigation.

27

Under Florida law, the elements of the tort of intentional interference with an advantageous business relationship are: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with that relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. *Nowik v. Mazda Motors of America (East), Inc.*, 523 So. 2d 769, 771 (Fla. 1st DCA 1988); *McCurdy v. Collis*, 508 So. 2d 380, 382-383 (Fla. 1st DCA 1987), *rev. den.*, 518 So. 2d 1274 (Fla. 1987). In order to maintain a cause of action against moving defendants under Count VIII, the alleged "interference" alleged by Phelps, must be found to have been "unjustified."

The trial court correctly found that as a matter of Florida law, the filing of an complaint against a police officer is not a tortious act. Florida courts have repeatedly held that citizens must be free to make complaints against government officials without fear of reprisal. In *Gray v. Rodriguez*, 481 So. 2d 1298 (Fla. 3rd DCA 1986), the plaintiff, Larry A. Gray ("Gray"), a Dade County police officer, had arrested the defendant, Dr. Roniel Rodriguez ("Rodriguez"), in connection with an alleged domestic disturbance. Rodriguez filed a grievance report with the Metropolitan Dade County Police Department claiming that Gray's actions in connection with the arrest constituted official misconduct. Gray obtained a favorable result from the Police

28

Internal Review Board and later filed a defamation suit against Rodriguez seeking damages for libel and slander under *Fla.Stat.. §112.532.* Rodriguez defended the action and was granted summary judgment from which Gray appealed. *Gray*, 481 So. 2d at 1298 - 1299.

The Third District affirmed the grant of summary judgment in favor of Rodriguez and held that a complainant has an "absolute constitutional right" to petition the government for the redress of grievances without fear of a retaliatory suit from the police. Id., at 1299. While a police officer also has the right to be protected from libel and slander, the legislature enacted *Fla. Stat. §112.532* to provide the administrative remedy for an police officer. The Court reasoned:

> The public's right is protected without fear of suit (if the *probata* fails to match the *allegata*) so long as the administrative procedure is followed. Otherwise, there would be not only a chilling effect on citizens' complaints but a freezing over.

*Gray*, at 1299.

Based upon the clear holding in *Gray*, where Higgins, Tucker and Jenai had an "absolute constitutional right to file complaints against Phelps, as a matter of law, the filing of complaints cannot be "unjustified"[4] and an essential element of a cause of

---

[4]Fla. Stat. §112.532 was specifically enacted as a means of determining whether the complaints made against Phelps by Higgins, Ticker and Jenai were justified, and the administrative process and the internal affairs investigations, as stated in plaintiff's complaint,

tortious interference with a business relationship is fatally lacking.  In addition, as a fair reading of Phelps' complaint makes plain, Phelps' lawsuit is precisely the type of retaliatory action prohibited by *Gray*.[5]  There are no allegations in plaintiff''s complaint that Higgins, Tucker and/or Jenai failed to follow proper procedures in filing the grievances against Phelps.  Phelps's allegation regarding the motivations of moving defendants are irrelevant and the fact that Tucker and Jenai put a name - "Project Mayhem" - on their intention to seek formal redress against Phelps for her official misconduct is similarly irrelevant under *Gray*.  Moreover, unlike Officer Gray, who was apparently exonerated by his department's internal affairs division, Phelps was disciplined and ultimately terminated after investigations by the Monroe County Internal Affairs of the complaints made by moving defendants determined that defendant's complaints had merit.  **(No. 4 at 93a, ¶ 126; 95a, ¶ 136)** Accordingly, based upon the allegations of the complaint, Higgins, Jenai and Tucker

---

determined that they were.

[5]The Third District, in *Gray*, cited *Mesa v. Rodriguez*, 357 So. 2d 711 (1978), which held that a police officer has a common law right to sue for damages and that F.S. §122.532(3) simply restates the common law right.  *Gray* however made it clear that a police officer cannot sue a citizen for damages arising out of a citizen's action in bringing a complaint for misconduct against a police office.  Count VI of the Phelps complaint is therefore absolutely barred under *Gray*.  The remaining and critical issue however is that even though Phelps may have a right to sue the defendants for alleged action other than for filing a grievance, Phelps's right to sue does not mean that she has legitimate causes of action against Higgins, Tucker and Jenai as purportedly stated in the complaint.  Phelps's causes of action set forth in Counts III, V, VI, VII, VIII and IX are legally barred and therefore fail to state a claim against moving defendants.

followed proper administrative procedures and properly filed complaints against Phelps for misconduct, the trial court correctly dismissed this count of the complaint.

