CASE NO. 23-11299-E

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

**PENNY PHELPS,**

Appellant,

vs.

**SHERIFF RICK RAMSAY, in his official and individual capacities,
CARA HIGGINS, LAUREN JENAI and FRANKLIN TUCKER,**

Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 4:21-cv-10070-JEM

---

**APPELLEE SHERIFF RAMSAY'S ANSWER BRIEF**

---

Brian Koji
Florida Bar No. 0116297
bkoji@anblaw.com

**ALLEN NORTON & BLUE, P.A.**
324 S. Hyde Park Ave., Suite 225
Tampa, Florida 33606
P: 813.251.1210 | F: 813.253.2006

**Case No. 23-11299-E**
**Phelps v. Ramsay, et al.**

# CERTIFICATE OF INTERESTED PERSONS
# AND CORPORATE DISCLOSURE STATEMENT

Appellee, Sheriff Rick Ramsay, individually and in his official capacity as Sheriff of Monroe County, Florida, by and through undersigned counsel and pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, hereby certifies that the following persons and entities have an interest in the outcome of this case:

1.  Allen, Norton & Blue, P.A. – Counsel for Appellee Ramsay

2.  Ballarotto Law – Counsel for Appellees Higgins, Jenai, and Tucker

3.  Ballarotto, Jerome A. – Counsel for Appellees Higgins, Jenai, and Tucker

4.  Becerra, Honorable Jacqueline – Magistrate Judge, United States District Court for the Southern District of Florida

5.  Catanzaro, Mark W. – Counsel for Appellees Higgins, Jenai, and Tucker

6.  Florida Sheriff's Risk Management Fund – Self-Insurance Pool Administrator

7.  Higgins, Cara – Defendant-Appellee

8.  Jenai, Lauren – Defendant-Appellee

9.  Kelly, Kevin J. – Counsel for Appellant

10. Koji, Brian – Counsel for Appellee Ramsay

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

11.   Law Offices of Mark W. Catanzaro – Counsel for Appellees Higgins, Jenai, and Tucker

12.   Martinez, Honorable Jose E. – District Judge, United States District Court for the Southern District of Florida

13.   Mastromarco, Jr., Victor J. – Counsel for Appellant

14.   Mays-Reak, Rikki M. – Counsel for Appellant

15.   Monroe County Sheriff's Office

16.   Norton, Robert L. – Counsel for Appellee Ramsay

17.   Phelps, Penny – Plaintiff-Appellant

18.   Ramsay, Rick, in his individual capacity and his official capacity as Sheriff of Monroe County, Florida – Defendant-Appellee

19.   Reiner, David P. – Counsel for Appellant

20.   The Mastromarco Firm – Counsel for Appellant

21.   Tucker, Franklin, Defendant-Appellee

No public traded company or corporation has an interest in the outcome of the case or appeal.

**Case No. 23-11299-E**
**Phelps v. Ramsay, et al.**

# STATEMENT REGARDING ORAL ARGUMENT

Sheriff Ramsay does not believe oral argument is necessary because this case does not involve complex or novel legal arguments or facts.

Case No. 23-11299-E
Phelps v. Ramsay, et al.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .......................................................... CS-1

STATEMENT REGARDING ORAL ARGUMENT ........................................... i

TABLE OF CITATIONS ........................................................................... v

STATEMENT OF THE ISSUES ............................................................... 1

    1.    Whether the District Court properly dismissed Phelps' claim alleging violations of Florida's Law Enforcement Officer's Bill of Rights after concluding that established Florida law does not recognize such a cause of action; ........................................... 1

    2.    Whether the District Court properly found that Sheriff Ramsay was entitled to absolute immunity from Phelps' defamation claim; ................................................................................. 1

    3.    Whether the District Court properly granted summary judgment to Sheriff Ramsay as to Phelps' discrimination claims after determining that Phelps was discharged for directing a subordinate deputy to act like a neo-Nazi white supremacist harassing a black man; and, ........................................... 1

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

4.    Whether the District Court properly granted summary judgment to Sheriff Ramsay on the basis of qualified immunity. ...............................................................................1

**STATEMENT OF THE CASE**...............................................................................**1**

I.    Nature of the Case, the Course of Proceedings, and Disposition in the District Court ...........................................1

II.    Statement of the Facts ...........................................................3

A.    Phelps' Career at the Monroe County Sheriff's Office. .............3

B.    The Treehouse Murder Investigation and Phelps' Inflammatory Racial Directive. ...................................5

C.    The Fallout from Phelps' Racially Inflammatory Directive and her Subsequent Discharge. ...................................8

III.    Standard of Review ...........................................................10

**SUMMARY OF ARGUMENT**...............................................................................**11**

**ARGUMENT** ...............................................................................**13**

I.    The District Court Properly Dismissed Phelps' Florida Law Enforcement Officers' Bill of Rights Claim Because Florida Law Does Not Recognize a Judicial Cause of Action for Alleged Violations of that Statute. ...................................13

**Case No. 23-11299-E**
**Phelps v. Ramsay, et al.**

II.    The District Court Properly Dismissed the Defamation Claim

Against Sheriff Ramsay on the Basis of Absolute Immunity. ............17

III.    The District Court Properly Granted Summary Judgment on

Phelps' Discrimination Claims Because She was not Treated

Less Favorable than Any Comparator and Because She was

Discharged For Legitimate, Non-Discriminatory Reasons. ...............22

    A.    Phelps cannot establish a *prima facie* showing as she

was not treated less favorably than a similarly situated

employee outside her protected class. ......................................23

    B.    Phelps was discharged from her employment based on

a legitimate, non-discriminatory reason, namely, her

actions in directing a subordinate to act like a Neo-Nazi

white supremacist harassing a black man. ...............................26

IV.    The District Court Properly Granted Summary Judgment to

Sheriff Ramsay on Phelps' Equal Protection Claim on the

Basis of Qualified Immunity. ...............................................................33

**CONCLUSION** ....................................................................................................**34**

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B)** ....................**35**

**CERTIFICATE OF SERVICE** ........................................................................**35**

Case No. 23-11299-E
Phelps v. Ramsay, et al.

# TABLE OF CITATIONS

**Page**

**CASES**

*Alfino v. Dep't of Health & Rehabilitative Servs.*, 676 So. 2d 447 (Fla.

5th DCA 1996) ............................................................................19

*Alvarez v. Royal Atlantic Developers, Inc*., 610 F.3d 1253 (11th Cir.

2010) ................................................................................. 28, 30

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 207 L.Ed.2d 218 (2020).....................23

*Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000)..........................27

*City of Miami v. Cosgrove*, 51 So. 2d 1125 (Fla. 3d DCA 1987) ............ 14, 15, 16

*City of Miami v. Wardlow*, 403 So. 2d 414 (Fla. 1981)..................................... 18, 19

*Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068 (11th Cir.