Phelps seeks to resurrect this count of the complaint by referencing other paragraphs in the complaint. In many aspects they fail to reference specific paragraphs but instead identify a number of paragraphs, some that cite what they claim while others do not. In some cases, Defendants and the the court, must divine what plaintiff is referencing. An example of plaintiff paying fast and loose with citations is located in paragraph (b) of their brief on page 29. They say:

> October 3, 2019 - Higgins emailed McCullah, complaining about officers in the courtroom and blaming Phelps.

The complaint says:

> 60.    That Defendant Higgins further took photographs of the officers in attendance as they left the courthouse.

> 61.    That Defendant Higgins made an internal affairs complaint regarding the officers in the courtroom.

**(No. 4 at 85a)** Nowhere in the complaint does it say that Higgins blamed Phelps for the officers in the courtroom. To the extent Phelps wishes to refer to matters outside of the record in her brief, it is inappropriate as they previously cite to the standard on a motion to dismiss. In (a) she cites to paragraph 50 of the complaint wherein Tucker submitted his complaint to the Sheriff's Office. This is exactly the type of submission

protected by both *Mesa* and *Gray*.  In (c), Higgins disclosed the memorandum to news outlets.  That is not in the complaint.  The complaint notes Higgins attached the memorandum to a filing in the criminal case in the defense of Tucker. **(No. 4 at 86a, ¶¶ 69-70)** In (d, e, f, and g) Higgins communicated with the Sheriff's Office concerning the complaints she and her clients had with Phelps.  This is exactly the type of submission protected by both *Mesa* and *Gray*.  The balance of the allegations contained in the brief (h through p) are the basis for Phelps defamation claims.  More importantly, it is ridiculous to maintain that what Higgins, Jenai or Tucker may have posted to the public interfered with Phelps business relationship with the Sheriff.  Everything that was published was known to, and in the hands of, the Sheriff.  The "Sheriff terminated plaintiff for conidering using a ruse involving a deputy pretending to be a racist cop, ..." **(No. 4 at 97a, ¶ 157)** Phelps complaint failed to state a cause of action for tortious interference with a business relationship.

III. **THE TRIAL COURT CORRECTLY DETERMINED THAT NO CAUSE OF ACTION EXISTED AS TO HIGGINS, JENAI AND TUCKER FOR DEFAMATION.**

STANDARD OF REVIEW: The trial court granted defendants' motion for summary judgement pursuant to Fed. R. Civ. P. 56.  The standard of review is *de novo.*

The trial court went to great lengths to consider the arguments and factual

assertions of Phelps concerning her claims of defamation. The court identified each alleged defamatory statement that was to have been uttered. The court also considered "Project Mayhem" which is Phelps' principal argument in support of her appeal on the defamation claims. **(No. 32 Court's Opinion at 1987a-1991a)** Initially it must be noted that the court made clear that Phelps was arguing for the first time that the statements were defamation per se and allegations sufficient to support such claims were lacking in Plaintiff's Amended Complaint. **(No. 32 at 2010a)** Phelps does not appear to contest the court's determination on this point.

There is no question that Phelps was a public figure based upon her position as a high ranking official in the Monroe County Sheriff's Office. The court so found **(No. 32 at 2011a)** and Plaintiff does not contest that finding in her memorandum of law. **(Pb 45)** The court then went on an exhaustive analysis of Phelps' burden and her failure to meet it.

The trial court recognized that Phelps had the burden of establishing by clear and convincing evidence that the defendants published the statements with "actual malice", citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 2270, 279-80 (1964) **(No. 32 at 2011a)** The defendants had to know that the statements were false or with reckless disregard for the truth citing *Berisha v. Lawson,* 973 F.3d 1304, 1312 (11th Cir. 2020). Phelps had to show by clear and convincing evidence that defendants in

fact actually entertained serious doubts as to the truth of the publications. Phelps' entire case is based upon the premise that "Project Mayhem" was created to harm her. She does not establish that defendants "entertained serious doubts as to the truth of the publications". One can wish for a result based upon facts as they believe them to be. While it may be unusual to give your actions a name (Project Mayhem), it fails to establish actual malice on defendants' part. The trial court was not impressed with the conclusory statements of the Phelps. The trial court correctly noted that plaintiff offered nothing factually to support her position. The only argument the court could discern involved Tucker which will be discussed after Jenai and Higgins.