1995) ................................................................................. 23, 26

*Crowder v. Barbati*, 987 So. 2d 166 (Fla. 4th DCA 2008)....................................20

*Denney v. City of Albany*, 247 F.3d 1172 (11th Cir. 2001). ...................................27

*Diaz v. Miami-Dade Cnty.*, 849 F. App'x 787 (11th Circ. 2021)............. 14, 15, 16

*Earle v. Birmingham Bd. of Educ.*, 843 Fed. App'x 164 (11th Cir. 2021)

..........................................................................................24

*Ga. State Conf. of the NAACP v. City of LaGrange*, 940 F.3d 627 (11th

Cir. 2019)..................................................................................10

*Gogel v. Kia Motors Mfg. of Ga.*, 967 F.3d 1121 (11th Cir. 2020)........................11

v

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

*Grady v. Scaffe*, 435 So. 2d 954 (Fla. 2d DCA 1983) ..............................18

*\*Hauser v. Urchisin*, 231 So. 2d 6 (Fla. 1970).......................................18

*Kamenesh v. City of Miami*, 772 F. Supp. 583 (S.D. Fla. 1991) ..................... 14, 15

*Knight v. Starr*, 275 So. 2d 37 (Fla. 4th DCA 1973) ...............................20

*\*Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019) (en banc)......... 23, 24

*Marshall v. City of Cape Coral*, 797 F.2d 1555 (11th Cir. 1986) ..........................18

*Maynard v. Bd. of Regents*, 342 F.3d 1281 (11th Cir. 2003)..................................23

*Migliore v. City of Lauderhill*, 415 So. 2d 62 (Fla. 4th DCA 1982) ............... 16, 17

*Migliore v. City of Lauderhill*, 431 So. 2d 986 (Fla. 1983)....................................16

*Molinoes Valle Del Cibao, C. por A. v. Lama*, 663 F.3d 1330 (11th Cir.

2011) ............................................................................16

*Morris v. Town of Lexington*, 748 F.3d 1316 (11th Cir. 2014) ..............................33

*Mueller v. The Fla. Bar*, 390 So. 2d 449 (Fla. 4th DCA 1980)..............................20

*Rioux v. City of Atlanta*, 520 F.3d 1269 (11th Cir. 2008)................................. 25, 33

*Silvera v. Orange County School Board*, 244 F.3d 1253 (11th Cir. 2001)

..........................................................................26

*Stevens v. Geoghegan*, 702 So. 2d 517 (Fla. 2d DCA 1997)........................... 18, 19

*Walker v. Darby*, 911 F.2d 1573 (11th Cir. 1990)....................................11

*Williams v. Hous. Auth. of Savannah, Inc.*, 934 F. App'x 482 (11th Cir.

2020) ............................................................................30

Case No. 23-11299-E
Phelps v. Ramsay, et al.

## STATUTES

§ 112.531, Fla. Stat. .................................................................................2, 13

§ 112.533, Fla. Stat. ............................................................................. 13, 21

42 U.S.C. § 2000e-2(a)(l) ............................................................................23

## RULES

11th Cir. R. 26.1-1 .........................................................................................1

Fed. R. App. P. 26.1 ......................................................................................1

Fed. R. App. P. 32(a)(5)..............................................................................35

Fed. R. App. P. 32(a)(6)..............................................................................35

Fed. R. App. P. 32(a)(7)(B) .........................................................................35

Fed. R. App. P. 32(f)....................................................................................35

Fed. R. Civ. P. 56(a).....................................................................................11

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

# STATEMENT OF THE ISSUES

The issues presented for resolution in this appeal are:

1.    Whether the District Court properly dismissed Phelps' claim alleging violations of Florida's Law Enforcement Officer's Bill of Rights after concluding that established Florida law does not recognize such a cause of action;

2.    Whether the District Court properly found that Sheriff Ramsay was entitled to absolute immunity from Phelps' defamation claim;

3.    Whether the District Court properly granted summary judgment to Sheriff Ramsay as to Phelps' discrimination claims after determining that Phelps was discharged for directing a subordinate deputy to act like a neo-Nazi white supremacist harassing a black man; and,

4.    Whether the District Court properly granted summary judgment to Sheriff Ramsay on the basis of qualified immunity.

# STATEMENT OF THE CASE

I.    **NATURE OF THE CASE, THE COURSE OF PROCEEDINGS, AND DISPOSITION IN THE DISTRICT COURT**

In this case, Penny Phelps, a former captain with the Monroe County Sheriff's Office, sued Sheriff Rick Ramsay in his official and individual capacities. Phelps alleged that Sheriff Ramsay (1) violated her constitutional equal protection rights and Title VII by discharging her from her employment because of her gender and

**Case No. 23-11299-E**
**Phelps v. Ramsay, et al.**

her sexual orientation (Doc. 28, pp. 27-330); (2) violated her rights under Florida's Law Enforcement Officers' Bill or Rights, § 112.531 *et seq*., Fla. Stat., by disclosing confidential information obtained pursuant to an internal investigation and by failing to interview all pertinent witnesses during the internal investigation (Doc. 28, pp. 33-35); and, (3) defamed her by disclosing the existence of the internal investigation against her and by stating that the Sheriff's Office does not tolerate the type of racially inflammatory remarks that Phelps was accused of – and later admitted to – making. (Doc. 28, pp. 14, 17, 35-37).[1]

In response, Sheriff Ramsay asserted that he discharged Phelps, not because of her sexual orientation or gender, but because, by her own admission, she inexplicably directed a subordinate deputy to act like a white supremacist neo-Nazi "messing with the black guy riding the bike" while effecting a traffic stop. (Doc. 110, pp. 8-11; Doc. 111, pp. 3, 9-15; Doc. 142, p. 2). Phelps' racially charged comments were inadvertently recorded and, predictably, when they were publicly disclosed as part of discovery in an ongoing criminal case against Appellee Tucker, caused considerable outrage within the Monroe County community and beyond. (Doc. 110, pp. 8-9; Doc. 111, p. 12; Doc. 142, p. 2).

---

[1] Phelps also brought claims against individual defendants Cara Higgins, Franklin Tucker, and Lauren Jenai. (Doc. 28, pp. 33-35, 36-44). These claims are not the subject of the appeal against Sheriff Ramsay and, as such, are not discussed in this brief except as necessary to fully set forth Sheriff Ramsay's position.

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

With respect to her state law claims, Sheriff Ramsay contended that Florida law does not recognize a judicial cause of action for alleged violations of the Law Enforcement Officers' Bill of Rights and that the allegedly defamatory statements were protected by absolute immunity. (Doc. 30, pp. 4-6).

The District Court agreed with Sheriff Ramsay, determined that Phelps had not stated a plausible claim under Florida's Law Enforcement Officers' Bill of Rights or Florida defamation law, and dismissed those claims. (Doc. 49, pp. 7-10). Subsequently, the District Court granted summary judgment to Sheriff Ramsay as to Phelps' discrimination claims, finding that she was not treated less favorably than any similarly-situated comparators outside of her protected class and that her discharge was predicated on a legitimate, non-discriminatory reason, namely, her actions in "direct[ing] a subordinate officer to act like a neo-Nazi, white supremacist and harass a known African American suspect in connection with a high-profile murder investigation." (Doc, 164, pp. 20-30). This appeal followed.

## II.    STATEMENT OF THE FACTS

### A.    Phelps' Career at the Monroe County Sheriff's Office.

Phelps began her employment with the Monroe County Sheriff's Office in 2002 as a Captain in the Corrections Bureau under then Sheriff Richard Roth. (Doc 108-1, p. 9; Doc. 109, p. 1). Shortly thereafter, Phelps transferred into the role of Support Services Captain. (Doc. 108-1, p. 12; Doc. 109, p. 2). In that role, she

Case No. 23-11299-E
Phelps v. Ramsay, et al.

supervised numerous subordinate officers and oversaw various functions within the Sheriff's Office, including the Training Division, Internal Affairs, Professional Standards, Planning and Research, and Corrections Accreditation. (Doc. 108-1, pp. 12-15; Doc. 109, p. 2).