The fallacy of plaintiff's position that "Project Mayhem" essentially establishes malice is best illustrated with regard to Lauren Jenai. The first statement attributable to Jenai was contained in the NEW Key West Paper, also known as The Blue Paper published on October 19, 2019 and states:

> "I looked into the case", says Lauren. "The reports said Ty was on surveillance video - he was not. The reports said a lot of things that ended up not being true. And when I saw there was absolutely no credible evidence against him, I became 100% sure of his innocence"

**(No. 4, ¶ 71 at 86a; No. 20(b), Jenai's declaration ¶ 1 at 1066a and 1071a)**

The second alleged defamatory statement attributed to Lauren Jenai was contained in the New York Times and states:

34

> I think the bigger story here is really about a very corrupt police department and prosecutor's office in a very small town. Basically, they've been getting away with this kind of thing for years, because mostly they're picking on poor people and homeless people, and they count on the fact that nobody's going to come and look into what they're doing.

**(No. 4, ¶ 107 at 91a)**

The third alleged defamatory statement attributed to Lauren Jenai was made during the Sean Hannity radio program when Ms. Jenai and Mr. Tucker were interviewed by Jonathan Gilliam. **(No. 4, ¶ 138 at 95a)** Ms. Jenai made the following statements during that program:

> Thank you Jonathan. I heard that Ty got arrested. I immediately looked into the case and saw that it it was apparent he had been um named as a suspect due to association with another suspect he was ID'd by one of the victim. Right from the bat it has been a really interesting story and has been fascinating in a terrible way to see how the system has been broken down here in Key West.

**(No 20(b), ¶ 3 at 1067a)**

The last defamatory statement alleged is Lauren Jenai appeared in the New York Post on November 23, 2020 and said, "What if somebody framed me for murder and there was nobody to help?" **(No. 4, ¶ 152 at 96a; No. 17, ¶ 33 at 909a; No. 20(b), ¶ 3 at 1067a)**

Jenai never mentioned Phelps by name, rank or any other identifier. She made

general statements about a police department and prosecutor's office. In short, she said absolutely nothing that could be contrued as about Phelps or defamatory in any respect.

The plaintiff has alleged that Cara Higgins made defamatory statements that are actionable. The first statement attributable to Higgins was contained in a Facebook post on December 7, 2019 where she said:

> "I want you to be the neo-Nazi picking on the black guy on the bike." This is how a Captain at the MCSO directs her subordinates to act. Like neo-Nazis. A prosecutor who lies and hides evidence. A racist cop who thinks she is above the law. Why do they STILL have jobs?

**(No. 4, ¶ 89 at 88a)** The Facebook post linked the Florida Keys Citizen article, "Officials may lose jobs in the aftermath of murder case". The article is about the Assistant State Attorney then assigned to the case, Colleen Dunne, and Phelps, being removed from the case. The article notes that it had obtained and reviewed a recording where:

> In a recording entered into evidence in the Tree House case, Phelps can be heard using racially charged language in relation to a suspect in the case. Phelps can be heard telling another officer to act so overzealously that the black suspect will think "you are a white supremacist messing with a black guy riding a bike." The transcript seems to detail a tactic by Phelps to have deputies pull over the suspect on his bike under the ruse of a routine traffic stop when the real intent was to obtain a phone number and

other information and evidence.

"I want you to be the neo-Nazi picking on the black guy on the bike," Phelps said several seconds later.

A recording of the conversation has been reviewed by the Key West Citizen.

**(No. 20(a) at 989a)**

The Facebook post is not defamatory. The first sentence of the Facbook post is a quote from the news article linked to the post AND an accurate quote of what Phelps said on the recording. The second sentence is accurate and truthful. Phelps did direct her subordinate to "act" like a neo-Nazi. It goes on to say, "A racist cop who thinks she is above the law." Why do they STILL have jobs?". These comments constitute "pur opinion" or rhetorical hyperbole" and are protected by the law. In *Fortson v. Colangelo*, *434 F. Supp. 2d 1369, 1378 (S.D. Fla. 2006)*, the court stated:

> Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listeners a member of the public. *From v. Tallahassee Democrat, Inc., 400 So. 2d 52, 57 (Fla. 1ˢᵗ DCA 1981); see also Restatement (Second) of Torts § 566 (1977)* (describing pure opinion as "a comment as to plaintiffs conduct, qualifications or character").