Years later, around 2010, then-Sheriff Robert Peryam determined it necessary to relieve Phelps from command, effectively taking away most of her supervisory responsibilities. (Doc. No. 108-1, p.14-16; Doc. 110, p. 2). As a result of Sheriff Peryam's decision, Phelps' span of supervision was reduced from 165 subordinates to only three. (Doc. 108-7, ¶ 5; Doc. 110, p. 2).

After having worked for the Monroe County Sheriff's Office for 25 years, Rick Ramsay was elected Sheriff in 2012. (Doc. 108-2, p. 5). At the time Phelps was hired as a Captain in 2002, Ramsay was also employed as a Captain in the Sheriff's Office. (Doc. 108-1, p. 11).

Throughout her employment with the Sheriff's Office, Phelps has been openly homosexual. (Doc. 108-1, pp. 10-11). Indeed, Ramsay has been aware of her sexual orientation since at least 2003 or 2004. (Doc. 108-1, p. 11; Doc. 109, p. 2).

After being elected Sheriff in 2012, Ramsay tapped Phelps to command the Support Services Division, resurrecting her managerial career and restoring her substantial supervisory span of control that had been taken away by Sheriff Peryam. (Doc. 108-1, pp. 16, 18-19, 21; Doc. 109, p. 2). In her role over Support Services,

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

Phelps supervised one-third of the Law Enforcement Bureau, including the Communications Center, the Criminal Intelligence Division, the School Resource Officers, the Traffic Division, the Civil Deputies, the Bomb Team, the Dive Team, the Aviation Team, and the Crisis Negotiators. (Doc. 108-1, p.16, 18-21; Doc. 109, p. 2). A few years later, in approximately 2015-2016, Sheriff Ramsay assigned Phelps the additional responsibilities of overseeing the Major Crimes and Narcotics Units. (Doc. 108-1, p. 21; Doc. 109, p. 2). Thereafter, in 2018, Sheriff Ramsay assigned Phelps even more responsibilities, including overseeing the High Intensity Drug Trafficking Area (HIDTA) Team and overseeing the design and construction of the firearm range. (Doc. 108-1, pp. 21-22; Doc. 108-7, ¶ 6; Doc. 109, p. 2).

### B. The Treehouse Murder Investigation and Phelps' Inflammatory Racial Directive.

In November 2017, Matthew Bonnett was murdered, and the case came to be colloquially referred to as the Treehouse Murder. (Doc. 108-1, p. 22; Doc. 109, p. 3). On November 20, 2017, Phelps discussed investigative strategy in the Criminal Investigations Office along with other members of her Major Crimes Unit. (Doc. 108-1, p.23-24). Unbeknownst to Phelps and her subordinates, the recording equipment in the adjacent interview room was left on following a witness interview and, as a result, their conversation was inadvertently recorded. (Doc. 108-1, pp. 24-27; Doc. 109, p. 3).

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

During the conversation, Phelps and her subordinates discussed options for obtaining the identification of a black male known only at the time as "Detroit." (Doc. 108-1, pp. 141, 146-47). To accomplish that objective, Phelps devised a plan in which a deputy would make a legitimate traffic stop while Detroit (later learned to be Rory Wilson) was riding a bicycle. (Doc. 108-1, p. 147). After being stopped, the deputy would obtain a fingerprint on a subsequently issued traffic citation, which could then be used to determine Detroit's identity. (Doc. 108-1, p. 147). While there is nothing inherently inappropriate about using a legitimate traffic stop to obtain a fingerprint, Phelps went further and inexplicably interjected an inappropriate racial directive into the plan. (Doc. 108-1, pp. 146-47). To that end, she telephoned Deputy Lee Malone and directed him:

> Just do this … hang out, make a traffic stop. If you do have a legitimate traffic stop, we'll have a road patrol deputy come over and meet you and you can write a ticket with road patrol deputy.
>
> I just need somebody that can be in the area Lee, and not leave, because I don't know when he's going to move or if he's going to move but I got to have a marked unit and the bearded dwarfs and David Smith have been told to keep you in their sights in case the traffic stop goes badly but to stay the hell away from the traffic stop because we don't want Detroit knowing that we know who the hell he is **we want it to look like you the grumpy old man … you have nothing better to do than … you know, you're the white supremacist you're messing with the black guy riding the bike**. (Doc. 108-1, p. 366-67).

Phelps continued, going so far as to direct Deputy Malone to be aggressive enough with Detroit such that he would file a citizen's complaint against the

Case No. 23-11299-E
Phelps v. Ramsay, et al.

Sheriff's Office: "[t]here you go … I just want you to be the neo-Nazi that's picking on the black guy riding the bike … get me a citizen's complaint … give me a citizen's complaint if you have to." (Doc. 108-1, p. 367).

The audio recording of Phelps' statements was later provided to the State Attorney's Office together with the other audio-recorded interviews from the investigation and was subsequently produced to Appellees Higgins and Tucker as part of the discovery in the criminal case against Tucker. (Doc. 108-1, pp. 29, 31; Doc. 109, p. 3).

Subsequently, at a status hearing on October 3, 2019 in the criminal case against Tucker, Phelps and more than 20 deputies crowded the courtroom, prompting Higgins to complain to the Sheriff's Office over concerns of intimidation. (Doc. 108-1, pp. 35-37, 224; Doc. 110, pp. 4-5). The following day, Colonel Louis Caputo directed a memorandum to Phelps advising her that, to avoid any appearance of impropriety, supervision of the criminal investigation against Tucker was being transferred to Major Chad Scibilia. (Doc. 108-1, p. 38, Ex. 2; Doc. 110, p. 5). Of note, the October 4, 2019 memorandum did not contain any information emanating from an ongoing internal affairs investigation. (Doc. 108-5, pp. 75-76; Doc. 110, p. 5).

In late October 2019, Higgins and Tucker reported a number of concerns to the Sheriff's Office Internal Affairs Unit about Phelps' conduct during the

Case No. 23-11299-E
Phelps v. Ramsay, et al.

Treehouse Murder investigation. (Doc. 108-1, p. 41; Doc. 110, p. 5). These concerns included, *inter alia*, Phelps' recorded statement to Deputy Malone directing him to act like a white supremacist, Neo-Nazi and harass Wilson as part of the traffic stop ruse to obtain his identification. (Doc. 108-1, p. 41; Doc. 109, p. 3; Doc. 110, p. 5).

### C.    The Fallout from Phelps' Racially Inflammatory Directive and her Subsequent Discharge.

Based on the concerns raised by Higgins and Tucker, an internal affairs investigation was conducted and concluded that Phelps violated Sheriff's Office policy by making the racially charged directive to Deputy Lee. (Doc. 108-1, pp. 41-42; Doc. 108-5, p. 27). After reviewing the investigation, both Major Scibilia and Colonel Caputo each recommended that Phelps be discharged. (Doc. 108-1, pp. 484-85; Doc. 110, p. 8).