There is no question that the statements made by Higgins is a comment or opinion based on facts in the article. She provided the reader with the article. The *Fortson*

matter clearly establishes that Higgins comments fall within the protected category.

Fortson was a professional basketball player that injured another player during the game. After the game was over, Jerry Colangelo, the Chairman and CEO of the Phoenix Suns called Fortson, among other things, a "thug". Fortson argued that the definition contained in the dictionary of "thug" was, [A] vicious criminal or ruffian." In granting Colangelo's motion for summary judgment, the court noted at least one court had found the term "thug" not to be defamatory. Higgins submits at least one court has found the term "racist" not to be defamatory finding it constituted pure opinion. See *Tillett v. BJ's Wholesale Club Inc.*, *2010 U.S. Dist. LEXIS 79443(M.D. Fla. 2010)*. Higgins was expressing her opinion on a topic of public importance concerning the removal of an Assistant State Attorney and Captain from the Monroe County Sheriff's Office from a high profile murder case being adjudicated in Key West. To allow plaintiff to recover for these comments would chill everyone's right to express themselves. The comments are simply not actionable.

The second alleged defamatory statement attributed to Higgins is associated with an article in the Washington Post on December 9, 2019, entitled, "Deputy told to act like a 'white supremacist' when stopping black murder suspect". Plaintiff alleges she was defamed because:

Higgins wanted Phelps dismissed from the agency. The

article quoted Higgins as saying, "Anyone who uses those words has no place in that department at that level.

**(No. 4, ¶ 99 at ; No. 20(a) at 1064a)**

The first statement is a fact but it is an absolutely true fact. Higgins wanted Phelps dismissed from the agency. It is not a statement as to Phelps conduct. It is Higgins expression of opinion that she wants Phelps terminated. The second sentence is equally an expression of an opinion. Higgins is commenting on the language used by Phelps being reported in the article and states that "**Anyone** who uses those words has no place in that department at that level". (Emphasis added). While it is true that the article references Phelps using the language, Higgins is expressing her opinion that people in her position that use that language should no longer be employed. It is inconceivable that the comment constitutes an untrue statement of fact about Phelps.

The final alleged defamatory statements attributable to Higgins occurred during an interview with US 1 Radio on December 11, 2019. She said:

> I heard the Sheriff say that he is not going to make a determination on whether or not to terminate Captain Phelps based on one complaint. Captain Phelps has an IA file that is over 600 pages long. She does not have an exemplary record and she has had at least one prior complaint for race discrimination. It was several years ago at the Sheriff's department. The Sheriff's Internal Affairs division found  that it was unfounded, but for the Sheriff to say that this was based on one complaint about Penny Phelp's behavior is simply outrageous,"

39

**(No. 20(a) at 1017a)**

Higgins said Phelps had an Internal Affairs file over 600 pages long. That is an absolutely true statement. **(No. 20(a), ¶¶ 20-21at 954a-955a; 1020a-1041a)** Higgins noted she had a prior complaint for race discrimination "several years ago" and it was determined to be unfounded. That is an absolutely true statement. **(No. 20(a), ¶ 20 b and c at 955a)** Higgins, commented on Sheriff Ramsay suggesting it was one incident was outrageous for the reasons noted. Furthermore, using the term outrageous concerning conduct is quintessential pure opinion or rhetorical hyperbole.

The second comment Higgins made in the interview was:

> We don't feel that she had any probable cause whatsoever. What Penny Phelps did was botch this investigation. She created a story in her mind and manufactured the evidence to fit her narrative. The actions of Penny Phelps, in my opinion, are criminal. And, for this to be taken lightly and suggested that it's just one complaint over a poor choice of words is really despicable.

**(No. 20(a) at 1018a)**

The comments made were pure opinion. It is what Higgins, and those associated with her, thought about Phelps and the investigation. It constituted her opinion as to the investigation and manner in which it was done. Finally calling Phelp's actions "criminal" are without question an expression of opinion which no reader could construe as anything else. Higgins says, "...in my **opinion**, are criminal." (Emphasis

40

added).