In addition, the President of the South Florida Police Benevolent Association – the labor union that represents nearly all deputies employed at the Sheriff's Office – sent a letter to Sheriff Ramsay expressing serious concern about Phelps' conduct and its effect on the deputies. (Doc. 108-1, p. 481; Doc. 108-7, ¶ 12; Doc. 110, p. 8). In the letter, the PBA President stated that, based on the allegations against Phelps, "our members, and your employees as a whole, even those we do not represent, [are] entitled to a workplace free of [Phelps'] oversight in any capacity, including training." (Doc. 108-1, p. 481; Doc. 110, p. 8).

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

During that same time, an influential group of community leaders known as *Leadership Monroe County* informed Sheriff Ramsay that, due to Phelps' racial statements, the group no longer wanted her representing the Sheriff at their upcoming session. (Doc. 108-7, ¶ 12; Doc. 110, p. 9).

Likewise, the College of the Florida Keys advised Sheriff Ramsay that the College decided to revoke Phelps' longstanding teaching privileges and to banish her from teaching at the College due to her racial statements. (Doc. 108-7, ¶ 12; Doc. 108-2, pp. 54-57; Doc. 110, p. 9). Additionally, the Sheriff's Director of Human Resources, a black female, openly wept at the Sheriff's weekly staff meeting while describing feedback she received in the community regarding Phelps' conduct. (Doc. 108-7, ¶ 12; Doc. 108-2, pp. 54-57; Doc. 110, p. 9). Significantly, Phelps' conduct also received widespread negative attention on local, state, national, and international news coverage. (Doc. 108-1, pp. 434-74; Doc. 110, p. 9).

After reviewing the recommendations from Colonel Caputo and Major Scibilia, after considering the fallout amongst community leaders and the widespread negative media coverage, and after affording Phelps' a pre-disciplinary hearing opportunity, Sheriff Ramsay decided to discharge Phelps for making the inappropriate and inflammatory racial directive. (Doc. 108-1, pp. 67-68, 486-88; Doc, 108-2, p. 46; Doc. 108-7, ¶ 14). In that regard, Sheriff Ramsay testified, "[p]utting the racial component in this was totally unacceptable, was not needed, and

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

was not part of the [traffic stop] ruse." (Doc. 108-2, p. 35-36). He further elaborated:

> This particular case this was a bad call, bad decision, was not needed. It put the officer, Malone, in a terrible situation. It put the agency in a terrible situation. It went out to hurt this agency. There was no need for this and this component was not part of the [ruse]. The [ruse] was the traffic stop to identify the person to get his ID, his thumbprint. The other component I do not know why it was put in there, but it was not needed, not justified and would have – not have been authorized. (Doc. 108-2, p. 39).

Sheriff Ramsay appointed Patricia Thompson, a homosexual female, to fill Phelps' former position. (Doc. 108-1, pp. 48, 506).

At no point during the relevant events leading up to her dismissal did Phelps ever file a complaint with human resources alleging she had been discriminated against because of her sex and/or her sexual orientation. (Doc. 108-1, p. 82). To the contrary, in her each of her annual employee performance evaluations in the years prior to her discharge, Phelps expressly certified, "I have not been the subject of discrimination or harassment in the MCSO workplace." (Doc. 108-12, pp. 3-17).

## III.   STANDARD OF REVIEW

This Court employs de novo review of an order granting a motion to dismiss for failure to state a claim, accepting the complaint's allegations as true and construing them in the light most favorable to the plaintiff. *Ga. State Conf. of the NAACP v. City of LaGrange*, 940 F.3d 627, 631 (11th Cir. 2019).

Likewise, the Court reviews a grant of summary judgment de novo, viewing

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

the evidence in the light most favorable to the non-moving party. *Gogel v. Kia Motors Mfg. of Ga.*, 967 F.3d 1121, 1134 (11th Cir. 2020). Summary judgment is proper if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Gogel*, 967 F.3d at 1134 (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

## SUMMARY OF ARGUMENT

The facts in this case are undisputed. Phelps was recorded directing her subordinate, Deputy Lee Malone, to act like a neo-Nazi, white supremacist harassing a black man as part of a traffic stop aimed at obtaining the citizen's fingerprint. After Phelps' racially inflammatory directive came to light in 2019, the backlash and damage to the Sheriff's Office's reputation was swift and far reaching. Local groups immediately severed relationships with Phelps, while local, state, national, and international media castigated the Sheriff's Office.

Faced with those facts, Sheriff Ramsay made the difficult decision to dismiss Phelps. That decision was not taken lightly, as Sheriff Ramsay had championed Phelps' career and elevated her level of responsibility on several occasions since being elected in 2012. Those decisions by Sheriff Ramsay culminated in Phelps

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

becoming one of the highest ranking and most publicly visible members of the Sheriff's command staff, with responsibility for overseeing a large swath of operations and personnel.

Against this backdrop, Phelps is incredulous and claims that she did nothing inappropriate. As such, in her mind Sheriff Ramsay's decision must have been predicated on her gender and her sexual orientation, despite the fact that Sheriff Ramsay has long been aware of Phelps' openly homosexual sexual orientation while continuing to support her and advance her career.

Contrary to Phelps' allegations, the District Court properly determined that summary judgment in Sheriff Ramsay's favor was warranted as there were no factual disputes by which a reasonable jury could conclude that Phelps was discharged because of her gender or her sexual orientation. As the District Court aptly noted, Phelps has not "put forth a single shred of evidence tending to show her termination had anything to do with her gender or sexual orientation." (Doc. 164, p. 26).

Likewise, the District Court properly dismissed Phelps' state law claims. To that end, the District Court applied decades of Florida law in finding that Florida's Law Enforcement Officers' Bill of Rights does not provide a private cause of action permitting officers to sue their employers for alleged violations. Indeed, the Florida Supreme Court, the Florida intermediate appellate courts, and this Court have all so held. Phelps' argument that this legion of case law was erroneously decided and

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

should be cast aside is unavailing.

Finally, the District Court's determination that absolute immunity precluded Phelps' defamation claim against Sheriff Ramsay should also be affirmed. Florida law is clear that statements of the kind made by Sheriff Ramsay, in which he merely advised the media that an investigation was ongoing, are within the scope of his official duties and are therefore cloaked with absolute immunity.

# ARGUMENT

## I. THE DISTRICT COURT PROPERLY DISMISSED PHELPS' FLORIDA LAW ENFORCEMENT OFFICERS' BILL OF RIGHTS CLAIM BECAUSE FLORIDA LAW DOES NOT RECOGNIZE A JUDICIAL CAUSE OF ACTION FOR ALLEGED VIOLATIONS OF THAT STATUTE.

In her First Amended Complaint, Phelps alleged violations of the Florida Law Enforcement Officers' Bill of Rights, §§ 112.531-.36, Fla. Stat. (2019). (Doc. 28, ¶¶ 264-281). In particular, she contended that the release of the October 4, 2019 memorandum between Colonel Caputo and Phelps – in which Caputo transfers responsibility for the Treehouse Murder investigation to Major Scibilia – violated Section 112.533(4) of the Florida Statutes. (Doc. 28, ¶¶ 267-68). Phelps also alleged that the Sheriff's Office internal investigation into her racially inflammatory directive was deficient in that it failed to interview all relevant witnesses and gather all necessary evidence. (Doc. 28, ¶ 273).