The plaintiff has alleged that Franklin Tucker made defamatory statements that are actionable. The first statement attributable to Franklin Tucker was contained in a Facebook post on December 7, 2019 where he said:

> I'm happy she's finally being outed and yeah the racist set up is bad but setting someone up for murder is so much worse.

**(No. 4, ¶ 104 at 90a)**

He made a second post that day where he said:

> While they did release the audio of her racist bullshit, they seem to have left out the parts where she was setting me up ...

**(No.4, ¶ 105 at 90a)**

A third post followed which stated:

> [O]ne of the things she's in trouble for is telling a deputy to play a neo-nazi, racist cop to illegally pull Rory over on his bike.

**(No.4, ¶ 106 at 90a)**

In responding to the allegations of defamation as to Higgins, defendants have outlined for the court the litany of Captain Phelps misconduct and efforts to create charges against Franklin Tucker and to convict him of those charges. They need not be repeated here. Suffice it to say, the statements made by Franklin Tucker were true.

41

Equally important is that the posts contained on Facebook also had reference to discovery in the case. In addition to the Facebook page, Tucker had a YouTube channel and website which contained the bulk of the discovery provided by the State's Attorney's Office in an unedited fashion. The reader had available to them exactly what had been provided to Franklin Tucker by the State of Florida and placed everything into context. Tucker submits it also falls within the purview of rhetorical hyperbole. As the court has said in this regard:

> In determining whether [the defendant's] statement is entitled to protection as rhetorical hyperbole, we must consider the circumstances in which the statement was expressed.

*Horsley v. Rivera*, *292 F. 3d 695, 702 (11th Cir. 2002)*. In the matter before this court, Tucker was charged with a murder he adamantly denied committing. Florida has conceded two significant motions which Phelps was involved in in the underlying action.

On December 11, 2019, Tucker posted on Facebook:

> My only real criticism is one of the expert who says her actions were 'probably legal'. While the acting like a racist may be legal, telling the officer to pull him over for some imagined infraction, is not. Once again, this is the least of what Captain Phelps did wrong in this case but hopefully this topic will shed light on her many other acts of misconduct, namely framing me for murder.

42

**(No. 4, ¶ 109 at 91a)**

On December 13, 2019, Tucker posted on Facebook:

> I'd love to see her not only fired but charged criminally for setting me up.

**(No. 4, ¶ 125 at 93a)**

On December 14, 2019, Tucker posted on Facebook:

> "Hopefully, she'll be charged criminally for the shit she did to me !!"

**(No. 4, ¶ 127 at 93a)**

On December 20, 2019, Tucker and Jenai appeared on the Sean Hannity radio program with Jonathan Gilliam hosting. **(No. 4, ¶ 138 at 95a)** During that program, Tucker, without mentioning Captain Phelps, discussed how he was arrested for being white and living in the same building with a suspect, as well as how video had been manipulated. **(No. 20(b) at 1081a)** Tucker then notes that Captain Phelps is recorded interviewing Rory Wilson and then the video cuts out before returning with three minutes missing. **(No. 20(b) at 1082a)** He further notes that he made an internal affairs complaint against Captain Phelps, and others, and noted that Phelps got in trouble for "racially motivated comments" and she directed officers to make illegal stops. He confirmed that Phelps had been terminated. **(No. 4, ¶ 141 at 95a; No. 20(b) at 1082a-1083a)** No further comments are made about Phelps. Phelps cherry picks the

43

one sentence from a much broader conversation involving the case and the criminal justice system in Key West; Phelps said to make a "legal traffic stop" on the neo-Nazi recording. One has to be able to predict the future to know that the officer can make a legal stop. The clear import of the conversation was to get Rory Wilson's information. The legality of the stop was not significant. Everything Tucker said was true during that interview. Buried in the middle of a ten plus minute conversation, Tucker said "illegal" one time. It is simply ridiculous to say that the listener would form a negative connotation of Captain Phelps based upon that statement when there were any number of issues that were factually accurate.

On December 20, 2019, Tucker appeared on his YouTube channel and indicated that Phelps had instructed an officer to make an illegal stop. **(No. 4, ¶ 143 at 96a)** Tucker repeats the argument that Phelps could not predict the future so the legality of the stop was not her concern. In addition, the conversation was for the officer to act like a neo-Nazi or White Supremacist and make the stop. It is unreasonable to believe that any listener would hold Phelps in disrepute because of the suggestion she wanted an illegal stop to be made when she made far more significant racial comments. The court cannot forget that the Sheriff fired Phelps for the racial order. He never mentions the legality or illegality of the anticipated stop that was never made.