Sheriff Ramsay moved to dismiss these claims on the basis that well-settled

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

Florida law has consistently held that the Law Enforcement Officers' Bill of Rights does not provide a cause of action permitting an officer to sue her employer. (Doc. 30). The District Court agreed and dismissed these claims. (Doc. 49, pp. 7-8). That order should be affirmed because the statute expressly states that it does not provide a viable cause of action in these circumstances and the Florida courts have unanimously concurred.

Turning first to the statutory language, the Law Enforcement Officers' Bill of Rights states:

> Every law enforcement officer or correctional officer shall have the right to bring civil suit against any person, group of persons, or organization or corporation, or the head of such organization or corporation, for damages, either pecuniary or otherwise, suffered during the performance of the officer's official duties, for abridgment of the officer's civil rights arising out of the officer's performance of official duties, or for filing a complaint against the officer which the person knew was false when it was filed. **This section does not establish a separate civil action against the officer's employing law enforcement agency for the investigation and processing of a complaint filed under this part.** § 112.532(3), Fla. Stat. (Emphasis added).

Unsurprisingly, the courts – including this Court – have consistently reached the same conclusion. *Diaz v. Miami-Dade Cnty.*, 849 F. App'x 787, 793 (11th Circ. 2021); *City of Miami v. Cosgrove*, 51 So. 2d 1125, 1127 (Fla. 3d DCA 1987); *Kamenesh v. City of Miami*, 772 F. Supp. 583, 593 (S.D. Fla. 1991) (abrogated on other grounds). In *Diaz*, this Court stated:

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

Courts have found that section 112.532 does not create a private right of action for money damages. *See City of Miami v. Cosgrove*, 516 So. 2d 1125, 1127 (Fla. Dist. Ct. App. 1987) (per curiam) (finding that section 112.534 provides the only express remedy for alleged violations of section 112.532, and "[c]learly, Section 112.534 provides only for a suit for an injunction, not a suit for damages"). In *Kamenesh v. City of Miami*, the District Court for the Southern District of Florida found "that the holding in Cosgrove was intended to quash all suits for damages under § 112.532," whether against a municipality or a defendant in his individual capacity. 772 F. Supp. 583, 593 (S.D. Fla., 1991) (abrogated on other grounds).

Therefore, because "[t]he sole remedy provided for in § 112.534 is injunctive relief," case law precludes Diaz's claim for money damages against Rosen. *See id.* Count 4 was therefore properly dismissed by the district court.

*Diaz*, 849 Fed. Appx. At 793. *Cosgrove* is an accord: "Clearly, Section 112.534 provides only a suit for an injunction, not for an action for damages."[2] 516 So. 2d at 1127.

Attempting to circumvent the holdings of these cases, Phelps argues that this entire body of case law amounts to an erroneous interpretation of Florida law and should be disregarded. Phelps' strained argument in that regard is unpersuasive. As the launching point for her arguments, Phelps contends that "[t]he Florida

---

[2] It should be noted that the Law Enforcement Officers' Bill of Rights was amended after *Cosgrove* to remove the injunctive remedy in favor of a more comprehensive administrative procedure for remedying alleged violations. § 112.534, Fla. Stat. Importantly, although this administrative procedure was substituted in place of injunctive relief, the amendment did not add any language providing for the availability of monetary relief or otherwise recognizing a private judicial cause of action against an officer's employer.

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

intermediate appellate courts' erroneous interpretation of the Law Enforcement Officers' Bill of Rights begins with *Migliore v. City of Lauderhill*, 415 So. 2d 62 (Fla. Dist. Ct. App. 1982), *approved* 431 So. 2d 986 (Fla. 1983)." (Phelps' Initial Brief, p. 19). The intermediate appellate court's decision in *Migliore* held, *inter alia*, that the plaintiff was preluded from suing his employer for reinstatement and backpay and was instead limited to pursuing the employer's administrative appeal procedure. 415 So. 2d at 65.

Notwithstanding Phelps' striking claim that the intermediate appellate court got it wrong in *Migliore*, the Florida Supreme Court specifically approved the result and adopted its rationale. 431 So. 2d 986. In that respect, the Supreme Court held, "We agree with the decision of the district court in *Migliore* [and] adopt its opinion as our own[.]" *Id*.

As for *Cosgrove's* equally unambiguous holding that Section 112.534 "provides only a suit for an injunction, not for an action for damages[,]" Phelps simply waves away this holding (and *Diaz's* subsequent reliance on it) on the premise that the court reached that conclusion "without any real statutory analysis." (Phelps' Initial Brief, p. 19).

As Phelps notes, when interpreting Florida law, this Court is bound to follow the Florida Supreme Court whenever it "has spoken on a topic." *Molinoes Valle Del Cibao, C. por A. v. Lama*, 663 F.3d 1330, 1348 (11th Cir. 2011). If the Supreme

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

Court has not spoken on a topic, the Court "must follow the decisions of [the] intermediate courts[,]" only disregarding those decisions "if persuasive evidence demonstrates that the highest court would conclude otherwise." *Id*.

Here, the Florida Supreme Court has spoken on the issue. It specifically adopted the rationale in *Migliore*. That decision unambiguously held that the Law Enforcement Officers' Bill of Rights did not establish a claim for backpay damages. Moreover, aside from *Migliore*, every other judicial decision on this issue has reached the same conclusion. Phelps has produced no evidence – let alone persuasive evidence – demonstrating that the Florida Supreme Court would disregard this longstanding case law in favor of her strained interpretation.

Accordingly, the District Court's dismissal Phelps' claim based on its straightforward application of this longstanding precedent should be affirmed.

## II. THE DISTRICT COURT PROPERLY DISMISSED THE DEFAMATION CLAIM AGAINST SHERIFF RAMSAY ON THE BASIS OF ABSOLUTE IMMUNITY.

In her First Amended Complaint, Phelps also alleged a defamation claim against Sheriff Ramsay. (Doc. 28, ¶¶ 111-12, 131, 282-92). In particular, she alleged that, on December 11, 2019, Sheriff Ramsay appeared on a radio show called "Morning Magazine" and, while speaking about the allegations against Phelps, simply stated, "I need all of the information before I can make a decision. I can't make a decision on one complaint that comes in … there is due process, and we are

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

in the middle of that due process now." (Doc. 28, ¶¶ 110–11). She alleged that Sheriff Ramsay also mentioned that an investigation was ongoing. (Doc. 28, ¶ 112). Additionally, Phelps alleged that, on or about December 18, 2019 after the investigation had concluded and Sheriff Ramsay had proposed to discharge her as a result, Sheriff Ramsay stated on the same radio program, "[the] Sheriff's Office does not tolerate these types of comments. I just cannot defend this[.]" (Doc. 28, ¶ 131).

Sheriff Ramsay contended that absolute immunity precluded Phelps' defamation claims as these statements were undoubtedly made within the scope of his duties as Sheriff. (Doc. 30, pp. 5-7).