On November 23, 2020, Tucker was interviewed along with Jenai and wore a shirt that said "Not Guilty". Tucker said, "If we declared ready for trial today, there is no way the prosecution would be ready. They don't have a case." **(No. 4, ¶ 151 at 96a)** The statement does not relate to a person or even suggest a particular person. It makes an observation that the government cannot prove its case. It does not concern the plaintiff and is not actionable.

Phelps complaint identifies those statements she finds to be defamatory. Those allegations can be broken down into several categories: she is a racist cop, she directed a subordinate to make an "illegal stop", her internal affairs file and comments associated with it, she botched the investigation, she manufactured evidence to fit the narrative she had and that she set up Franklin Tucker.

Higgins and Tucker submit the statements that plaintiff is a racist are true. She directed a subordinate to act like a neo-Nazi or White Supremacist when stopping an African American suspect. **(No. 20a, ¶ 9 at 951a)** There was no reason for the "ruse" for the deputy to act in that way. There are any number of other things that could have been done absent acting in a racially offensive manner. For example, the police could have simply stopped everyone riding a bicycle and issued warnings irrespective of race. Defendants had more than simply the direction to a subordinate. Phelps had been investigated for racist conduct previously.  Furthermore, she had tried to have an

45

African American correction officer fired. **(No. 20(a), ¶ 12 at 952a)** They clearly did not act with "actual malice".

Phelps takes issue with Tucker saying on a number of occasions that Phelps directed a subordinate to make an "illegal" stop. The Phelps recording does indicate that Phelps told the officer to make a "legal"stop of Rory Wilson. The difficulty with Phelps direction is that Wilson had not done anything wrong or was there reason to believe he would. Phelps had to be able to predict the future for the deputy to make a legal stop. The deputy, at his Captain's direction is to obtain evidence for a murder investigation. It is inconceivable he would allow Rory Wilson to simply proceed unimpeded if he did not witness an infraction. Tucker's statement was eminently reasonable.

There is no question that Higgins' statements about Phelps internal affairs file were absolutely true. The file was over 600 pages. She had any number of complaints, some of which were sustained. Significantly she had been given a last chance agreement because just cause existed to terminate Phelps in 2010. She was given one last opportunity to comply with the Rules and Regulations of the Department **(No. 20(a), ¶ 20(d) at 954a; 1037a-1041a)** It was certainly fair comment to say her record was not exemplary.

The last group of comments concern Phelps "botching" the investigation

manufacturing evidence and "setting up" Tyrone Tucker. Phelps decided Tucker was responsible and manipulated the facts to support her theory. "Botched is defined as: unsuccessful because of being poorly done; spoiled by mistakes *Mirriam-Webster.com Dictionary, Mirriam-Webster*, https://www.merriam-webster.com/dictionary/botched. Phelps concluded Tucker was involved despite an eyewitness description not fitting Tucker's. **(No. 20(a) ¶ ¶ 25 & 27)** The depths she went to charge Tucker can be seen in her own words. When discussing a line up, she said " I hope Todd can ID him otherwise, Jesus Christ we are all in trouble". **(No. 20(a), ¶ 31 at 957a)** The witness she hoped would identify Tucker in fact indicated it was not him. **(No. 20(a), ¶ 32 at 957a and 1051a, lines 18-23)** She decided it was Tyrone Tucker based on a Facebook post of Tucker dressed for a Halloween event and utilized it to charge him with murder. **(No. 20(a), ¶ 33 at 958a, 968a & 969a, 1053a)** Phelps directed Tucker's arrest despite the lead detective maintaining they did not have probable cause. **(No. 20(a), ¶ 35 at 958a and 971a)** Pitcher believed Phelps told a witness what to say and had serious concerns about Phelps conduct in this investigation. Pitcher believed Phelps led Rory Wilson down a path when interrogating him. **(No. 20(a), ¶ 4 at 961a and 978a)**

Phelps argues there were material facts that the trial judge ignored. Nothing that she says were material to the court's disposition. As noted above, the court discussed "Project Mayhem" and explained how that was not sufficient to establish a factual