Under Florida law, public officials enjoy absolute immunity with respect to statements made within the scope of their official duties. *Hauser v. Urchisin*, 231 So. 2d 6, 8 (Fla. 1970); *City of Miami v. Wardlow*, 403 So. 2d 414, 416 (Fla. 1981); *Stevens v. Geoghegan*, 702 So. 2d 517, 522 (Fla. 2d DCA 1997); *Marshall v. City of Cape Coral*, 797 F.2d 1555, 1561-62 (11th Cir. 1986); *Grady v. Scaffe*, 435 So. 2d 954, 955 (Fla. 2d DCA 1983). "The public interest requires that statements made by officials of all branches of government in connection with their official duties be absolutely privileged." *Hauser*, 231 So. 2d at 8. Democracy needs "free and open explanations" of government actions and the right to this absolute privilege is a function of that necessity. *Id.* "However false or malicious or badly motivated the accusation may be, no action will lie therefore in this state." *Grady*, 435 So. 2d at

Case No. 23-11299-E
*Phelps v. Ramsay, et al.*

955. The court in *Stevens* stressed the breadth of this rule, emphasizing, "[t]his grant of immunity is justified because it is in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." 702 So.2d at 522.

The controlling factor in the determination of whether absolute immunity applies is whether the statements were made in the scope of the employee's duties. *Wardlow*, 403 So. 2d at 416. Conduct is within the scope of one's employment if it is the type of conduct that the employee is hired to perform, the conduct occurs substantially within the time and space limits authorized or required by the job, and the conduct is activated at least in part by the employee's purpose to serve his or her employer. *Alfino v. Dep't of Health & Rehabilitative Servs.*, 676 So. 2d 447, 449 (Fla. 5th DCA 1996). In this respect, courts have taken a liberal approach regarding statements construed to be within the scope of one's official duties. *Wardlow*, 403 So. 2d at 415 ("It has long been clear that a high-ranking officer of the executive branch of the national government, in explaining to the public the reasons for a decision or policy, enjoys absolute immunity from suit for libel.").

As *Stevens* makes clear, "[a]bsolute immunity for public officials faced with accusations of defamation applies when statements are made to media." 702 So. 2d at 523. Indeed, Florida courts have specifically applied the privilege to public comments and press releases made by Florida sheriffs. *Crowder v. Barbati*, 987 So.

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

2d 166, 168 (Fla. 4th DCA 2008); *Knight v. Starr*, 275 So. 2d 37, 38 (Fla. 4th DCA

1973). As the Court in *Crowder* highlighted:

> In the instant case, the act of issuing a press release concerning the official duties of the sheriff was "within the scope" of the office of the sheriff. The purpose of the release was to induce delinquent parents to pay their child support, a proper governmental function. Precedent indicates an inclination to give a broad definition to the term scope of office and its synonyms.

987 So. 2d at 168 (internal citations omitted); *see also Mueller v. The Fla. Bar*, 390

So. 2d 449, 451 (Fla. 4th DCA 1980) (holding that the Florida Bar's issuance of a

press release was absolutely privileged).

In this case, there can be no question that Sheriff's Ramsay's statements were

made in his role as the elected Sheriff of Monroe County. He was being interviewed

in his capacity as the Sheriff and was specifically addressing the accusation made

against Phelps. Moreover, the accusation against Phelps garnered local, national, and

international media attention and admittedly occurred in the context of a high-profile

murder investigation. The Sheriff was free to publicly speak on the topic and the

doctrine of absolute immunity was specifically designed to prevent the stifling of

this type of speech and to shield the Sheriff from meritless litigation such as the

defamation claim advanced by Phelps.

Notwithstanding, Phelps claims, without any legal support, that Sheriff

Ramsay's statements could not have been made within the scope of his official duties

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

because they violated the Law Enforcement Officers' Bill of Rights. (Phelps' Initial Brief, pp. 36-38). Phelps' argument in this regard is unavailing. Indeed, the very section cited by Phelps, Section 112.533(4), specifically provides that "a sheriff … is not precluded by this section from acknowledging the existence of a complaint and the fact that an investigation is underway." Here, during the December 11 radio show, Sheriff Ramsay was specifically asked about the allegations against Phelps and, in response, he simply acknowledged the existence of an ongoing investigation while unremarkably commenting, "I need all of the information before I can make a decision. I can't make a decision on one complaint that comes in … there is due process, and we are in the middle of that due process now."

Regarding the subsequent comment a week later (i.e., "[the] Sheriff's Office does not tolerate these types of comments. I just cannot defend this"), in addition to not being defamatory under any reasonable interpretation, this statement is also entirely consistent with the Law Enforcement Officers' Bill of Rights. At the time this statement was made, the investigation had already concluded and discipline had been proposed. (Doc. 108-1, p. 486) (Notifying Phelps on December 13, 2019 that "the investigation was concluded" and "it is my intention to withdraw your appointment to the Monroe County Sheriff's Office."). As a consequence, the investigation and its results were no longer confidential. *See* § 112.533(2)(a) (providing that an investigation is only confidential until the officer is notified that

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

the agency has "concluded the investigation with a finding to proceed with disciplinary action[.]").

For these reasons, the District Court's dismissal of Phelps' defamation claim on the basis of absolute immunity was proper and should be affirmed.

### III. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT ON PHELPS' DISCRIMINATION CLAIMS BECAUSE SHE WAS NOT TREATED LESS FAVORABLE THAN ANY COMPARATOR AND BECAUSE SHE WAS DISCHARGED FOR LEGITIMATE, NON-DISCRIMINATORY REASONS.

In addition to asserting the state law claims addressed above, Phelps also sued Sheriff Ramsay alleging her discharge was motivated by her gender and her sexual orientation. The District Court granted summary judgment in Sheriff Ramsay's favor as to those claims after concluding that Phelps could not establish a *prima facie* showing and, alternatively, that Sheriff Ramsay's decision to discharge her was based on a legitimate, non-discriminatory reason. The District Court's decision in that regard should be affirmed.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

origin." 42 U.S.C. § 2000e-2(a)(l).[3] An employer violates Title VII if it discriminates against an employee based on that individual's sexual orientation. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1754, 207 L.Ed.2d 218 (2020).

> **A.    Phelps cannot establish a *prima facie* showing as she was not treated less favorably than a similarly situated employee outside her protected class.**

"[T]o prove discriminatory treatment in violation of Title VII, a plaintiff must first establish a prima facie case of discrimination." *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995). Where, as here, a litigant relies on circumstantial evidence, she must first establish a prima facie case showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside her protected class or was treated less favorably than a similarly-situated individual outside her protected class. *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003). Here, since there is no dispute that Phelps was replaced by a homosexual female, Patricia Thompson, she instead contends that she was treated less favorably than a similarly situated officer, Sergeant David Lariz.

---

[3] The same analysis applicable to Title VII gender discrimination claims also applies to equal protection claims. *Lewis v. City of Union City*, 918 F.3d 1213, 1220, n. 5 (11th Cir. 2019) (en banc).

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

To be a valid comparator, Phelps must show that she was similarly situated "in all material respects." *Lewis*, 918 F.3d at 1229. In making this assessment, this Court has delineated several guideposts for consideration:

• A valid comparator will have engaged in the same basic conduct or misconduct as the plaintiff;

• A valid comparator will have been subject to the same employment policy, guideline, or rule as the plaintiff;

• A valid comparator will ordinarily have been under the jurisdiction of the same supervisor as the plaintiff; and,

• A valid comparator will share the plaintiff's employment or disciplinary history. *Lewis*, 918 F.3d at 1227-28; *see also Earle v. Birmingham Bd. of Educ.*, 843 Fed. App'x 164, 165 (11th Cir. 2021).