47

issue. In her memorandum to this court, she argues evidence of malice is, "Higgins unlawfully released the November 20, 2017 audio recording of Phelps' conversation, part of a confidential internal affairs investigation to the New York Times."[6] **(Pb 46)** How does releasing a recording of Phelps voice to a newspaper constitute a false statement let alone one Higgins knew to be untrue. To the extent Phelps is arguing that it shows malice, Phelps fails to tie it together. Is Phelps suggesting that because Higgins allegedly released the recording, she had malice. Phelps blends concepts in an effort to confuse the court. It is apparent that Higgins did not like Phelps conduct and believed action was warranted by the Sheriff. One might argue that Higgins did not like Phelps but that is not the same as malice for defamation purposes. Malice, in that context, is publishing something that the person **knows is untrue or probably not true.** (emphasis added) The recording was Phelps. It was definitively true.

The trial court said it far more eloquently than the defendants could:

> Plaintiff contends that proving actual malice, by its nature, involves questions of intent, and thus, the mere presence of such issues will always defeat summary judgment because intent is always a question for the jury. Plaintiff's reliance on this overstatement of the law is misplaced. Indeed, summary judgment is routinely granted where, as here, the plaintiff fails to put forth "evena scintilla of evidence-much less clear and convincing proof of-actual malice." *Grayson v. No*

---

[6]Higgins denies any unlawful conduct on her part and quotes Plaintiff's brief for the pruposes of this argument only.

*Labels, Inc.,* No. 6:20-cv-1824, 2022 U.S. Dist. LEXIS 96317, at *18 (M.D. Fla. May 20, 2022); *see, e.g., Medina,* 2003 U.S. Dist. LEXIS 4890, at *8 (granting summary judgment because "[w]hile it is true that City officials, such as the Police Chief made statements that stigmatized [plaintiff] to the media, Plaintiff has not produced any evidence to show that the City officials knew that they were false"); *Silvester,* 839 F.2d at 1499 (affirming district court's grant of summary judgment and quoting the district court's reasoning that "there is no evidence that defendants doubted the truth of" the alleged defamatory statements).

The only argument Plaintiff offers in support of actual malice pertains to Tucker's statement that Plaintiff instructed Deputy Malone to make an *illegal* stop. Plaintiff argues that Tucker knew this was a false statement because on the recording she says to act like a neo-Nazi, white supremacist and make a *legal* stop. However, merely because Plaintiff said to make a legal stop does not mean her ruse necessarily would have been conducted legally or more importantly that Tucker thought what Plaintiff said on the recording was legal. Tucker was aware that Plaintiff was terminated for giving that very instruction and believed Plaintiff was framing him for murder as part of what he viewed as a corrupt investigation. Furthermore, Tucker could not have knowledge of the legality of a stop that never occurred. Plaintiff does not put forth any evidence tending to show that Tucker in fact thought the proposed ruse was legal.

Beyond Plaintiff's own opinion that the various allegedly defamatory statements were false and part of a broad conspiracy to discredit her, she offers no evidence that the Individual Defendants entertained serious doubts or were highly aware that their statements were probably false. It is not enough to show the "existence of a false statement," the "failure to conduct a thorough and objective investigation," or even "ill will" on the part of a defendant. *Edward Lewis*

49

*Tobinick, MD v. Novella,* 848 F.3d 935, 946-47 (11th Cir. 2017). Plaintiffs failure to focus on whether or not the statements at issue were published with actual malice proves fatal to her claims. This Court finds, as a matter of law, that no jury could find by clear and convincing evidence the existence of actual malice in any of the statements at issue. Plaintiff makes a variety of arguments in an attempt to overcome the Individual Defendants' motion for summary judgment on the issue. None succeed. "Plaintiffs conspiracy theory falls far short of establishing actual malice by clear and convincing evidence." *Berisha v. Lawson,* 378 F. Supp. 3d 1145, 1161 (S.D. Fla. 2018), *aff'd,* 973 F.3d 1304 (11th Cir. 2020).

Plaintiff equates giving her all favorable inferences pursuant to the summary judgment standard as accepting everything plaintiff says as true and not having to put forth evidence sufficient to make out a case.  The court made clear that Phelps failed to present facts upon which a jury conclude that defendants' defamed her.  Phelps has offered nothing to this court to challenge that decision other than generalizations and innuendo.  As noted, that is not enough.  What has Phelps offered to this court by way of facts that would support the cause of action.  All they offer is generalities and conclusions.