Applying these considerations makes it apparent that Sgt. Lariz is not an appropriate comparator. There is no dispute that Phelps and Lariz possess significant differences in their respective rank and job responsibilities. Phelps was one of the high ranking and highly visible command officers in the entire Sheriff's Office, whereas Sgt. Lariz was a first-line supervisor and was not a command officer. Phelps held a public-facing position and was responsible for leading investigations, managing entire units, training for the entire agency, and representing and speaking publicly on behalf of the Sheriff's Office. Sgt. Lariz possessed none of these

Case No. 23-11299-E
*Phelps v. Ramsay, et al.*

responsibilities. As the District Court aptly recognized, "'[i]t cannot be said that conduct that might be tolerated or treated with progressive discipline at lower ranks must be similarly accepted from' high ranking officials 'who are held to a higher level of professionalism and who are expected to set the standard of conduct for the [agency].'" (Doc. 164, p. 23) (quoting *Rioux v. City of Atlanta*, 520 F.3d 1269, 1281 (11th Cir. 2008)).

Moreover, Sgt. Lariz's alleged misconduct was materially different than the misconduct committed by Phelps. To that end, on two occasions Sgt. Lariz asked motorists for immigration documentation during traffic stops. As the District Court noted, there was no evidence that Sgt. Lariz targeted anybody on the basis of race or ethnicity when deciding to conduct the traffic stop. (Doc. 164, p. 23). Despite Phelps' unsupported arguments to the contrary, he was never accused of racial profiling or engaging in any racial misconduct, and no complaints were filed against him. In contrast, Phelps used her authority to specifically direct a subordinate to act like a white supremacist neo-Nazi harassing a local black man to the point that he would file a harassment complaint against the Sheriff's Office.

Moreover, the record is undisputed that the issues involving Sgt. Lariz were handled and decided at a lower level of command and were never elevated to Sheriff Ramsay for a decision. In contrast, Phelps' misconduct was elevated by senior command staff directly to Sheriff Ramsay to decide on the appropriate discipline.

Case No. 23-11299-E
Phelps v. Ramsay, et al.

*Silvera v. Orange County School Board*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001) ("Differences in treatment by different … decision makers can seldom be the basis for a viable comparator.").

Accordingly, the District Court properly concluded that Sgt. Lariz was not a valid comparator for purposes of Phelps' *prima facie* showing, and the summary judgment granted in Sheriff Ramsay's favor on that basis should be affirmed.

### B. Phelps was discharged from her employment based on a legitimate, non-discriminatory reason, namely, her actions in directing a subordinate to act like a Neo-Nazi white supremacist harassing a black man.

Assuming *arguendo* that Phelps could establish a *prima facie* showing, the summary judgment in Sheriff Ramsay's favor should nonetheless be affirmed as the undisputed facts conclusively establish that Phelps was discharged for a legitimate, non-discriminatory reason.

Under the familiar *McDonnell Douglas* framework, if a plaintiff can establish a *prima facie* showing, the employer is obligated to articulate its legitimate, non-discriminatory reason for its decision. *Coutu*, 47 F.3d at 1073. Once the employer articulates its lawful reason, "the plaintiff then has the burden of persuading the court that the proffered reason is a pretext for the true discriminatory reason." *Id*.

Importantly, in making these assessments, this Court has repeatedly cautioned that a plaintiff "is not allowed to recast an employer's proffered non-discriminatory

reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). "Title VII is not designed to make federal courts 'sit as a super-personnel department that reexamines an entity's business decisions.'" *Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001).

Phelps does not dispute that she made the racially charged comments directing Detective Malone to act like a white supremacist neo-Nazi and harass Rory Wilson (a/k/a Detroit) as part of the traffic stop to obtain Wilson's fingerprint. Faced with that undisputed fact, Phelps instead absurdly contends that her conduct was entirely appropriate. (Phelps' Initial Brief, p. 39) ("There is no explanation as to what Phelps did wrong that warranted termination. Phelps discussed engaging in a ruse that involved an officer playing a role in which he would play a white supremacist role. The proposed ruse is no different than other ruses.").

Phelps' argument is misplaced and cannot, as a matter of law, establish a genuine factual dispute as to pretext. To that end, this Court has made clear that the relevant inquiry is not whether the Phelps subjectively believes her conduct was appropriate, nor whether even this Court believes it so. Rather "the inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). In other words, Phelps must demonstrate a material factual dispute that Sheriff Ramsay did not honestly believe that her interjection of neo-Nazi behavior into the traffic stop warranted discharge, which she has not done.

It bears repeating that Sheriff Ramsay's decision to discharge Phelps for her racially inflammatory directive was made after receiving recommendations from the two most senior members of the Sheriff's command staff and after considering the colossal damage done to the agency's reputation in the community. Here again, Phelps cannot dispute that her conduct resulted in a deluge of negative local, state, national, and international news coverage.

Nor can she dispute that the labor union representing the Sheriff's Office's deputies implored Sheriff Ramsay to remove those deputies from Phelps' "oversight in any capacity[.]" Likewise, she cannot dispute that an association of community leaders, *Leadership Monroe County*, requested that she not appear on the Sheriff's behalf because of her racially inflammatory directives. Finally, she cannot dispute that the College of the Florida Keys revoked her teaching privileges and banned her from teaching future courses at the College as a result of her conduct. Perhaps most importantly, the record is undisputed that Sheriff Ramsay considered each of these facts in reaching his decision to discharge Phelps.

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

In contrast to the undisputed facts establishing Phelps' misconduct and the widespread damage to the Sheriff's Office caused by that misconduct, is the extensive undisputed evidence showing Sheriff Ramsay's complete lack of discriminatory animus toward Phelps. In that regard, despite having known of Phelps' sexual orientation for over 15 years, Sheriff Ramsay increased her scope of influence with the Sheriff's Office as well as her public profile in the community on several occasions, giving her substantial influence and responsibility in a high-ranking, public-facing position. Indeed, after her span of supervision had been nearly eliminated in 2010 by Sheriff Ramsay's predecessor, Sheriff Ramsay effectively resurrected her career following his election. Further demonstrating his complete lack of discriminatory animus is the fact that Sheriff Ramsay replaced Phelps with another openly homosexual female command officer.

In an attempt to concoct material issues of fact where none exists, Phelps attempts to shift the focus away from her misconduct and Sheriff Ramsay's decision and instead argues that Sheriff Ramsay tolerated sexist behavior by male deputies, that Sheriff Ramsay occasionally referred to female deputies as "Miss," that there were supposed irregularities in the internal investigation, and that Sheriff Ramsay initially offered words of support to Phelps prior to the investigation sustaining charges of misconduct against her. None of these arguments is persuasive and the District Court properly rejected each of them. (Doc. 164, pp. 28-30).