## IV.    THERE CAN BE NO CIVIL CONSPIRACY

STANDARD OF REVIEW: The trial court granted defendants' motion for summary judgement pursuant to Fed. R. Civ. P. 56.  The standard of review is *de novo.*

Under Florida law, a civil conspiracy is not actionable by itself; there must be

a distinct civil wrong alleged to have been done pursuant to a conspiracy. *Loeb v. Geronemus*, 66 So. 2d 241, 243 (Fla. 1953); *Balcor Property Management v. Ahronovitz*, 634 So. 2d 277, 279 (Fla. 4th DCA 1994). Therefore where the acts of Higgins, Tucker and/or Jenai, as demonstrated, *supra*, cannot be the subject of a civil action for damages, the acts cannot be actionable if done in concert. *Fish v. Adams*, 401 So. 2d 843, 845 (Fla. Dist. Ct. App. 1981).

## CONCLUSION

The United States District Court for the Southern District of Florida correctly granted Defendant's motion to dismiss Count III of the complaint alleging that Cara Higgins violated Fl. Stat. 112.533 and Count VIII alleging Higgins, Jenai and Tucker interfered with Plaintiff's business relationship with the Sheriff. The Court was also correct to grant summary judgement to those individuals as to Counts V, VI and VII alleging defamation and Count VIII alleging a Civil Conspiracy.

Dated: August 23, 2023

Respectfully submitted,

By:   /s/ *Mark W. Catanzaro, Esquire*
MARK W. CATANZARO, ESQUIRE
Law Offices of Mark W. Catanzaro
21 Grant Street
Mt. Holly, New Jersey 08060
(609) 261-3400
Mark@catanzarolaw.com
*Attorneys for Dependants-Appellees*
*Higgins, Jenai and Tucker*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. App. P. 32(a)(7)(B) because it contains 12,302 words, excluding the parts of the brief exempted by 11th Cir. R. 32-4.  This brief further complies with typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirement of Fed. R. App. P. 32(a)(6) as counsel prepared the brief using proportionally spaced typeface with WordPerfect, in 14-point Times New Roman font.

Dated: August 23, 2023                                  Respectfully submitted,

                                                        By:  /s/ Mark W. Catanzaro, Esquire
                                                        MARK W. CATANZARO, ESQUIRE

                                                        Law Offices of Mark W. Catanzaro
                                                        21 Grant Street
                                                        Mt. Holly, New Jersey 08060
                                                        (609) 261-3400
                                                        Mark@catanzarolaw.com
                                                        *Attorneys for Dependants-Appellees*
                                                        *Higgins, Jenai and Tucker*

52

**CERTIFICATE OF SERVICE**

I hereby certify that on August 23, 2023, I presented the foregoing papers to the

Clerk of the Court for the filing and uploading to the Court's electronic filing system,

which will send notification of such filing to the following:

Victor J. Mastromarco, Jr.
Kevin J. Kelly
Rikki M. Mays-Reak
The Mastromarco Law Firm
1024 North Michigan Avenue
Saginaw, Michigan 48602
(989) 752-1414
*Attorneys for Plaintiff-Appellant*

David P. Reiner, II
Reiner & Reiner, P.A.
9100 S. Dadeland Blvd., Ste. 301
Miami, Florida 33156
(305)670-8282
dpr@reinerslaw.com
*Attorneys for Plaintiff-Appellant*

Jerome A. Ballarotto
143 White Horse Avenue
Trenton, New Jersey 08610
(609)581-9509
jabesquire@aol.com
*Attorneys for Dependants-Appellees Higgins, Jenai and Tucker*

Robert L. Norton
Brian Koji
Allen, Norton & Blue, P.A.
121 Majorca Ave., Ste. 300
Coral Gables, Florida 33134
(305) 445-7801
*Attorneys for Dependant-Appellee Ramsay*

Dated: August 23, 2023                    Respectfully submitted,
                                          By:   /s/ *Mark W. Catanzaro, Esquire*
                                          MARK W. CATANZARO, ESQUIRE

                                          Law Offices of Mark W. Catanzaro
                                          21 Grant Street
                                          Mt. Holly, New Jersey 08060
                                          (609) 261-3400
                                          Mark@catanzarolaw.com
                                          *Attorneys for Dependants-Appellees*
                                          *Higgins, Jenai and Tucker*