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

First, there is no evidence that Sheriff Ramsay tolerated inappropriate sexist behavior. In this regard, Phelps references an allegation that a co-worker once referred to Phelps as "my dumb, cunt captain" and that another deputy once grabbed a female deputy's breast over her bullet proof vest. The record is clear however, that the inappropriate comment occurred in 2003 or 2004 and that Richard Roth, not Rick Ramsay, was the Sheriff at that time. There is also no dispute that Ramsay lacked any authority to demote or discharge anyone in 2003 or 2004. Similarly, the incident involving the deputy grabbing the female's breast occurred in 2012 and was not brought to Sheriff Ramsay's attention but was instead handled at a lower level of command. (Doc. 108-1, p. 99; Doc. 108-2, pp. 80-81; Doc. 141, ¶¶ 74-75; Doc. 164, pp. 29-30). These dated and tenuous incidents by non-decisionmakers cannot establish a factual dispute as to pretext. *Williams v. Hous. Auth. of Savannah, Inc.*, 934 F. App'x 482, 490 (11th Cir. 2020) (Sexist or discriminatory behavior "by non-decision makers unrelated to the employment decision at issue are generally 'too weak to raise a genuine fact issue.'"); *Alvarez*, 610 F.3d at 1268 (racist comment that "Cubans are dumb" made by a non-decision maker was insufficient.).

Second, Sheriff Ramsay's use of pleasantries, such as occasionally referring to a female officer as "Miss," does not establish a factual dispute as to pretext. The record evidence establishes that Sheriff Ramsay used similar pleasantries with male officers, often referred to them as "Sir." (Doc. 141, ¶ 73). Moreover, as noted above,

30

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

even Phelps could not have considered such routine, common courtesies to be discriminatory as she expressly certified each year during her annual evaluation, "I have not been the subject of discrimination or harassment in the MCSO workplace." (Doc. 108-12, pp. 3-17).

Third, there are no factual disputes demonstrating any irregularities with respect to the internal affairs investigation. Phelps argues that there was no basis to initiate an investigation, that it was not timely completed, and that there was a question regarding the scope of the investigation. As the District Court correctly determined, however, each of these assertions lacks merit. Regarding the origin of the investigation, there is simply no dispute that Tucker and Higgins raised concerns about the Treehouse Murder investigation, which, among other expressed concerns, disclosed Phelps' inappropriate racially charged directive to Detective Malone. After being apprised of those statements, the Sheriff's Office promptly initiated an investigation.

Regarding the timeliness of the investigation's completion, the District Court properly found that the Sheriff's policy did not pose a strict 30-day deadline, but rather provided that the policy provided, "every effort shall be made to complete all investigations within 30 days." (Doc. 164, p. 29). Moreover, the undisputed record evidence established that investigations taking longer than 30 days was not an unusual occurrence. (Doc. 164, p. 29). As to the scope of the investigation, Phelps

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

is merely quarreling with the wisdom of the Sheriff's Office's actions. In that respect, Phelps is not disputing any salient facts, but rather is only arguing that the investigator should not have included copies of the negative news articles in the investigative file. Whether Phelps believes it was proper, however, does not have any bearing on the fact that the investigator and the Sheriff's Office believed that the impact of her racially inflammatory statements on the community was an important consideration to be included.

Lastly, the fact that Sheriff Ramsay texted Phelps at the outset of the internal investigation and offered words of support[4] is not an indication that he did not genuinely believe that Phelps should be discharged a month later after the investigation concluded she had, in fact, violated policy and made the racially inflammatory statements.

In this case, the District Court properly determined that Phelps "ha[d] not put forth a single shred of evidence tending to show her termination had anything to do with her gender or sexual orientation." As such, the summary judgment granted in Sheriff Ramsay's favor should be affirmed.

---

[4] Sheriff Ramsay texted Phelps on November 14, 2019, and stated, in relevant part, "please do not stress too much over the complaint…we have to look into a complaint by Ms. Higgins…[w]e support you and hope to clear your name!" (Doc. 164, p. 28).

Case No. 23-11299-E
Phelps v. Ramsay, et al.

IV. **THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO SHERIFF RAMSAY ON PHELPS' EQUAL PROTECTION CLAIM ON THE BASIS OF QUALIFIED IMMUNITY.**

Finally, Phelps contends that the District Court erred in determining that Sheriff Ramsay is entitled to qualified immunity with respect to her equal protection claim. Her argument in that regard lacks merit.

To establish entitlement to qualified immunity, Sheriff Ramsay must show that he acted within the scope of his discretionary authority in performing the challenged conduct, and, if so, Phelps has the burden to demonstrate that: (1) the Sheriff Ramsay violated a constitutional right, and (2) the right was clearly established at the time of the alleged violation. *Morris v. Town of Lexington*, 748 F.3d 1316, 1322 (11th Cir. 2014). Here, there is no dispute that Sheriff Ramsay was acting within the scope of his discretionary authority when he discharged Phelps.

Moreover, as the District Court held, and as discussed at length above, Sheriff Ramsay "had a legitimate and lawful motivation for [Phelp's] termination, namely her instruction to a subordinate officer to act like a neo-Nazi, white supremacist during a traffic stop of a black man coupled with the resulting widespread backlash and damage to the [agency's] reputation in the community." (Doc. 164, p. 35). Under those undisputed facts, there can be no question that qualified immunity attaches. *Rioux*, 520 F.3d at 1284-85 (determining a defendant is entitled to qualified immunity if the undisputed records shows "that the defendant in fact was motivated,

Case No. 23-11299-E
**Phelps v. Ramsay, et al.**

at least in part, by lawful considerations.").

Accordingly, the District Court's grant of summary judgment in Sheriff Ramsay's favor on the basis of qualified immunity should be affirmed.

## CONCLUSION

There is no dispute in this case that Penny Phelps, a long-tenured and high-ranking member of the command staff of the Monroe County Sheriff's Office, directed a subordinate deputy under her command to act like a neo-Nazi white supremacist harassing a black man during a traffic stop designed to obtain a fingerprint needed to confirm the individual's identity. As Sheriff Ramsay testified, although the traffic stop plan itself was proper, interjecting a racially inflammatory component was unnecessary, improper, and put the agency "in a terrible situation." After considering the facts, the recommendation of the command staff, and the immediate and disastrous reaction from the community, Sheriff Ramsay made the difficult decision to discharge Phelps, an officer whose career he had long championed and helped to advance.

As comprehensively discussed above, neither Phelps' gender nor her sexual orientation played any role whatsoever in Sheriff Ramsay's decision. As such, Sheriff Ramsay respectfully contends that the District Court's decision to dismiss Phelps' state law claims and to grant summary judgment in Sheriff Ramsay's favor as to Phelps' discrimination claims should be affirmed.

**Case No. 23-11299-E**
**Phelps v. Ramsay, et al.**

Respectfully submitted,


s/ Brian Koji
Brian Koji
Florida Bar No. 0116297
bkoji@anblaw.com

**Allen, Norton & Blue, P.A.**
324 South Hyde Park Ave., Ste. 225
Tampa, Florida 33606
Ph: (813) 251-1210
Fax: (813) 253-2006

# CERTIFICATE OF COMPLIANCE
# WITH RULE 32(a)(7)(B)

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8207 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f). Furthermore, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point, Times New Roman font.

s/ Brian Koji
Attorney


# CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 29th day of August 2023, I electronically filed the foregoing with the Eleventh Circuit Court of Appeals using the CM/ECF

**Case No. 23-11299-E**
**Phelps v. Ramsay, et al.**

filing system, which will send a notice of electronic filing to all counsel of record

via transmission of Notices of Electronic Filing generated by CM/ECF.


*s/ Brian Koji*
Attorney